# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued March 24, 2011          Decided July 29, 2011

No. 05-3050

UNITED STATES OF AMERICA,
APPELLEE

v.

RODNEY L. MOORE, ALSO KNOWN AS RASOO,
APPELLANT

———

Consolidated with 05-3051, 05-3052, 05-3053, 05-3054,
05-3064

———

Appeals from the United States District Court
for the District of Columbia
(No. 1:00-cr-00157)

———

*Stephen C. Leckar*, appointed by the court, *John Kenneth Zwerling, Neil H. Jaffee*, Assistant Federal Public Defender, and *Charles A. Murray* argued the cause for appellants. With them on the briefs were *A. J. Kramer*, Federal Public Defender, and *Deborah A. Persico*, appointed by the court.

*Leslie Ann Gerardo*, Assistant U.S. Attorney, U.S. Attorney's Office, argued the cause for appellee. With her on the brief were *Ronald Machen*, *Jr.*, U.S. Attorney, *Roy W. McLeese III* and *Elizabeth Trosman*, Assistant U.S. Attorneys, and *Angela M. Miller*, Special Assistant U.S. Attorney.

Before: SENTELLE, *Chief Judge*, and ROGERS[1] and KAVANAUGH,[2] *Circuit Judges*.

Opinion for the Court filed PER CURIAM.

Opinion concurring in part in Part I filed by *Circuit Judge* ROGERS.

## TABLE OF CONTENTS

I. *BATSON* ...........................................................................5
    A. *Batson* Framework ...........................................6
    B. Strike-by-Strike Analysis ................................9
II. STUN BELTS .............................................................14
III. ANONYMOUS JURY............................................21
IV. PROSECUTORIAL MISCONDUCT.......................25
    A. Opening and Closing Arguments ..................25
    B. Overview Witness .........................................33
    C. Cumulative Error ..........................................47
V. RULE 404(b) EVIDENCE ....................................50
VI. *BRADY* ................................................................52
VII. STATUTE OF LIMITATIONS ..............................55
VIII. JOINDER .........................................................61

---

[1] Circuit Judge Rogers concurs in part in Part I, *see infra* concurring opinion, and in part in Part V, *see infra* note 11.

[2] Circuit Judge Kavanaugh does not join Parts IV.A.1 and IV.A.2.

IX. CONFRONTATION CLAUSE ...............................................62
X. JENCKS ACT ....................................................................73
XI. RELIGIOUS CONVERSION TESTIMONY ..............................75
XII. TESTIMONY OF STEVE GRAHAM .....................................77
XIII. DESTRUCTION OF EVIDENCE .........................................81
XIV. MULTIPLE CONSPIRACIES INSTRUCTIONS ......................81
XV. MOORE'S CONVICTION FOR CONTINUING CRIMINAL
ENTERPRISE .........................................................................84
XVI. MERGER OF MOORE'S MURDER CONVICTIONS ..............86
XVII. EXCLUSION OF ANTOINE WARD CONFESSION ..............87
XVIII. SMITH'S CONVICTION FOR MURDER OF ANTHONY DENT
............................................................................................91
XIX. SMITH'S INEFFECTIVE ASSISTANCE OF COUNSEL CLAIM
............................................................................................94
XX. CONSPIRACY WITHDRAWAL INSTRUCTION ....................103
XXI. AIDING AND ABETTING INSTRUCTION..........................105
XXII. SEVERANCE ..............................................................113
XXIII. HANDY'S NEW TRIAL MOTIONS................................117
    A. Sufficiency of Evidence ............................................119
    B. *Brady* ....................................................................121
XXIV. CONCLUSION............................................................127

PER CURIAM: Six defendants appeal from judgments of conviction in the district court on multiple charges, including drug conspiracy, RICO conspiracy, continuing criminal enterprise, murder, and other related charges in violation of federal and District of Columbia laws. They assert a wide variety of alleged errors covering, among other things, evidentiary issues, both as to admission and sufficiency; conduct of the trial; prosecutorial misconduct; and jury instructions. Upon review, we conclude that most of the asserted errors either were not erroneous or were harmless. As to one category of issue involving alleged violations of the Confrontation Clause of the Constitution, a Supreme Court decision intervening between the trial and our consideration

of the case compels us to remand convictions of some drug charges (Counts 126-138) for further consideration by the district court in light of the Supreme Court's opinion. We also remand for further proceedings a claim of ineffective assistance of counsel raised by appellant Smith (Counts 4 and 5). We vacate one murder conviction as to appellant Moore that, as the parties agree, merges with another conviction (Count 32).

\* \* \*

According to the indictment in the district court and the evidence of the United States at trial, during the late 1980s and 1990s, appellants Rodney Moore, Kevin Gray, John Raynor, Calvin Smith, Timothy Handy, and Lionel Nunn, along with others, some of whom were also indicted but tried separately, conspired to conduct and did conduct an ongoing drug distribution business in Washington, D.C. In the course of conducting that business, various of the co-conspirators committed a wide-ranging course of violence including 31 murders. The United States obtained a 158-count superseding indictment upon which the defendants were tried by a jury. After a trial lasting over ten months, the jury returned verdicts of guilty on several of the charges, including the drug conspiracy, 21 U.S.C. § 846, the RICO conspiracy, 18 U.S.C. § 1962(d), continuing criminal enterprise (Moore and Gray), 21 U.S.C. § 848(a)-(b), murder, D.C. Code § 22-2401, -3202; D.C. Code § 22-2101; 18 U.S.C § 1959(a)(1); 21 U.S.C. § 848(e)(1)(A); 18 U.S.C. § 1512, assault with intent to murder (Moore and Gray), D.C. Code § 22-503, -3202, illegal use of a firearm (Moore, Gray, Raynor, Handy, and Nunn), 18 U.S.C. § 924(c), distribution of cocaine base and heroin (Gray), 21 U.S.C. § 841(a)(1), possession with intent to distribute heroin (Raynor), *id.*, and tampering with a witness (Handy), 18 U.S.C. § 1512(b). The trial court entered

judgment imposing substantial criminal sentences generally amounting to terms in excess of life imprisonment from which the defendants now appeal.

Further details of the facts, evidence, and proceedings will be set forth as necessary for the discussion of the issues raised by appellants.

## I.[3]

The Constitution's equal protection guarantee bars prosecutors from using peremptory challenges to strike prospective jurors on the basis of race. *See Batson v. Kentucky*, 476 U.S. 79 (1986). In this case, although 9 of the 12 jurors were African-American, appellants argue that the prosecution unconstitutionally used its peremptory challenges to remove prospective jurors who were African-American. The district court rejected appellants' challenge. We affirm the district court's decision.

A *Batson* challenge proceeds in three steps: *First*, the defendant must establish "a *prima facie* case of discriminatory jury selection by the totality of the relevant facts about a prosecutor's conduct during the defendant's own trial." *Second*, "the State [must] come forward with a neutral explanation for challenging jurors within an arguably targeted class." *Third*, the "trial court then will have the duty to determine if the defendant has established purposeful discrimination." *Miller-El v. Dretke*, 545 U.S. 231, 239 (2005) (alterations and internal quotation marks omitted). In the district court, appellants argued that the prosecution's use of 34 peremptory strikes to remove African-Americans from

---

[3] Circuit Judge Rogers filed a separate opinion concurring in part in Part I.

the venire for regular jurors established a *prima facie* case of discrimination. Accepting that the *prima facie* hurdle was cleared, the district court required the prosecution to explain each of its peremptory challenges of African-Americans. After the prosecution provided those explanations, the district court required further argument from both sides as part of *Batson*'s final stage. The court allowed the defense counsel to dispute the validity of each government explanation and required the prosecution to individually respond to the defense's argument on each disputed strike. The court actively engaged in the entire process, consulting its notes and correcting and questioning counsel. At the conclusion of the multi-hour hearing, the district court ruled that appellants had not "established purposeful discrimination." *Miller-El*, 545 U.S. at 239; *see also Purkett v. Elem*, 514 U.S. 765, 768 (1995) ("[T]he ultimate burden of persuasion regarding racial motivation rests with, and never shifts from, the opponent of the strike.").

In this court, appellants dispute the district court's conclusion that there was no *Batson* violation.

**A.**

Appellants' challenge to the district court's *Batson* decision faces a demanding standard. "On appeal, a trial court's ruling on the issue of discriminatory intent must be sustained unless it is clearly erroneous." *Snyder v. Louisiana*, 552 U.S. 472, 477 (2008). The Supreme Court has emphasized that the "trial court has a pivotal role in evaluating *Batson* claims." *Id.* The Court has explained that the demeanor of the prosecutor exercising a challenged strike is often "the best evidence of discriminatory intent." *Id.* (alterations omitted). The district court, unlike this court, observed the prosecutor's demeanor firsthand. Further, when

the asserted basis for a strike is a prospective juror's behavior in court, the trial court will have observed and evaluated that juror's demeanor as well. *See id.* For those reasons, the Supreme Court has stated that "in the absence of exceptional circumstances, we would defer to the trial court" in resolving a *Batson* claim. *Id.* (alterations omitted); *see also Hernandez v. New York*, 500 U.S. 352, 365-66 (1991) (plurality opinion).

Appellants argue that we should reject the district court's findings because the court itself did not individually discuss each challenged strike on the record. *Batson*'s third step requires trial courts to closely analyze the prosecutor's proffered reason for each disputed strike in light of all the relevant circumstances. *See Miller-El*, 545 U.S. at 241-42, 251-52. The record here demonstrates that the district court appropriately exercised its *Batson* responsibilities. The district court required three rounds of argument on each strike of an African-American juror: a prosecution opening in which the government individually justified each strike; a defense response disputing those government explanations; and a prosecution reply to every defense argument. Throughout the hearing, the district court questioned counsel, reviewed its own notes, and corrected mistakes by counsel. The district court then concluded, based on the arguments and its personal observation of the prosecutors and of the prospective jurors' demeanor, that the government's race-neutral explanations were genuine. Appellants cite no controlling precedent requiring a trial court to render its decision in a strike-by-strike format. Given the obvious thoroughness of the district court's application of *Batson*'s third step, we cannot conclude that the lack of strike-specific findings creates the sort of "exceptional circumstances" that would overcome our deference to the trial court. *Snyder*, 552 U.S. at 477.

Moreover, the circumstances of this case seriously undermine appellants' claim. Nine of the 12 jurors seated in this case were African-American. That jury composition mirrored the make-up of the venire, which contained 68 African-Americans out of 90 persons in the pool from which regular jurors were selected. Thus, while the prosecution used many strikes to remove prospective African-American jurors, that is largely explained by the fact that the jury pool was predominately African-American. In addition, the prosecutor's strikes did not skew the racial composition of the resulting jury. The circumstances here are a far cry from the facts of cases in which the Supreme Court has found a *Batson* violation. *Cf. Snyder*, 552 U.S. at 476 (all African-Americans in jury pool struck by prosecution); *Miller-El*, 545 U.S. at 240-41 (10 of 11 African-Americans in jury pool after dismissals for cause or by agreement struck by prosecution); *Batson*, 476 U.S. at 100 (all African-Americans in jury pool struck by prosecution).

Finally, in this case there are no extrinsic indicators of racial discrimination of the kind found in successful *Batson* challenges. For example, in *Miller-El*, a case in which the trial occurred before the 1986 *Batson* decision, the Court relied in part on the "widely known evidence of the general policy of the Dallas County District Attorney's Office to exclude black venire members from juries." *Miller-El*, 545 U.S. at 253. In contrast, the Supreme Court has explained that cases where the stricken jurors are the same race as the majority of victims and prosecution witnesses are unlikely candidates for a finding of racial discrimination. *See Hernandez*, 500 U.S. at 369-70 (plurality opinion). The overall facts and circumstances of this case thus do not support appellants' claim of intentional discrimination. *See Snyder*, 552 U.S. at 478 ("[I]n reviewing a ruling claimed to

be *Batson* error, all of the circumstances that bear upon the issue of racial animosity must be consulted.").

**B.**

Although the circumstances of this case strongly suggest that the prosecution did not use its peremptory strikes to discriminate on the basis of race, those facts alone are not dispositive. The dismissal of even a single prospective juror on the basis of race violates equal protection principles. *See Snyder*, 552 U.S. at 478. We therefore review each of the 11 strikes challenged by appellants. *Cf. Bond v. Beard*, 539 F.3d 256, 270 (3d Cir. 2008) (finding overall circumstances suggest no *Batson* violation, but nonetheless conducting analysis of each strike to resolve *Batson* claim).

Of the 11 strikes challenged on appeal, appellants objected to the following seven strikes in the district court. We review the district court's findings on those seven strikes for clear error. *Snyder*, 552 U.S. at 477. Because the district court empanelled an anonymous jury in this case, we identify each prospective juror using the numbers assigned by the district court.

**2932**: Among its concerns about this prospective juror, the prosecution noted 2932's statement that long delays in bringing criminal cases to trial impaired witnesses' memories. The prosecution worried that 2932 would be suspicious of the government's case because this case involved long delay and the government was relying on witnesses' memories of long-past events. Appellants do not rebut the plausibility of that specific, race-neutral objection or show that any other seated juror worried about the effect of delay on witnesses' memories.

**3559**: The prosecution explained that it struck 3559 on the basis of his youth. The government's statement that it struck every juror age 22 or younger, regardless of race, remains unrebutted.

**3872**: The prosecution stated that it struck 3872 for appearing disrespectful in court. Appellants cite trial transcripts in an attempt to demonstrate that seated white jurors *might* have behaved just as inappropriately. This is an instance in which "[a]ppellate judges cannot on the basis of a cold record easily second-guess a trial judge's decision." *Rice v. Collins*, 546 U.S. 333, 343 (2006) (Breyer, J., concurring); *see Snyder*, 552 U.S. at 483. We cannot tell from the record whether there was anything inappropriate about those seated jurors' demeanors. And contrary to appellants' assertion, *Snyder* does not establish a rule that trial courts must make specific findings about demeanor. *Cf. Thaler v. Haynes*, 130 S. Ct. 1171 (2010). Because appellants have not demonstrated any "exceptional circumstances" that require otherwise, we defer to the district court's finding on an issue that is "peculiarly within a trial judge's province." *Snyder*, 552 U.S. at 477.

**4463**: The prosecutor explained that 4463 appeared unstable in court and that "his voir dire indicated numerous answers that would make clear why the government opposes this juror." May 7, 2002 PM Tr. at 75. A quick review of 4463's rambling statements, in which he detailed how his brother had been unfairly framed for distribution of crack cocaine, makes clear why a prosecutor would want to strike 4463, regardless of race. Appellants' citation to a seated white juror whose family also had drug problems is not comparable. That juror calmly related the long-past problems of his relatives, and expressly stated that his brother had been dealt with fairly.

**4730**: The government claims to have struck 4730 in part because 4730 was suspicious of law enforcement and unsure that the death penalty should apply in Washington, D.C. Appellants question the strength of 4730's views on this subject, but they point to no seated juror who expressed reservations about law enforcement similar to 4730's concern about "rogue police officers," and a "bad experience" with law enforcement that "[l]eft a bad taste." Apr. 5, 2002 PM Tr. at 23-24. 4730's views on law enforcement provided a race-neutral explanation for the prosecution's decision to strike her.

**5698**: This prospective juror was a former special police officer whom the prosecutor claimed to have struck for being "quiet," "submissive," and possibly not "strong enough" to be an effective juror. May 7, 2002 PM Tr. at 42. To the extent we can discern demeanor from a written transcript, 5698's colloquy with the district court suggests a passive, uncertain, and quiet person. And passivity can be a plausible, race-neutral reason to exclude a juror. *See United States v. Changco*, 1 F.3d 837, 840 (9th Cir. 1993). Appellants may be correct that former law enforcement officers are often desirable jurors from the prosecution's perspective. But that does not bar the prosecution from dismissing any particular juror because the government believes her personality would make her a less than desirable juror from the prosecution's perspective.

**5773**: The prosecution claimed to have struck 5773 due to 5773's concerns about imposing the death penalty. Appellants respond that seated white jurors appeared equally hostile to the death penalty. We disagree. As to the seated white juror whose views come closest to matching 5773's, he repeatedly followed questions about his ability to impose the death penalty with notations such as "I would try to abide by

the Court's instruction, not my personal belief." By contrast, 5773's doubts about the death penalty were sufficiently salient that he used his questionnaire to indicate that he had concerns about his ability to be a fair juror. The prosecution thus had legitimate grounds to suspect that 5773 would be significantly more hesitant to impose the death penalty than the seated white juror.

In the district court the defense did not object to the prosecution's strike of the following four prospective jurors. The district court's rulings on these strikes are therefore reviewed only for plain error. *See, e.g.*, *United States v. Charlton*, 600 F.3d 43, 50 (1st Cir. 2010).

**866**: The prosecution explained that it struck 866 because 866 "had a relative who had been convicted of murder." May 7, 2002 PM Tr. at 35. The record shows that 866's nephew, with whom she was personally close, murdered his wife and was then imprisoned, where 866 believes he was abused by his guards. Appellants' attempts to minimize the potential effect of 866's experiences with murder convictions and to draw comparisons to seated jurors who had relatives convicted of much less serious crimes are not convincing.

**2486**: The prosecution struck 2486 "based on things she said about her prior jury service . . . as well as other statements in her questionnaire." May 7, 2002 PM Tr. at 39. 2486's questionnaire and the transcript of what she said during *voir dire* refer to her participation in an acquittal during her prior jury service, which she attributed to the prosecution's lack of direct evidence. The record also demonstrates 2486's reticence to impose the death penalty and suspicion of law enforcement competence. Appellants now contend that the prosecutor's mere reference to 2486's statements and questionnaire responses is too vague to qualify

as a credible, race-neutral explanation. But the prosecution had no reason to give a more detailed explanation, because appellants did not question this strike in the district court. Given that the record referenced by the prosecutor does in fact reflect an objective basis for the prosecutor's proffered explanation, we cannot say that the district court plainly erred in finding no racial motivation for this strike.

**3143**: The prosecution claims that it struck 3143 because 3143 demanded a higher standard of proof to impose the death penalty and was generally hostile to the death penalty. On appeal, appellants offer a lengthy comparison of 3143's views to those of seated white jurors. The government attempts — with considerable success — to distinguish the seated jurors' views from 3143's, but the government also has a more telling point: It is difficult to say that the district court plainly erred in not noticing similarities between those seated jurors and 3143, given that none of the six defendants' lawyers noticed those similarities during jury selection. We reject appellants' challenge to the prosecution strike of 3143.

**3505**: The prosecution explained its strike of 3505 based on 3505's statements in her questionnaire and during *voir dire* that the death penalty is "never justified." Appellants do not argue either that the prosecution's explanation is false or that other seated jurors had the same views. Appellants argue only that 3505 also claimed to be able to set her personal views aside. That in no way implies that the prosecutor considered race in striking 3505. This challenge could not succeed under any standard of review, much less under plain error review.

In short, appellants have failed to sufficiently undermine the government's race-neutral explanations for its peremptory strikes of prospective African-American jurors. Moreover,

the circumstances of this case strongly suggest that the prosecution did not discriminate on the basis of race. Especially given the deferential standard under which we review challenges to the district court's decisions on this issue, we reject appellants' *Batson* claims.

## II.

A week before trial began, the government filed a motion requesting that the district court order appellants to wear stun belts during trial. Gray filed written opposition to the motion and, at a pretrial hearing five days later, all appellants opposed the motion orally. Feb. 27, 2002 PM Tr. at 36-52. The court granted the government's motion, *id.* at 57, and issued a memorandum opinion in support of its order, *see United States v. Gray*, 254 F. Supp. 2d 1 (D.D.C. 2002). Appellants contend that the district court violated their due process rights when it ordered them to wear stun belts at trial.

The right to a fair trial is a fundamental liberty secured by the due process guarantee of the Fifth and Fourteenth Amendments. *Estelle v. Williams*, 425 U.S. 501, 503 (1976); *In re Murchison*, 349 U.S. 133, 136 (1955). Invoking this fair trial right, the Supreme Court has stated that certain government practices during criminal trials prejudice defendants because they offend three "fundamental legal principles," *Deck v. Missouri*, 544 U.S. 622, 630 (2005): (1) that "the criminal process presumes that the defendant is innocent until proved guilty," *id.*; (2) that "the Constitution, in order to help the accused secure a meaningful defense, provides him with a right to counsel," *id.* at 631; and (3) that "judges must seek to maintain a judicial process that is a dignified process," *id.* When a government practice is prejudicial because it either inherently or in a particular defendant's case offends these principles, the Court has

forbidden district courts from utilizing the practice unless it is justified by an essential state interest, such as courtroom security or escape prevention, specific to the defendant on trial. *See, e.g.*, *Deck*, 544 U.S. 622; *Holbrook v. Flynn*, 475 U.S. 560 (1986); *Estelle*, 425 U.S. 501.

Accordingly, the Supreme Court has held it is inherently prejudicial to require a criminal defendant to wear jail garb during trial and therefore, because no state interest is ever served by the practice, it violates his fair trial right. *See Estelle*, 425 U.S. at 505, 512-13. Similarly, the Court has held that visibly restraining a criminal defendant during either a criminal trial or the penalty phase of a capital prosecution is inherently prejudicial and thus is permissible only when justified by an essential state interest specific to the defendant. *See Deck*, 544 U.S. at 629. In contrast, the Court has held that deployment of security personnel in a courtroom is not inherently prejudicial, and is thus permissible, regardless of the state interest served, as long as it is not actually prejudicial in a particular case. *See Holbrook*, 475 U.S. at 568-69, 572.

Applying these lessons to the case before us, if the use of stun belts to restrain criminal defendants at trial either is inherently prejudicial or in this case was actually prejudicial to the defendants, the district court had the obligation to determine whether the belts were justified by an essential governmental interest specific to the defendants on trial. Appellants, who argue that stun belts are inherently prejudicial, contend that the district court failed to meet this obligation for three reasons. First, they assert that the district court failed to make an individualized determination of whether a stun belt was needed to restrain each defendant. Second, they argue that the district court was required but refused to hold an evidentiary hearing to resolve factual disputes they raised concerning the visibility of, necessity for,

and alternatives to the stun belts. Finally, appellants maintain that the district court erroneously failed to consider how the stun belts would affect appellants' right to communicate with counsel and assist in their own defense. On review, we hold that, even assuming that stun belts are inherently or were actually prejudicial, the district court did all that was required of it.

In review of a district court's authorization of an inherently or actually prejudicial governmental practice, we find error only when the district court has abused its discretion. *See Deck*, 544 U.S. at 629 ("[T]he Fifth and Fourteenth Amendments prohibit the use of physical restraints visible to the jury absent a trial court determination, in the exercise of its discretion, that they are justified by a state interest specific to a particular trial."); *United States v. Wardell*, 591 F.3d 1279, 1293 (10th Cir. 2009); *United States v. Durham*, 287 F.3d 1297, 1304 (11th Cir. 2002).

It is true, as appellants say, that prior to authorizing the use of an inherently or actually prejudicial government practice, the district court must consider each defendant before him and determine whether the practice serves an essential interest in the particular trial at hand. *Deck*, 544 U.S. at 624, 633; *Holbrook*, 475 U.S. at 568-69. However, the district court did just this. In a memorandum opinion, the court carefully analyzed the following factors in its decision to require stun belts:

> 1) the seriousness of the crimes charged and the severity of the potential sentences; 2) the numerous allegations of threats of violence made by the defendants against witnesses; 3) previous guilty pleas or convictions of a substantial number of the defendants to prior gun charges and/or violent crimes; 4) allegations of gang activity, and

the likelihood that associates or rivals of the alleged gang may be present at the trial; 5) the opinion of the U.S. Marshal for this District, particularly as it relates to knowledge of security in this courthouse and of cases of this nature; 6) potential prejudice to the defendants from the use of the stun belts; 7) likelihood of accidental activation of the stun belts; 8) potential danger to the defendants if the belts are activated; 9) the availability and viability of other means to ensure courtroom security; 10) the potential danger for the defendants and others present in the courtroom if other means are used to secure the courtroom; and 11) the existence of a clear written policy governing the activation of stun belts worn by defendants.

*Gray*, 254 F. Supp. 2d at 4. Finding that "[e]ach of the eleven factors" militated in favor of imposing stun belts, the district court concluded that the use of stun belts would "best preserve . . . the security of the courtroom." *Id.* at 4-6.

The district court's memorandum opinion demonstrates that it considered the security concerns presented by the particular defendants at trial before making the determination that stun belts were appropriate. It thoroughly examined factors relevant to each defendant and, in the exercise of its broad discretion, made a determination based on those factors. That appellants shared many of the same characteristics (e.g., they were charged in the same conspiracy, they all faced either the death penalty or life sentences) does not mean the district court failed to consider them individually. And that the district court reached a result with which the defendants disagree does not mean it abused its discretion.

We also reject appellants' contention that the district court was obligated to hold an evidentiary hearing. When making the discretionary decision whether to authorize an inherently

or actually prejudicial government practice at trial, "[a] formal evidentiary hearing may not be required, but if the factual basis for the extraordinary security is controverted, the taking of evidence and finding of facts may be necessary." *United States v. Theriault*, 531 F.2d 281, 285 (5th Cir. 1976); *cf. United States v. Law*, 528 F.3d 888, 903-04 (D.C. Cir. 2008); *United States v. Microsoft Corp.*, 253 F.3d 34, 101 (D.C. Cir. 2001) (holding that district courts are not required to conduct evidentiary hearings prior to issuing relief in civil cases when "there are no disputed factual issues regarding the matter of relief"). Although the defense pointed out that due to the short notice of the hearing the evidence before the district court about how stun belts functioned was provided entirely by the government and there had "to be another side of the story with respect to the proffers that [the government has] made," appellants did not allege any specific inaccuracy or misrepresentation. Feb. 27, 2002 PM Tr. at 44-46. While appellants disputed the government's contention that other measures would be inadequate to secure the courtroom, *id.* at 49, this dispute is, in essence, the ultimate question the district court must answer. *See Durham*, 287 F.3d at 1304 ("[A] decision to apply leg shackles to the defendant 'must be subjected to close judicial scrutiny to determine if there was an essential state interest furthered by compelling a defendant to wear shackles and whether less restrictive, less prejudicial methods of restraint were considered or could have been employed.'" (quoting *Elledge v. Dugger*, 823 F.2d 1439, 1451 (11th Cir. 1987) (per curiam))). Appellants must make a more specific factual challenge.

The only specific factual matter relevant to the district court's determination about which the government and appellants meaningfully disagreed was whether the stun belts would be visible. Feb. 27, 2002 PM Tr. at 38, 44, 56-57. However, in its memorandum opinion, the court accepted

appellants' contention that there was *some* risk the stun belts would be visible. The court then specifically ordered precautions to reduce the visibility of the belts. The opinion states: "Although the Court does not believe that it is likely that any juror will see the stun belts, the Court will take precautions to minimize prejudice to the defendants. The defendants will be brought into the courtroom before the jury is brought in, and will be escorted from the courtroom after the jury has left." *Gray*, 254 F. Supp. 2d at 4. Under these circumstances, we hold that the district court acted within its discretion when it declined to hold an evidentiary hearing.

Turning to appellants' claim that the district court erred by not considering the effect of stun belts on appellants' ability to confer with their counsel and participate in their defense, we again find no error. As discussed above, whether wearing a stun belt affects a criminal defendant's ability to confer with counsel and participate in his defense is one of the three questions relevant to the determination of whether, before authorizing such a restraint, a district court must first determine whether it is justified by an essential governmental interest specific to the defendant on trial. When the district court made the appropriate findings to determine that the use of stun belts was so justified in appellants' case, the court implicitly assumed that the belts did risk negatively affecting appellants' abilities in this way. It was not required to revisit this question in its substantive decisionmaking process. We also note that while appellants direct us to case law that warns abstractly of the potential harm of stun belts, *see, e.g.*, *Durham*, 287 F.3d at 1305-06, they have offered us no evidence stun belts in any way affected their communication with their counsel or their participation in their defense.

Moore also repackages appellants' arguments that the district court abused its discretion by authorizing stun belts

into an objection to the court's refusal to grant his post-trial motion for a new trial. Before the district court Moore argued that he was entitled to a new trial because "a sufficient factual predicate did not exist" to justify the district court's authorization of stun belts. Def. Moore's Mot. for New Trial at 2 (June 8, 2003). He also maintained that a new trial was warranted because his stun belt was activated, outside the presence of the jury. On appeal, Moore argues that he was physically and psychologically injured by the activation of the stun belt and that these injuries interfered with his ability to communicate with his attorney and assist in his own defense.

Moore's stun belt was activated on November 12, 2002, while trial was ongoing but before trial had started on that day. Nov. 12, 2002 AM Trial Tr. at 8. Defense counsel reported the incident to the court and asked the court to consider taking a break. *Id.* at 97. The court did so and, after reconvening, announced that it had asked a nurse to examine Moore and that the nurse had reported that Moore "fe[lt] that the use of the device was unjustified," but that he was "physically . . . all right" and "was willing to go forward today." *Id.* at 98. Moore's counsel did not challenge these representations or otherwise object further. *Id.*

We reject Moore's claims. That Moore's stun belt was activated does not undermine the district court's reasoned decision, which we have upheld, to require him to wear a stun belt. Insofar as Moore now claims that the district court violated his constitutional rights not by requiring him to wear the belt but by continuing the trial after the belt's activation, we again find no error. As noted, the district court acceded to the request for a break by Moore's counsel, who never disputed the representation by the nurse, who had examined Moore, that Moore was ready to proceed with the trial.

**III.**

Appellants contend that the district court erred in empaneling an anonymous jury insofar as the prospective jurors' names, addresses, and places of employment were withheld. Our review is for abuse of discretion, despite appellants' contention that the *de novo* standard applies because "constitutional principles are involved." Appellants' Br. at 73. The court rejected this view in *United States v. Childress*, 58 F.3d 693 (D.C. Cir. 1995), a case concerning (in part) whether "the use of anonymous juries violates the *Constitution*," *id.* at 702 (emphasis added), because "[d]ecisions on . . . anonymity require a trial court to make a sensitive appraisal of the climate surrounding a trial and a prediction as to the potential security or publicity problems that may arise during the proceedings," *id.*

In *United States v. Edmond*, 52 F.3d 1080 (D.C. Cir. 1995), the court advised that "[i]n general, the [district] court should not order the empaneling of an anonymous jury without (a) concluding that there is a strong reason to believe the jury needs protection, and (b) taking reasonable precautions to minimize any prejudicial effects on the defendant and to ensure that his fundamental rights are protected." *Id.* at 1090 (first alteration in original) (citation and quotation marks omitted). In determining whether such protection is warranted, the court has found its analysis aided by five factors identified by the Eleventh Circuit:

> (1) the defendant's involvement in organized crime, (2) the defendant's participation in a group with the capacity to harm jurors, (3) the defendant's past attempts to interfere with the judicial process, (4) the potential that, if convicted, the defendant will suffer a lengthy incarceration and substantial monetary

penalties, and (5) extensive publicity that could enhance the possibility that jurors' names would become public and expose them to intimidation or harassment.

*Id.* at 1091 (quoting *United States v. Ross*, 33 F.3d 1507, 1520 (11th Cir. 1994)). Finding that all five factors were satisfied here, the district court granted the government's motion for an anonymous jury. As justification, the district court noted that appellants were charged in the superseding indictment with participating in a drug and RICO conspiracy that involved multiple acts of violence using firearms, in addition to threatening potential witnesses and preventing individuals from cooperating with law enforcement, and that if convicted appellants faced the maximum penalty of death or life imprisonment. Pointing to two *Washington Post* articles, the district court noted that this case had garnered media attention capable of increasing the potential danger to jurors. *See United States v. Gray*, No. 00-cr-157, at 12-13 (D.D.C. Feb. 7, 2002) (resolving pretrial motions).

Appellants challenge the district court's decision to empanel an anonymous jury on three grounds. None is persuasive. First, appellants maintain that the district court's decision was unfounded because the superseding indictment did not allege any history of juror intimidation. This argument misunderstands and too narrowly construes the requirements set forth in *Edmond*. As the court explained, "we do not believe such evidence [of jury tampering] is necessary in every case. Rather, we think the District Court . . . reasonably could have ascertained a threat to jurors from the charges in the indictment." *Edmond*, 52 F.3d at 1091. Here, the particular allegations of "multiple acts of violence to prevent individuals from contacting law enforcement," *Gray*, No. 00-cr-157, at 13 (Feb. 7, 2002), were sufficient, viewed in

context, for the district court to be concerned about appellants' capacity to harm jurors and interfere with the judicial process. *See Edmond*, 52 F.3d at 1091-92. As support, the district court cited the factual findings set forth in its November 15, 2001 memorandum regarding appellants' history of interfering with the judicial process, in resolving various discovery and evidentiary disclosure requests. *See United States v. Gray*, No. 00-cr-157, at 5-12 (D.D.C. Nov. 15, 2001).

Second, appellants maintain that media interest in this criminal prosecution would not endanger jurors' safety. The district court identified two *Washington Post* articles covering appellants' case as a prosecution brought against "Murder, Inc." Both articles appeared on the front page of the Metro section and described the number of alleged murders as historic and unprecedented. Such evidence of "initial media interest," *United States v. Wilson*, 160 F.3d 732, 746 (D.C. Cir. 1998), in a high-profile prosecution of a major drug conspiracy involving multiple defendants over a substantial period of time and alleged purposeful and random acts of murder supports the district court's decision.

Third, appellants suggest that the district court failed to take reasonable precautions to minimize any potential prejudice to them as a consequence of juror anonymity. In granting the motion for an anonymous jury, the district court advised that it would "use a questionnaire and extensive voir dire to examine the jurors' backgrounds" and, in addition to instructing jurors that appellants were presumed innocent until proven guilty, "provide a neutral explanation to the jurors regarding their anonymity." *Gray*, No. 00-cr-157, at 13 (Feb. 7, 2002). These precautions were, in fact, taken. A combination of instructions downplaying the significance of jurors' anonymity and a lengthy *voir dire* questionnaire can

adequately safeguard a defendant's fundamental rights. *See, e.g.*, *Childress*, 58 F.3d at 701-02; *Edmond*, 52 F.3d at 1092-93. Here the neutral instruction, set forth in the jury questionnaire,[4] informed jurors that they would meet at specific locations to be escorted to and from the courthouse "for [their] convenience as well as to assure both the government and the defense that no one has attempted to contact, communicate, or influence the jury." For *voir dire*, the 46-page jury questionnaire — at least double the length of the jury questionnaires that passed muster in *Childress* and *Edmond* — provided appellants with "a broad variety of personal information, including the quadrant of the city in which jurors resided, their educational history, marital status, military service, employment status and work description, their spouse's and children's employment, and their experience with crime, drugs, and law enforcement." *Edmond*, 52 F.3d at 1092. This sufficed "to compensate for the information denied by juror anonymity" because "[i]t elicited information . . . far more extensive and detailed than the generalizations appellants might have drawn from jurors' mere names and addresses." *Id.* Appellants have pointed to no particular example of prejudice.

Accordingly, we hold that the district court, having made the necessary findings under the *Edmond* factors, did not

---

[4] Although appellants note in the "background" section of their brief that the district court's instruction was not given orally or repeated during the trial, appellants do not pursue this issue in their argument section. We therefore have no occasion to consider whether a written instruction that is not orally repeated thereafter would alone be an adequate safeguard. *See Am. Wildlands v. Kempthorne*, 530 F.3d 991, 1001 (D.C. Cir. 2008); FED. R. APP. P. 28(a)(9).

abuse its discretion in granting the government's motion for an anonymous jury.

## IV.

Appellants raise numerous claims of prosecutorial misconduct, including inflaming the passions and prejudices of the jury, vouching for and bolstering the credibility of witnesses, soliciting testimony to that effect, denying appellants a presumption of innocence through elicitation of improper opinion testimony, and violating appellants' Sixth Amendment right by introducing evidence that they associated with and often sought the advice of legal counsel.[5] We have reviewed these claims and limit our discussion to those having arguable merit, and concluded that even when appellants' claims are viewed cumulatively, they fail to show a violation of their due process rights as would entitle them to a new trial.

## A.[6]

Opening and Closing Arguments. Appellants contend that the prosecutor's opening argument to the jury was improper and substantially prejudiced the trial proceedings by interfering with the jury's ability to properly assess the evidence. Our review of allegedly improper prosecutorial arguments is for substantial prejudice where the defendants

---

[5] Appellants also incorporate their arguments relating to *Brady v. Maryland*, 373 U.S. 83 (1963), and the federal bribery statute, 18 U.S.C. § 201(c)(2), which are addressed in Parts VI and XII, respectively.

[6] Circuit Judge Kavanaugh does not join Parts IV.A.1 and IV.A.2.

lodged an objection, but we apply the plain error standard where they failed to object. *See United States v. Small*, 74 F.3d 1276, 1281 (D.C. Cir. 1996); *see also United States v. Catlett*, 97 F.3d 565, 573 (D.C. Cir. 1996). When, as here, the alleged prosecutorial misconduct forms the basis for an unsuccessful motion for a mistrial, our review of the district court's denial of that motion is for abuse of discretion. *See Small*, 74 F.3d at 1284. This court has identified three factors that guide the determination whether improper remarks in closing and opening statements prejudiced a defendant so as to warrant reversal, under either the substantial prejudice or plain error standard: "(1) the closeness of the case; (2) the centrality of the issue affected by the error; and (3) the steps taken to mitigate the error's effects." *United States v. Becton*, 601 F.3d 588, 598 (D.C. Cir. 2010); *see also United States v. Gartmon*, 146 F.3d 1015, 1026 (D.C. Cir. 1998). In addition, this court will presume "that a jury acts with common sense and discrimination when confronted with an improper remark from a prosecutor and owes deference to the district court's assessment of such a statement's prejudicial impact on the jury." *United States v. Childress*, 58 F.3d 693, 716 (D.C. Cir. 1995) (citation and internal quotation marks omitted).

The Supreme Court has described the federal prosecutor as occupying a position of public trust:

> The United States Attorney is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done. As such, he is in a peculiar and very definite sense the servant of the law, the twofold aim of which is that guilt shall not escape or innocence suffer. He

> may prosecute with earnestness and vigor — indeed, he should do so. But, while he may strike hard blows, he is not at liberty to strike foul ones. It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one.

*Berger v. United States*, 295 U.S. 78, 88 (1935); *accord Taylor v. United States*, 413 F.2d 1095 (D.C. Cir. 1969). It follows from this rigorous standard that, in making opening and closing arguments, a prosecutor has an obligation "to avoid making statements of fact to the jury not supported by proper evidence introduced during trial," even when the misstatements are made in good faith. *Gaither*, 413 F.2d at 1079. Equally well settled, "[a] prosecutor may not make comments designed to inflame the passions or prejudices of the jury." *United States v. Johnson*, 231 F.3d 43, 47 (D.C. Cir. 2000); *see Childress*, 58 F.3d at 715. These general principles apply to, and inform the particular function of, the government's opening and closing arguments in a criminal trial.

1. "The purpose of an opening statement is to provid[e] background on objective facts while avoiding prejudicial references," and hence "[t]he prosecutor's opening statement should be an objective summary of the evidence reasonably expected to be produced, and the prosecutor should not use the opening statement as an opportunity to poison the jury's mind against the defendant or to recite items of highly questionable evidence." *United States v. Thomas*, 114 F.3d 228, 247 (D.C. Cir. 1997) (alterations in original) (citations and internal quotation marks omitted). So understood, prosecutorial misconduct exists where the government's argument touches upon facts prejudicial to the defendant that the government fails to support by admissible evidence at

trial. *See Small*, 74 F.3d at 1283. On the other hand, a prosecutor's reference in opening argument to the defendants as "two armed gunmen driving through the streets of D.C., armed to the teeth, dressed for action, carrying a load of dope," although strong and vivid, was not prosecutorial misconduct because the statement was supported by ample evidence introduced at trial. *United States v. Moore*, 104 F.3d 377, 390 (D.C. Cir. 1997).

The prosecutor's opening argument appears to have improperly departed from the standard in *Berger* and applied to opening arguments by this court. As in *Small*, 74 F.3d at 1283, it appears "the prosecutor came close to the line . . . in several instances and crossed it in others." For example, appellants were charged with committing 31 murders, and the prosecutor's repeated use of the word "execute" at the start of the trial seems to run afoul of the concern expressed by the court in *United States v. Jones*, 482 F.2d 747, 753 (D.C. Cir. 1973), in stating the court could "not condone" the prosecutor's reference during closing argument to the defendant as an "executioner." More generally, the opening argument includes a number of instances where the prosecutor went beyond merely providing an "objective summary of the evidence." *Thomas*, 114 F.3d at 248 (citation and quotation marks omitted). Such statements referring to the murdered victims as "[w]here there once was face and life, now there is nothing but empty black space. . . . Where there once was life, now there's death," May 9, 2002 PM Trial Tr. at 113, are neither based on evidence nor free from innuendo. Rather, they attempt to appeal to the jury's emotions by dramatic effect. *See Childress*, 58 F.3d at 715. Although other statements listing the 31 murder victims by names and dates on which they were killed are grounded in admissible evidence that the government intended to introduce at trial, this evidentiary nexus became tenuous once the prosecutor

began discussing the victims' first days of school, favorite songs, families, mothers, fathers, coffins, and funerals. *Cf. United States v. Dominguez*, 835 F.2d 694, 700 (7th Cir. 1987). Indeed, the district court recognized that although the prosecutor's opening argument "was fairly factually stated" it contained "some hyperbole," May 9, 2002 PM Trial Tr. at 127, a disfavored technique, *see United States v. North*, 910 F.2d 843, 895 (D.C. Cir. 1990); *United States v. Bouck*, 877 F.2d 828, 831 (10th Cir. 1989); *Dominguez*, 835 F.2d at 701.[7] Although the government is not required to make its opening argument in a rote manner, the court has admonished that "an opening statement to the jury should be carefully phrased to avoid overstatement." *Thomas*, 114 F.3d at 248. It is the government's opportunity to present the jury with argument based "on *objective* facts *while avoiding prejudicial references*." *Id.* at 247 (emphases added) (citation and quotation marks omitted).

---

[7] At the conclusion of the prosecutor's opening statement, the district court *sua sponte* instructed the jury, as it had at the outset of the trial, that

> the statements of the lawyers aren't evidence. They're intended to help you follow the evidence when the evidence is introduced. The defendants deny these charges, and you should keep an open mind until after you've heard all the evidence and I give you my final instructions on the law.

May 9, 2002 PM Trial Tr. at 114 (paragraph break omitted). The district court then denied appellants' oral motions for a mistrial. It explained that the jury instruction "takes care of any other problems" and that it "didn't find the opening to be inflammatory in the sense that defense counsel saw it . . . but, rather, was fairly factually stated with some hyperbole." *Id.* at 127.

2. "The sole purpose of closing argument is to assist the jury in analyzing the evidence," and hence courts have recognized that the prosecutor (as well as defense counsel) is afforded some leeway in "stat[ing] conclusions drawn from the evidence," *United States v. Bailey*, 123 F.3d 1381, 1400 (11th Cir. 1997) (citation and quotation marks omitted); *see also Herring v. New York*, 422 U.S. 853, 862 (1975); 6 WAYNE R. LAFAVE ET AL., CRIMINAL PROCEDURE § 24.7(b) (3d ed. 2007). "[I]n closing argument counsel may not refer to, or rely upon, evidence unless the trial court has admitted it." *United States v. Maddox*, 156 F.3d 1280, 1282 (D.C. Cir. 1998); *see also Small*, 74 F.3d at 1280. But the prosecutor may, for instance, draw inferences from evidence that support the government's theory of the case so long as the prosecutor does not intentionally misrepresent the evidence. *See United States v. Deloach*, 530 F.2d 990, 1000 (D.C. Cir. 1975). Indeed, the prosecutor "may strike hard blows," but not "foul ones." *Berger*, 295 U.S. at 88. Because the line between permissible and impermissible arguments will not always be clear, the inquiry is necessarily contextual. *See Catlett*, 97 F.3d at 572; *Deloach*, 530 F.2d at 999-1000.

Some statements by the prosecutor during closing argument appear problematic. Illustrative is the prosecutor's invitation for the jurors to "imagine Scott Downing," one of the murder victims, in "the last few minutes of [his] life." The prosecutor told the jury:

> Scott Downing is bound with duct tape. It's pitch black in the back of that U-haul. He does not know what's going to happen to him. He must — he must wonder if he's going to live through this night. . . . He's taken out of that U-haul. He tries to talk but he can't. All he can do is mumble. He feels the grass under his body. He feels the gravel of the road. . . .

> And then a gun is placed to the back of his head and two bullets.

Nov. 21, 2002 AM Trial Tr. at 112-13. On appeal, the government responds, in a footnote, that this narrative "had sympathetic overtones" only "[a]t a superficial level" because the jury heard evidence that Downing had been kidnapped, bound and gagged, and shot by the side of the road. Appellee's Br. at 96 n.68. This response, however, misses the fundamental distinction between permissible and impermissible closing arguments. In summarizing evidence supporting conviction, a prosecutor may not take artistic license with the trial evidence, construct a more dramatic version of the events, provide conjecture about a victim's state of mind, and then defend against a prosecutorial misconduct claim by maintaining the statements are "fact-based." Sensationalization, loosely drawn from facts presented during the trial, is still a "statement[] of fact to the jury not supported by proper evidence introduced during trial," *Gaither*, 413 F.2d at 1079, clearly "designed to inflame the passions or prejudices of the jury," *Johnson*, 231 F.3d at 47. Although not as egregious as comparing appellants to Hitler, as occurred in *North*, 910 F.2d at 895, there are, as every prosecutor knows, limits to striking "hard blows," *Berger*, 295 U.S. at 88.

3. Nonetheless, assuming, as appellants contend, that prosecutorial misconduct occurred during the arguments to the jury, it did not substantially prejudice appellants. Although the specific arguments to which appellants object appeared at times to address central issues in the case, there was overwhelming evidence of appellants' guilt of the crimes implicated by the prosecutor's purported misconduct, and the district court gave general limiting instructions on the arguments of counsel to the jury at the beginning of the trial,

after the prosecutor's opening argument, and during the final instructions to the jury before it began deliberating. *See Thomas*, 114 F.3d at 249; *Gaither*, 413 F.2d at 1079.

Appellants' reliance on *United States v. Moore*, 375 F.3d 259 (3d Cir. 2004), is misplaced. In that case the prosecutor's closing argument compared the defendant to a 9/11 "terrorist" on the eve of the first anniversary of those events and referenced irrelevant evidence that the defendant was forcing children to sell drugs. Reversal of the convictions, however, was based on the fact that "[i]nadmissible evidence and highly inflammatory statements came rolling in unimpeded" throughout the trial in such a pervasive manner as to undermine the soundness of the jury verdict. *Id.* at 263-65. This court applies a similar standard to the prejudice inquiry: "[A]bsent 'consistent and repeated misrepresentation' to influence a jury, '[i]solated passages of a prosecutor's argument, billed in advance to the jury as a matter of opinion not of evidence, do not reach the same proportions'" of severe misconduct; by contrast, "tainted closing arguments that follow on the heels of improper and indecorous prosecutorial conduct during trial are more likely to amount to the type of severe misconduct that justifies reversing a conviction." *North*, 910 F.2d at 897 (second alteration in original) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 646 (1974)). But unlike in the Third Circuit case, that standard is not met in the instant case.

Here, the severity of what appellants have identified on appeal as misconduct was limited to relatively small portions of lengthy opening and closing arguments. *See United States v. Monaghan*, 741 F.2d 1434, 1443 (D.C. Cir. 1984). As this court has observed on occasion, "the length of time between the prosecutor's opening statement and jury deliberations" — seven months in the instant case — "makes it unlikely that

specific allegations in the opening profoundly influenced those deliberations." *United States v. Williams-Davis*, 90 F.3d 490, 508 (D.C. Cir. 1996). Moreover, the district court repeated its general limiting instruction that the statements of counsel are not evidence at the outset of the trial and following the prosecutor's opening argument, May 9, 2002 PM Trial Tr. at 114, and again after closing arguments in giving final instructions to the jury, *see* Dec. 9, 2002 AM Trial Tr. at 72. This is usually a strong ameliorative consideration for prosecutorial misconduct during opening, *see Thomas*, 114 F.3d at 249, and closing argument, *Childress*, 58 F.3d at 716; *North*, 910 F.2d at 897; *United States v. Hawkins*, 595 F.2d 751, 754-55 (D.C. Cir. 1978). Although the type of general instruction given here is not a guarantee for the government as necessarily mitigating the prejudicial effects of prosecutorial misconduct in arguments, *see North*, 910 F.2d at 897 n.33, this is not a "particularly egregious case[]" that would require additional cautionary and limiting instructions, and the defense did not request them, *Thomas*, 114 F.3d at 249 (citation and quotation marks omitted). Under the circumstances, we conclude, assuming prosecutorial misconduct during opening and closing arguments to the jury, that the misconduct did not impermissibly and prejudicially interfere with the jury's ability to assess the evidence.

**B.**

Overview Witness. More problematic is the government's use of a Federal Bureau of Investigation ("FBI") agent as an overview witness. FBI Agent Daniel Sparks testified as the first witness in the government's case-in-chief. His testimony provided an overview of the government's case, setting forth for the jury the script of the testimony and evidence the jury could expect the government to present in its case-in-chief.

Further, he expressed his opinion, based on his training and experience, about the nature of the investigation conducted in this case.

Appellants contend that the use of an overview witness as the government's first witness improperly permitted the government, over defense objections, to elicit FBI Agent Sparks's opinions about the charged crimes, the reasons for appellants' actions in various circumstances, the nature of the charged conspiracy and the relationships between co-conspirators, including the cooperating co-conspirators who testified as government witnesses, and the strength of the evidence — all before the government had presented any such evidence. Appellants suggest that FBI Agent Sparks's testimony left the impression for the jury that it should accept that the co-conspirator cooperating witnesses would fully and truthfully recount the events and impressions that he outlined in his testimony. Hence, the question is whether such overview testimony is permissible, and even if permissible with respect to the FBI agent's description of aspects of the pre-indictment investigation of which he had personal knowledge, whether the overview witness's testimony here caused substantial prejudice to appellants. Our conclusions are not affected by whether appellants' challenge is viewed as a question of prosecutorial misconduct, as appellants contend, or a claim of abuse of discretion by the district court in admitting inadmissible evidence, *United States v. Watson*, 409 F.3d 458, 462 (D.C. Cir. 2005); *United States v. Microsoft Corp.*, 253 F.3d 34, 101 (D.C. Cir. 2001).

Until recently this court had not addressed the appropriateness of a government overview witness at the outset of its case, but had identified the "obvious dangers posed by summarization of evidence" by a non-expert witness called by the government during its case-in-chief in *United*

*States v. Lemire*, 720 F.2d 1327, 1348 (D.C. Cir. 1983). The analysis in *Lemire* is instructive. In that case, the government called toward the end of its case-in-chief an FBI agent, who was also a certified public accountant, "to summarize the evidence about the complex cash flow through offshore companies" in a prosecution for wire fraud, interstate transportation of proceeds of fraud, and conspiracy. *Id.* at 1346. The FBI agent "used four summary charts to re-examine th[e] evidence" already presented by the government "in a more organized fashion," and "prefaced each piece of his testimony by identifying the document in evidence from which he obtained the information." *Id.* Upon defense objection that the FBI agent was an improper witness under Federal Rule of Evidence 602,[8] the district court conducted a "full voir dire examination" before allowing the FBI agent to testify, "subject to limiting instructions that his testimony was explanatory and was not itself substantive evidence." *Id.* at 1346-47.

On appeal, this court held that the district court did not abuse its discretion in permitting the government to use a non-expert summary witness because

> neither Rule 602's literal language nor its overriding purpose was violated. [The FBI agent] did not testify about any of the events underlying the trial: he only summarized evidence about cash flows that several

---

[8] At the time, Rule 602 of the Federal Rules of Evidence provided, as relevant, that "'[a] witness may not testify to a matter unless evidence is introduced sufficient to support a finding that he has personal knowledge of the matter.'" *Lemire*, 720 F.2d at 1347 n.30 (quoting FED. R. EVID. 602). Subsequent amendments were technical in nature. *See* FED. R. EVID. 602 advisory committee's note.

> prior witnesses had already offered. As to that evidence, he testified from his personal knowledge of the transcripts and exhibits.

*Id.* at 1347. The court also noted that other courts had "permitted such summaries under Rule 1006, allowing for admission into evidence of summaries of documents too voluminous to be conveniently examined in court" even if the documents were already in evidence. *Id.*[9] That rule aside, the court observed that "[t]here is an established tradition that permits a summary of evidence to be put before the jury with proper limiting instructions." *Id.* (citations and quotation marks omitted). Nonetheless, this court concluded that the claim of unfair prejudice "raises more troubling concerns." *Id.* at 1347-48. Initially the court noted that the non-expert summary evidence was cumulative and subject to challenge under Rule 403 as more unfairly prejudicial than probative. *Id.* at 1348. It also acknowledged that a non-expert summary witness "can help the jury organize and evaluate evidence which is factually complex and fragmentally revealed in the testimony of a multitude of witnesses throughout the trial." *Id.* But the court pointed to three "obvious dangers posed by summarization of evidence." *Id.*

---

[9] Rule 1006 of the Federal Rules of Evidence provides:

> The contents of voluminous writings, recordings, or photographs which cannot conveniently be examined in court may be presented in the form of a chart, summary, or calculation. The originals, or duplicates, shall be made available for examination or copying, or both, by other parties at reasonable time and place. The court may order that they be produced in court.

First, the jury might treat the summary evidence as additional or corroborative evidence that unfairly strengthens the government's case. The court was satisfied that for a summary witness there were adequate safeguards, including cross-examination and limiting instructions, that could be fashioned by the district court to prevent the jury from treating the summary evidence as substantive proof. The court emphasized that the defendant's challenge to the personal knowledge of the summary witness was not an issue because the witness "had carefully reviewed the charts and ensured that they reflected information contained in documents *already in evidence*." *Id.* at 1349 (emphasis added); *see also United States v. Kayode*, 254 F.3d 204, 212 (D.C. Cir. 2001).

Second, summary witness testimony posed the risk that otherwise inadmissible evidence might be introduced. This concern was ameliorated, the court concluded, because "the judge, prosecutor and defense counsel all heard the evidence upon which [the witness] based his summary" and hence "he was unlikely to stray from that evidentiary base without quickly being stopped." *Lemire*, 720 F.2d at 1349 n.33. Indeed, the court noted, "at one point the witness inadvertently started to discuss material not in evidence, and the prosecutor prevented him from doing so." *Id.*

Third, a summary witness might permit the government to have an extra closing argument. The court noted, however, that the summary witness had made no "controversial inferences or pronounced judgment" and thus the district court had no need to interfere with the examination on this ground. *See id.* at 1349-50.

Other circuits to address the use of overview witnesses have reached uniformly negative conclusions in view of the

serious dangers of prejudice to a fair trial. The Court of Appeals for the First, Second, and Fifth Circuits have held that the use of overview testimony by the government is a "troubling development" for this very reason. *United States v. Casas*, 356 F.3d 104, 120 (1st Cir. 2004); *see also United States v. Garcia*, 413 F.3d 201 (2d Cir. 2005); *United States v. Griffin*, 324 F.3d 330 (5th Cir. 2003). As the First Circuit explained in describing the practice as "inherently problematic":

> [S]uch testimony raises the very real specter that the jury verdict could be influenced by statements of fact or credibility assessments in the overview but not in evidence. There is also the possibility that later testimony might be different than what the overview witness assumed; objections could be sustained or the witness could change his or her story. Overview testimony by government agents is especially problematic because juries may place greater weight on evidence perceived to have the imprimatur of the government.

*Casas*, 356 F.3d at 119-20 (internal citation omitted).

Approaching the question from a different perspective, the Second Circuit prohibited overview witnesses from giving lay opinions about anticipated evidence without satisfying the three requirements of Federal Rule of Evidence 701 — that the witness's testimony (1) be based on his personal perception, (2) be helpful to the jury, and (3) not be based on scientific, technical, or other specialized knowledge. *See Garcia*, 413 F.3d at 211-17. As regards the second factor, the Second Circuit dismissed the notion that an overview witness aided the jury by framing how the government's case-in-chief will unfold, observing that "[t]he law already provides an

adequate vehicle for the government to 'help' the jury gain an overview of anticipated evidence as well as a preview of its theory of each defendant's culpability: the opening statement." *Id.* at 214. To the extent the summary witness testified to the ultimate question of fact, the Second Circuit noted that "courts should be wary of opinion testimony whose 'sole function is to answer the same question that the trier of fact is to consider in its deliberations,'" *id.* at 210 (quoting 4 WEINSTEIN'S FEDERAL EVIDENCE § 701.05 (2d ed. 2004), and citing FED. R. EVID. 704 advisory committee's notes to 1972 proposed rules), observing that it had previously held in two other cases that it was "error to allow law enforcement witnesses to express opinions as to [the] defendants' culpability based on the totality of information gathered in the course of their investigations," *id.* at 211 (citing *United States v. Grinage*, 390 F.3d 746, 749-51 (2d Cir. 2004); *United States v. Dukagjini*, 326 F.3d 45, 54 (2d Cir. 2003)). The court held that "the foundation requirements of Rule 701 do not permit a law enforcement agent to testify to an opinion . . . based [on investigative work] and formed if the agent's reasoning process depended, in whole or in part, on his specialized training and experience." *Id.* at 216.

This court recently observed that the First, Second, and Fifth Circuits "have viewed agents' hearsay-laden or hearsay-based overview testimony at the onset of trial as a rather blatant prosecutorial attempt to circumvent hearsay rules." *United States v. Smith*, 640 F.3d 358, 367 (D.C. Cir. 2011) (citations omitted). In *Smith*, the defendant was charged with drug and firearm offenses. An FBI agent testified at the start of the trial that Smith and a co-conspirator "were working together putting their money together and going to New York to buy heroin." *Id.* at 366. On appeal, Smith contended that the overview testimony — the single sentence — was based on inadmissible hearsay and thus violated Federal Rules of

Evidence ("FRE") 701 and 802. Assuming the same prohibition against inadmissible hearsay testimony by an overview witness applied as in the other circuits, the court concluded that the FBI agent's objected-to single-sentence testimony was not based on otherwise inadmissible hearsay because the underlying statements were either admissions of a party-opponent or co-conspirator statements under FRE 801(d)(2), *see id.* at 367-68, and if error, was harmless, *see id.* at 368. The court reached the same ultimate conclusion with respect to the agent's lay opinion testimony about the meaning of slang used by Smith and his co-conspirators during recorded conversations; although the lay opinion testimony was inadmissible under FRE 701 because it was based on specialized knowledge gained from working on other drug investigations, *id.* at 365 (citing *United States v. Wilson*, 605 F.3d. 985, 1026 (D.C. Cir. 2010)), the error was harmless because the agent would have qualified as an expert under FRE 702 and offered the same testimony, *id.* at 366.

The district court is ordinarily afforded broad discretion to determine the manner in which evidence will be received. *See Huddleston v. United States*, 485 U.S. 681, 690 (1988). But in *Lemire*, this court concluded that "the pervasiveness of the[] dangers [it had identified with summarization of evidence] requires that we review the use of a summary witness closely." 720 F.2d at 1348. Indeed, it was only "under appropriate circumstances with appropriate instructions" that this court "in the past approved the use of summary witnesses . . . in jury trials." *Microsoft Corp.*, 253 F.3d at 101. We accordingly review FBI Agent Sparks's overview testimony closely, aware that there was no *voir dire* before his testimony and a limiting instruction was given to the jury only after he completed his testimony, and then only with regard to opinions, not otherwise described, that he may have offered while testifying.

All three dangers identified by this court in *Lemire* are evident from the record in this case: FBI Agent Sparks testified about evidence not yet presented while opining that the cooperating witnesses would present truthful evidence because they were insiders and were guilty themselves, strengthening the government's yet-to-be presented case and offering inadmissible evidence while providing the government with a second opening argument. For example, upon being shown a map of the District of Columbia, FBI Agent Sparks confirmed that the 31 circles located on the map accurately reflected the locations of the 31 charged murders, and that murders clustered in certain locations occurred toward the beginning of the charged conspiracy. *See* May 15, 2002 AM Trial Tr. at 68-69. But no such evidence was before the jury and FBI Agent Sparks did not purport to testify from personal knowledge of each murder. At other points, FBI Agent Sparks referred to witness testimony that was never presented to the jury during the course of the trial. In one exemplary circumstance, FBI Agent Sparks testified on redirect examination that co-conspirator Erskine Hartwell had described his role in the conspiracy as supplying drugs and introducing Moore and Gray to Oscar Veal. *See* May 16, 2002 AM Trial Tr. at 56. When asked by the district court whether this information was "based on what [Hartwell] told [him]," FBI Agent Sparks agreed, prompting the district court to state: "The jury is going to hear his testimony." *Id.* at 57. Yet when asked only moments later by the prosecutor "if Erskine Hartwell will be a witness in this case or not," FBI Agent Sparks replied that he "d[idn't] know for sure if [Hartwell] will." *Id.* at 59. From portions of the transcript submitted by the parties to this court, there is no indication that Hartwell testified at trial and hence "later testimony . . . differe[d] [from] what the overview witness assumed." *Casas*, 356 F.3d at 119-20. The prosecutor thus impermissibly invited the jury to "rely upon the alleged facts

in the [overview] as if [those] facts had already been proved." *Griffin*, 324 F.3d at 349 (alterations in original) (citation and internal quotation marks omitted).[10]

Likewise, FBI Agent Sparks impermissibly commented on the strength of the government's yet-to-be introduced evidence, vouched for the credibility of witnesses the government intended to call at trial, and gave his personal opinion as to guilt or innocence. Weighing trial evidence and making "[d]eterminations of credibility are for the jury," *United States v. Boyd*, 54 F.3d 868, 871 (D.C. Cir. 1995) (citation and quotation marks omitted); *see also Jackson v. Virginia*, 443 U.S. 307, 319 (1979), as is "draw[ing] the ultimate conclusion of guilt or innocence," *United States v. Gaudin*, 515 U.S. 506, 514 (1995); *see also Garcia*, 413 F.3d at 210-11; *United States v. Peterson*, 483 F.2d 1222, 1238 (D.C. Cir. 1973). FBI Agent Sparks's testimony crossed the line in a number of instances. For example, he testified that it was important, in his view, to use cooperating witnesses in this case because it was "the only way" to gain "access to the inside information." May 15, 2002 AM Trial Tr. at 25. Acknowledging that cooperating witnesses were "themselves . . . criminals[,] unfortunately," he further testified that the cooperating co-conspirator witnesses nonetheless

> know what's going on, they have the information, they're the eyewitnesses, ear-witnesses, they hear what these guys are talking about after they commit a murder, they witness a murder, they know where the stash locations are for drugs. . . . [T]hey are present

---

[10] Other co-conspirator cooperating witnesses testified to Hartwell's role in the conspiracy. *See, e.g.*, May 20, 2002 PM Trial Tr. at 139; Aug. 26, 2002 PM Trial Tr. at 113-16.

when drug deals are done. They have been with these people day in and day out, and you need that kind of testimony. That's the only way to put these kind[s] of cases together.

*Id.* He also testified that the goal in a debriefing session was to "[g]et[] complete and truthful information" and that it was important to "try and verify" the information "[j]ust to make sure the person is truthful, that they are complete." *Id.* at 15, 16. On redirect examination, FBI Agent Sparks reinforced the notion that the cooperating witnesses were guilty of committing crimes in their capacity as the defendants' co-conspirators:

Q: You were asked a lot of questions on cross-examination about cooperating witnesses, and you continually referred to them as criminals.

A: Yes.

Q: Any doubt in your mind about that?

A: None whatsoever.

May 16, 2002 AM Trial Tr. at 59.

All of this was opinion testimony that went far beyond "constructing the sequence of events in the investigation . . . to provide background information and to explain how and why the agents even came to be involved with [a] particular defendant." *United States v. Flores-de-Jesús*, 569 F.3d 8, 19 (1st Cir. 2009) (citations and internal quotation marks omitted). Instead, these statements suggested both directly and indirectly to the jury that an experienced and highly trained FBI agent had determined that the cooperating co-

conspirators who would testify at trial were to be treated as credible witnesses and that appellants were guilty of the charged crimes. The clear implication was that the government had selected only truthful co-conspirator witnesses for the pre-indictment investigation, from whom the jury would hear during the trial.

In sum, FBI Agent Sparks's testimony was improper in offering his non-expert opinions about the charged conspiracy and appellants, vouching for the reliability of the investigation and of the cooperating co-conspirator witnesses the government planned to have testify at trial, and discussing evidence that had yet to be introduced. Given the dearth of taped conversations and videotaped evidence — none as to Moore — and almost exclusive reliance on co-conspirator cooperators' testimony, the government understandably might seek at the outset to enhance its case in the jury's mind with the imprimatur of an FBI agent. But the prosecutor went too far in questioning, allowing FBI Agent Sparks to act as an expert witness with respect to gang investigations and to refer to evidence that would never be introduced at trial. The district court, in turn, failed to sustain appropriate defense objections to FBI Agent Sparks's testimony that purported to offer opinion testimony and to confirm government evidence that had yet to be introduced.

Because a witness presenting an overview of the government's case-in-chief runs the serious risk of permitting the government to impermissibly "paint a picture of guilt before the evidence has been introduced," *Griffin*, 324 F.3d at 349, and may never be introduced, *see Flores-de-Jesús*, 569 F.3d at 17, we join the circuits that have addressed the issue in condemning the practice. *Casas*, 356 F.3d at 119 (1st Cir.); *Garcia*, 413 F.3d at 214 (2d Cir.); *Griffin*, 324 F.3d at 349 (5th Cir.). *See generally* 6 WEINSTEIN'S FEDERAL EVIDENCE

§§ 1006.04[3], 1006.08[4]. The use of overview witnesses exacerbates the "obvious dangers" this court identified in *Lemire* in the use of non-expert summarization evidence. Overview testimony offers an opportunity to "poison the jury's mind against the defendant or to recite items of highly questionable evidence." *Thomas*, 114 F.3d at 248 (citation and internal quotation marks omitted). Avoidance of those dangers is largely beyond the ability of the district court, much less the defense, to prevent. As the record here demonstrates, a trained law enforcement officer is likely to go as far as the questions allow, presenting a picture for the jury of a solid prosecution case based on his opinion of the strength and credibility of the witnesses the government plans to call to testify at trial for reasons made persuasive in view of the officer's training and experience. *See, e.g.*, May 15, 2002 AM Trial Tr. at 15-16 (prosecutor asking FBI Agent Sparks why truthful information is important). After-the-fact limiting instructions can, at best, mitigate prejudice, rather than invariably eliminate its effects completely. *See United States v. Curley*, 639 F.3d 50, 57 (2d Cir. 2011); *Woodcock v. Amaral*, 511 F.2d 985, 994 (1st Cir. 1974). The view of the government's case has been implanted in the mind of the jury by an agent of the Federal Bureau of Investigation who worked on the case — he should know!

The government remains free to call as its first witness a law enforcement officer who is familiar with the pre-indictment investigation or was otherwise personally involved, where permissible under the Rules of Evidence and consistent with constitutional guarantees. *See Old Chief v. United States*, 519 U.S. 172, 186-88 (1997); *United States v. Curtis*, 481 F.3d 836, 838 (D.C. Cir. 2007). Such a witness may, for example, be able to provide relevant background information as to the investigation's duration and scope or the methods of surveillance, based on personal knowledge. *See*

*Flores-de-Jesús*, 569 F.3d at 19. Put another way, a law enforcement officer may "describe a complicated government program in terms that do not address witness credibility," but he may not offer "tendentious testimony." *Griffin*, 324 F.3d at 349. Thus, FBI Agent Sparks could properly describe, based on his personal knowledge, how the gang investigation in this case was initiated, what law enforcement entities were involved, and what investigative techniques were used. *See, e.g.*, May 13, 2002 PM Trial Tr. at 50-51. What he could not do was present lay opinion testimony about investigative techniques in general and opine on what generally works and what does not, as illustrated by informants who pled guilty. Neither could he anticipate evidence that the government would hope to introduce at trial about the charged offenses or express an opinion, directly or indirectly, about the strength of that evidence or the credibility of any of the government's potential witnesses, including the cooperating co-conspirators.

Although the question is close, we conclude for the following reasons that the prejudice resulting from the admission of FBI Agent Sparks's overview testimony, to the extent it was inappropriate, was ameliorated: (1) Each instance of FBI Agent Sparks's improper testimony identified by appellants was later confirmed by admissible evidence at trial, *see* Appellee's Br. at 105-07; *supra* note 10; *see also Griffin*, 324 F.3d at 350. (2) Appellants' defense was limited to cross-examining testifying cooperating co-conspirators and other government witnesses (such as Margarita Simmons, an eyewitness to the murder of her son, Richard Simmons, *see infra* Part XXIII.B), *see Garcia-Morales*, 382 F.3d at 18. (3) The district court instructed at the conclusion of FBI Agent Sparks's testimony in the government's case-in-chief that the jury was to disregard any opinion testimony he offered, *see* May 16, 2002 AM Trial Tr. at 90. (4) There was overwhelming evidence of appellants' guilt, *see, e.g.*, *infra*

Parts VII, XVIII, XXIII.B. And as to some of his impermissible opinion testimony, FBI Agent Sparks might have qualified as an expert, *see Smith*, 640 F.3d at 366. Accordingly, the error did not "affect[] the outcome of the district court proceeding[]," *United States v. Sumlin*, 271 F.3d 274, 281 (D.C. Cir. 2001) (citation and quotation marks omitted), and hence appellants are not entitled to reversal of their convictions because of improper overview testimony by FBI Agent Sparks.

The inauspicious beginning of the government's case-in-chief is easily avoided in the future. No less than the court, the Department of Justice recognizes the high standard set for the prosecution by the Supreme Court in *Berger*, 295 U.S. at 88. Similarly, this court's long-held view of the purpose of the opening statement to the jury, namely to allow the prosecutor the opportunity to provide the jury with an objective overview of the evidence that the government intends to introduce at trial, *see Thomas*, 114 F.3d at 247-48, has long afforded the prosecutor the opportunity to do that for which the prosecutor improperly used FBI Agent Sparks, *see Garcia*, 413 F.3d at 214. This court now having made clear the exacerbated "obvious dangers" of the overview witness testifying about evidence yet to be admitted before the jury affords all parties clear direction to avoid unnecessary risks — for the prosecutor of an overturned conviction, for the defense of an unfair trial, and for the district court of having to retry a case.

## C.

Much for the reasons stated in the government's brief, appellants' litany of prosecutorial misconduct claims do not, in their cumulative effect, warrant reversal. In this regard, we have considered the probable aggregate effect of any

impermissible prosecutorial conduct that may have occurred on the jury's ability to judge the evidence fairly. *See United States v. Celis*, 608 F.3d 818, 847 (D.C. Cir. 2010) (citing *Egan v. United States*, 287 F. 958, 971 (D.C. Cir. 1923)); *see also Thomas*, 114 F.3d at 246. In addressing only two of appellants' claims of prosecutorial misconduct, we implicitly have indicated that any other prosecutorial misconduct that may have occurred was minor in itself and had no prejudicial effect in view of limiting instructions. For example, appellants maintain that the prosecutor impermissibly vouched for the credibility of the government's witnesses, particularly co-conspirator cooperating witnesses, during closing rebuttal argument. Although statements such as "[t]hey're telling the truth about their experiences," Dec. 4, 2002 AM Trial Tr. at 86, impermissibly express the personal opinion of the prosecutor, they were responses, based on evidence introduced at trial, to appellants' attacks on the credibility of the government's witnesses during closing argument. *See United States v. Young*, 470 U.S. 1, 17-19, (1985); *United States v. Brown*, 508 F.3d 1066, 1075-76 (D.C. Cir. 2007); *United States v. Robinson*, 59 F.3d 1318, 1323 (D.C. Cir. 1995). The prosecutor emphasized to the jurors, however, that it was their province to weigh the credibility of witnesses regardless of the arguments of counsel. *See* Dec. 4, 2002 AM Trial Tr. at 69; *cf. United States v. Nnanyererugo*, 39 F.3d 1205, 1209 (D.C. Cir. 1994). Importantly, the district court instructed the jury that it alone determined "the weight, the effect and the value of the evidence and the credibility of the witnesses," which evidence did not include counsels' opening and closing arguments. *See* Dec. 9, 2002 AM Trial Tr. at 70, 72; *see also Childress*, 58 F.3d at 716; *North*, 910 F.2d at 897; *United States v. Hawkins*, 595 F.2d 751, 754-55 (D.C. Cir. 1978).

Other claims of prosecutorial misconduct, including appellants' arguments relating to *Brady v. Maryland*, 373 U.S. 83 (1963), and the federal bribery statute, 18 U.S.C. § 201(c)(2), *see infra* Parts VI and XII, are without merit. Similarly, appellants' claim that the prosecutor, by eliciting testimony that appellants had sought the advice of a certain named attorney to defend against criminal charges not at issue in this case, inappropriately implied that appellants were guilty because they took steps to retain this counsel, thus penalizing appellants for exercising their constitutional right to counsel under the Sixth Amendment, is without merit. *See United States ex rel. Macon v. Yeager*, 476 F.2d 613 (3d Cir. 1973). Although some testimony might impermissibly have revealed privileged attorney-client conversations, an argument appellants do not make, there was not a direct statement by the prosecutor, as in *Yeager*, that appellants retained counsel in the instant case because they were guilty. *Cf. United States v. Liddy*, 509 F.2d 428, 442-45 (D.C. Cir. 1974) (en banc). Rather, the evidence demonstrated that the attorney linked several members of the conspiracy, including Moore and Gray.

Having considered all of appellants' claims of prosecutorial misconduct, we conclude, in light of the district court's limiting instructions regarding statements of counsel and regarding particular arguments or evidence, and the overwhelming evidence of appellants' guilt insofar as any prosecutorial misconduct is concerned, that the cumulative effect of any prosecutorial misconduct of which appellants complain did not affect the outcome of the trial, and therefore, was harmless. *See Kotteakos v. United States*, 328 U.S. 750, 776 (1946); *see also Chapman v. California*, 386 U.S. 18, 24 (1967).

## V.

At trial, the government introduced evidence about Moore's role in an uncharged drug-trafficking conspiracy run by Rayful Edmond; Nunn's role in an uncharged conspiracy with Phyllis Webster; the apprehension of Rodman Lee, who was not a charged co-conspirator, while he was with Gray, and the contemporaneous discovery in Lee's car of cocaine and cocaine base, none of which the government claims pertained to the charged conspiracy; several uncharged murders and shootings; and Gray's uncharged conduct as a juvenile and others' perceptions of Gray as a leader while he was detained at the Oak Hill Juvenile Facility. Appellants argue that this evidence was irrelevant and highly prejudicial, admitted in violation of Rules 404(b) and 403 of the Federal Rules of Evidence. The cumulative effect of these evidentiary errors, appellants claim, deprived them of due process of law.

Rule 404(b) declares inadmissible evidence of "other crimes, wrongs, or acts . . . to prove the character of a person in order to show action in conformity therewith." FED. R. EVID. 404(b). But not all evidence of uncharged crimes, wrongs, or acts is barred by this rule. When evidence of such acts is "intrinsic" to the charged crime, it is not evidence of "other" acts and is thus wholly unregulated by Rule 404(b). *See United States v. Alexander*, 331 F.3d 116, 124-27 (D.C. Cir. 2003); *United States v. Bowie*, 232 F.3d 923, 927-28 (D.C. Cir. 2000); *United States v. Badru*, 97 F.3d 1471, 1473-75 (D.C. Cir. 1996). "Intrinsic" evidence encompasses evidence that is either "of an act that is part of the charged offense" or is of "acts performed contemporaneously with the charged crime . . . if they facilitate the commission of the charged crime." *Bowie*, 232 F.3d at 929.

Rule 403 provides that even evidence otherwise admissible "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." FED. R. EVID. 403. Rule 403 requires the district court to engage in "on-the-spot balancing of probative value and prejudice" and to exclude even factually relevant evidence when it fails the balancing test. *Sprint/United Mgmt. Co. v. Mendelsohn*, 552 U.S. 379, 384 (2008) (quoting 1 S. CHILDRESS & M. DAVIS, FEDERAL STANDARDS OF REVIEW § 4.02, at 4-16 (3d ed. 1999)) (internal quotation marks omitted).

Appellants claim that the district court should have barred the government from introducing the evidence of uncharged conduct in question because it was not "intrinsic" to the charged conduct and was therefore evidence of "other crimes, wrongs, or acts" barred by Rule 404(b). Appellants also contend that such evidence was erroneously admitted under Rule 403 because its risk of prejudice to the defendants substantially outweighed its probative value. Although appellants are likely correct that the district erred by permitting the government to introduce the evidence of uncharged conduct at issue, particularly of Moore's role in the Rayful Edmond conspiracy, Nunn's role in the Phyllis Webster conspiracy, and Gray's unlawful conduct as a juvenile, we hold that any error was not reversible.[11] Even

---

[11] Circuit Judge Rogers would find error under Rule 404(b) as to the introduction of certain evidence, but nonetheless conclude the errors were harmless beyond a reasonable doubt for the reasons stated by the court. Exemplary is the testimony of Rayful Edmond, a notorious drug kingpin in the District of Columbia serving multiple life sentences in prison following his conviction. *See United States v. Edmond*, 52 F.3d 1080, 1083-84, 1087 (D.C. Cir.

assuming constitutional error, we will not reverse a conviction if the error was "harmless beyond a reasonable doubt." *Chapman v. California*, 386 U.S. 18, 24 (1967). In light of the amount and strength of the evidence the government presented of the charged crimes, we find that any potential error was harmless.

## VI.

In 1996, Gray murdered Ricardo Bailey. Gray did so at the request of Rodman Lee. Gray and Lee were arrested while fleeing the scene of the murder, and a search of Lee's van revealed approximately five kilograms of cocaine hidden in a secret compartment. Lee pled guilty to the ensuing drug charges. Documents related to that plea show that Lee was a major drug dealer, that Lee was senior to Gray in status as a

---

1995). Edmond testified for two days at trial concerning a separate, violent conspiracy that predated the Moore and Gray conspiracy charged in the superseding indictment. The fact that Moore was involved in Edmond's conspiracy was irrelevant to the charged conspiracy, as the trial transcript belies the government's assertion that the Edmond conspiracy was the genesis of, and template for, Moore's drug-trafficking operation. Accordingly, Edmond's testimony about Moore's prior criminal activity can only be viewed as propensity evidence introduced to demonstrate Moore's bad character, *see United States v. Douglas*, 482 F.3d 591, 596 (D.C. Cir. 2007), and to "complete [Moore's] story" or "explain [his] circumstances," a practice this court rejected in *United States v. Bowie*, 232 F.3d 923, 929 (D.C. Cir. 2000). The same is true of evidence regarding Gray's unlawful conduct as a juvenile, which evidence the government purported was designed to demonstrate the formation and scope of the charged conspiracy. The evidence went beyond the fact that Gray met members of the charged conspiracy while incarcerated in a facility for juvenile delinquents and served no purpose other than to show his bad character. *See Douglas*, 482 F.3d at 596.

drug dealer, and that Lee was transporting most of the cocaine in his van to a distributor who was not implicated in the Moore and Gray conspiracy.

Appellants claim that the government's failure to disclose the information in Lee's plea documents to the defense violated the government's obligations under *Brady v. Maryland*, 373 U.S. 83 (1963).

"There are three components of a true *Brady* violation: The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999). Appellants' *Brady* claim fails because some of this information was not favorable to appellants, and because the government's failure to disclose the remainder did not cause prejudice.

The evidence showing that Lee was a higher-level drug dealer than Gray would not have aided appellants. The government itself contended that Lee was "at a higher level in terms of drugs than Kevin Gray." May 9, 2002 PM Trial Tr. at 69. According to the government, it was Lee's status as a major cocaine supplier that motivated Gray to murder Bailey on Lee's behalf.

With respect to the evidence that the drugs in Lee's van were destined for someone outside the Moore and Gray conspiracy, appellants' *Brady* claim fails because they cannot show prejudice. To show prejudice, appellants must demonstrate "a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Pettiford*, 627

F.3d 1223, 1227 (D.C. Cir. 2010) (quoting *Strickler*, 527 U.S. at 280). "The defendant bears the burden of showing a reasonable probability of a different outcome." *United States v. Johnson*, 519 F.3d 478, 488 (D.C. Cir. 2008) (citing *Strickler*, 527 U.S. at 291).

The evidence that the drugs in Lee's van were not destined for the Moore and Gray organization would have been of minimal value to the defense. In its opening statement, the government mentioned the drugs' destination only in passing, during a lengthy description of Gray murdering Bailey. *See* May 9, 2002 PM Trial Tr. at 71. The government made no other claims about those particular drugs' intended recipient, and the drugs' destination was not material to the government's case. Rather, the drugs were significant simply because their presence corroborated the government's claim that Lee was a major drug dealer for whom Gray would be willing to kill others.

Moreover, the evidence that Lee had distributors outside the Moore and Gray organization would not have materially aided appellants. The defense had already shown that members of the Moore and Gray conspiracy were *also* involved in other drug rings. Corroboration of that fact would have had little importance, because the government did not deny that Lee, Gray, or others had illegal business not directly related to Moore and Gray's conspiracy. Criminals may of course participate in more than one conspiracy. *See, e.g.*, *United States v. Marino*, 277 F.3d 11, 25 (1st Cir. 2002); *see also United States v. Childress*, 58 F.3d 693, 711 n.3 (D.C. Cir. 1995) ("[T]he fact that certain conspirators engage in independent drug transactions does not on its own negate the existence of a single conspiracy."). The fact that some appellants did so does not contradict the overwhelming evidence that Moore and Gray continued to collaborate on

crimes long after the defense claimed they had parted ways. *See Pettiford*, 627 F.3d at 1227 ("The court . . . has a responsibility to evaluate the impact of the undisclosed evidence not in isolation, but in light of the rest of the trial record." (citation and quotation marks omitted)).

The government did not violate *Brady* with respect to the Lee evidence.

**VII.**

In a superseding indictment filed on November 17, 2000, appellants and other indicted and unindicted co-conspirators were charged with participating in a drug and RICO conspiracy jointly led by Moore and Gray for over 12 years, from approximately 1988 through March 2000. Under the five-year statute of limitations applicable to these charges, *see* 18 U.S.C. § 3282, the government had to prove that Moore and Gray's joint leadership continued into the limitations period, beginning November 17, 1995.[12] *See United States v. Seher*, 562 F.3d 1344, 1364 (11th Cir. 2009). Applying well-settled law that the court must accept the jury's guilty verdict if "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt," we affirm the judgment of conviction on these charges. *United States v. Dykes*, 406 F.3d 717, 721 (D.C. Cir. 2005) (citation and quotation marks omitted).

Appellants contend that there was insufficient evidence for the jury to find beyond a reasonable doubt that Moore and

---

[12] This is the latest relevant date by which the government had to prove the jointly-led conspiracy and continuing criminal enterprise existed as to any appellant. For ease of analysis we address the sufficiency of evidence as to this date for all appellants.

Gray jointly led a unified conspiracy through November 17, 1995. They maintain that the evidence showed there were multiple conspiracies — essentially that Moore and Gray split up their drug operations in the 1993-1994 time frame and thereafter operated separate conspiracies in different sectors of the city that came into contact with each other only casually. *See generally United States v. Tarantino*, 846 F.2d 1384, 1391-93 (D.C. Cir. 1988). Rather than maintain that the government failed to prove the traditional elements for a single conspiracy — common goal, interdependence, and, to a lesser extent, overlap of participants, *see id.* at 1393 — appellants identify the "crux of this issue" to be whether the government presented sufficient evidence that "Moore and Gray *jointly led* the charged conspiracies and [the continuing criminal enterprise] within the statute of limitations periods," Reply Br. at 88, as charged.

As support for their position, appellants point to the evidence describing Moore's relocation from the Southeast to Northeast quadrant of Washington, D.C., prior to November 17, 1995, leaving Gray to operate separately in Southeast. An examination of this evidence shows that it falls short of undermining the jury's verdict that Moore and Gray's joint leadership of a single conspiracy continued after Moore's move. For instance, appellants emphasize Raymond Sanders's testimony that Moore "dropped out of Southeast" in 1993 or 1994 and was not seen in Southeast thereafter. *See* May 20, 2002 PM Trial Tr. at 126-27. The jury, however, could reasonably have credited other testimony that Moore continued to have dealings in Southeast. *See United States v. Eppolito*, 543 F.3d 25, 54 (2d Cir. 2008); *see also Dykes*, 406 F.3d at 721. Moreover, "shifting emphases in the location of operations do[es] not necessarily require a finding of more than one conspiracy." *United States v. Jones*, 482 F.3d 60, 72 (2d Cir. 2006). As in *United States v. Carson*, we reject the

argument that multiple conspiracies can be shown through "attempts artificially to split one conspiracy into two based simply on geographic lines." 455 F.3d 336, 376 (D.C. Cir. 2006) (citation and internal quotation marks omitted).

The central issue is whether Moore's and Gray's actions following Moore's relocation to Northeast are inconsistent with the jury's finding that they continued to jointly lead the charged conspiracy past November 17, 1995. On this point, appellants maintain that Moore's relationship with Gray changed, as shown by evidence that, according to Sanders, after the move Moore supplied Gray with cocaine *only* "a few times." May 20, 2002 PM Trial Tr. at 138. This mischaracterizes Sanders's testimony. On the previous page of the transcript of his testimony Sanders admits that he had no knowledge of who was regularly supplying cocaine to Gray, and that Gray *told him* of "a few times" that Moore had supplied cocaine. *Id.* at 137-38. This is not the same as evidence that Moore supplied Gray's operations in Southeast only a few times. Further, Maurice Andrews testified that Moore was Gray's primary supplier of large quantities of cocaine starting in 1995 and continuing at least into 1996. *See* July 9, 2002 PM Trial Tr. at 54-56; *see also Dykes*, 406 F.3d at 721. There was also evidence that Gray may have initially obtained cocaine from Ronald Alfred, and Frank Howard confirmed a separate conspiracy between himself, Alfred, and Rodman Lee, *see* July 17, 2002 PM Trial Tr. at 135. Such evidence is neither factually nor legally inconsistent with a finding that Moore and Gray continued to lead the charged conspiracy together. Here, much as in *United States v. Maynard*, 615 F.3d 544, 554 (D.C. Cir. 2010), as regards "[t]he two purportedly separate conspiracies . . . , each comprises the core conspiracy charged." And "the fact that certain conspirators engage in independent drug transactions does not on its own negate the existence of a

single conspiracy." *United States v. Childress*, 58 F.3d 693, 711 n.3 (D.C. Cir. 1995).

The government offered ample evidence of a jointly led conspiracy through November 17, 1995. This evidence extends to both the conspiracy's geographic scope and its twin principal aims: to unlawfully distribute drugs and commit murders. *See* Superseding Indict. at 4-5. The key testimony as regards the drug operation in Northeast came from Andrews, who accompanied Gray on a daily basis in 1996. July 9, 2002 PM Trial Tr. at 88. Andrews testified that Gray "had a lot of guys over [in Northeast]," including Moore's cousins, uncles, and brother. *Id.* at 82-84. Each of these family members participated in Gray's Northeast drug business, which involved Moore as well. *See id.* at 85, 86. Indeed, Andrews testified that Moore was the person "in particular responsible for overseeing the drug operation in that area of 7th and H, Northeast." *Id.* at 88. Moore and Gray's joint stewardship in Northeast after November 17, 1995, is established most clearly by Andrews's answers on the government's direct examination:

> Q:  How often, when you were hanging out with Kevin Gray every day, Mr. Andrews, how often would you go over to Northeast, Washington?
>
> A:  Every day.
>
> Q:  And why would you go over to Northeast every day?
>
> A:  [Gray] had money over there to pick up and basically we'll go to see [Moore] and then meet [Moore] and them.

Q:   And did that occur right on up through at least 1995 and 1996 and into 1997?

A:   Correct.

*Id.* at 88-89.

There was also sufficient evidence that Moore and Gray's joint leadership of the conspiracy continued after November 17, 1995, at a Southeast apartment complex located on Halley Terrace. Gray oversaw the drug operation in which Andrews, David Arnold, and Jermaine Vick participated. Although Arnold testified that "Moore never had any dealings with us down on Halley Terrace," Aug. 22, 2002 PM Trial Tr. at 16, Vick and Andrews testified that Moore supplied the Southeast operation with drugs. *See* Sept. 10, 2002 AM Trial Tr. at 11 (Vick); Oct. 16, 2002 AM Trial Tr. at 56 (Andrews); *see also Dykes*, 406 F.3d at 721. Moreover, Andrews's testimony makes clear that this relationship at Halley Terrace continued for six to eight months until a temporary two-month fallout between Moore and Gray around the time of the February 1998 NBA All-Star Game in New York. *See* Oct. 16, 2002 AM Trial Tr. at 56-60. Contrary to appellants' contention that Moore's actions hardly reflected that of a "leader," Appellants' Br. at 161, Vick recalled that Moore came to see Gray "[w]hen he need[ed] to see [Gray] or, you know, he need[ed] to deliver some important information or something like that, or *he needed somebody to carry out a task*." Sept. 10, 2002 AM Trial Tr. at 12 (emphasis added). Likewise, Oscar Veal testified that he met Moore at Halley Terrace to discuss murders of targets in Northeast through 1997. *See* Aug. 27, 2002 AM Trial Tr. at 13. From this evidence, the jury could reasonably infer that Moore's absence from time to time did not necessarily point toward a non-leadership role; instead it might suggest that Moore was a principal acting in a

supervisory role, while Gray coordinated the day-to-day operations.

Finally, the jury could have reasonably relied on evidence concerning Veal's 1998 murder of Roy Cobb, a rival drug dealer, well into the statutory limitations period. As Veal recounts, Gray drove both of them from Southeast to meet Moore at a location in Northeast. Once there, and in the presence of other members of the conspiracy, Moore and Gray discussed killing Cobb. Having already devised a plan for the murder, Moore and Gray walked Veal to a specific location where it was known that Cobb would stop at an intersection, and instructed Veal on how to go about killing Cobb. Although Moore and Gray continued to refine and change the plan, Gray provided Veal with the gun used to murder Cobb and afterward Moore compensated Veal with cash and cocaine. *See id.* at 50-55, 90; *see also* Oct. 16, 2002 AM Trial Tr. at 108-11, 116-20.

In sum, the evidence on which appellants rely in attempting to demonstrate that Moore and Gray ceased to serve as joint leaders of the charged conspiracy in 1993 or 1994 does not support the weight they place upon it, could reasonably have been rejected by the jury in light of other witnesses' contrary testimony, or is irrelevant to the existence of joint leadership. Mindful that "'the prosecution's evidence is to be viewed in the light most favorable to the government, drawing no distinction between direct and circumstantial evidence, and giving full play to the right of the jury to determine credibility, weigh the evidence and draw justifiable inferences of fact,'" *Dykes*, 406 F.3d at 721 (quoting *United States v. Foster*, 783 F.2d 1087, 1088 (D.C. Cir. 1986)), we hold that sufficient evidence supported the jury's finding that Moore and Gray jointly led the charged conspiracy within the limitations period.

**VIII.**

Appellants argue that all charges under the District of Columbia Code were improperly joined to their federal indictment under Rule 8(b) of the Federal Rules of Criminal Procedure. Because joinder was improper, appellants maintain, the district court lacked jurisdiction to hear those charges under § 11-502(3) of the District of Columbia Code, which provides that "the United States District Court for the District of Columbia has jurisdiction of . . . [a]ny offense under any law applicable exclusively to the District of Columbia which offense is joined in the same information or indictment with any Federal offense."

We have interpreted the term "joined" in § 11-502(3) to mean "properly joined under [Federal Rule of Criminal Procedure] 8." *United States v. Jackson*, 562 F.2d 789, 793 (D.C. Cir. 1977). Under Rule 8(b), joinder of the local charges was proper here only if all the offenses charged were part of the same "series of acts or transactions." *See id.* at 794 (holding that "the propriety of joinder in cases where there are multiple defendants must be tested by Rule 8(b) alone and that Rule 8(a) has no application"); FED. R. CRIM. P. 8(b) ("The indictment or information may charge 2 or more defendants if they are alleged to have participated in the same act or transaction, or in the same series of acts or transactions, constituting an offense or offenses."). Appellants' contention is that the superseding indictment and the evidence adduced at trial demonstrate that the local charges were not properly joined under Rule 8(b), and that the district court therefore lacked jurisdiction. We disagree.

We have held that "a 'series of acts or transactions' is 'two or more acts or transactions connected together or constituting parts of a common scheme or plan.'" *United*

*States v. Brown*, 823 F.2d 591, 598, (D.C. Cir. 1987) (quoting *United States v. Perry*, 731 F.2d 985, 990 (D.C. Cir. 1984)). Construing the facts of the superseding indictment as true, as we must, *United States v. Zicree*, 605 F.2d 1381, 1387 (5th Cir. 1979); *see United States v. Carson*, 455 F.3d 336, 372-73 (D.C. Cir. 2006); *United States v. Spriggs*, 102 F.3d 1245, 1255-56 (D.C. Cir. 1996), the local offenses charged were committed as acts in furtherance of the charged conspiracy and/or as predicate acts in the charged RICO conspiracy. All of the charged offenses, local and federal, were thus part of a common scheme or plan, which means that, for purposes of Rule 8(b), they were part of the same series of acts or transactions. *See Carson*, 455 F.3d at 373-74. Because we conclude that the superseding indictment establishes that joinder of the local offenses was proper, we hold the district court had jurisdiction under § 11-502(3).

Even if the evidence adduced at trial had demonstrated that all of the offenses were not part of the same series of acts or transactions — a proposition we reject — this would not strip jurisdiction from the district court. If the indictment establishes proper joinder under Rule 8(b), trial evidence cannot render joinder impermissible and is thus irrelevant to our inquiry. *Spriggs*, 102 F.3d at 1255 ("Rule 8(b) can be satisfied . . . by the indictment alone . . . ."); *Perry*, 731 F.2d at 990 (explaining that "[q]uite obviously, the indictment might satisfy th[e] requirement" for Rule 8(b) joinder).

## IX.

Appellants contend that the introduction into evidence of autopsy reports authored by the Office of the Chief Medical Examiner of the District of Columbia and reports of drug analyses performed by the U.S. Drug Enforcement Administration ("DEA") violates the Confrontation Clause of

the Sixth Amendment to the Constitution because the reports' authors were not available for cross-examination. Our review of the district court's legal conclusions regarding the Confrontation Clause is *de novo*, *United States v. Carson*, 455 F.3d 336, 362 (D.C. Cir. 2006), and subject to constitutional harmless error analysis pursuant to *Chapman v. California*, 386 U.S. 18, 23-24 (1967), *see United States v. Smith*, 640 F.3d 358, 364 (D.C. Cir. 2011); *United States v. Wilson*, 605 F.3d 985, 1014 (D.C. Cir. 2010).

The landscape of the Supreme Court's jurisprudence on the Confrontation Clause has changed since appellants' trial concluded in 2003. The governing rule at the time, set forth in *Ohio v. Roberts*, 448 U.S. 56, 65-66 (1980), was that out-of-court statements admitted against a criminal defendant avoided the requirements of the Confrontation Clause if they came within traditional hearsay exceptions or were otherwise reliable. In 2004, however, the Supreme Court relied on the Confrontation Clause's historical underpinnings to hold that "testimonial" out-of-court statements of a declarant not testifying at trial were inadmissible under the Confrontation Clause unless the declarant was unavailable and previously subject to cross-examination. *Crawford v. Washington*, 541 U.S. 36, 53-54, 59 (2004). Statements qualifying as "testimonial" included "*ex parte* in-court testimony or its functional equivalent — that is, material such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross-examine, or similar pretrial statements that declarants would reasonably expect to be used prosecutorially," other "formalized" materials such as "affidavits, depositions, prior testimony, or confessions," and "statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial." *Id.* at 51-52 (citations and quotation marks omitted). The Court

applied *Crawford* in *Melendez-Diaz v. Massachusetts*, 129 S. Ct. 2527, 2531-32 (2009), to hold that the state's use of a forensic laboratory report to prove that seized cocaine was of a certain quality and quantity violated the Confrontation Clause because no live witness competent to testify to the truth of the statements made in the report was available for cross-examination.

The Supreme Court's most recent decision on the Confrontation Clause is *Bullcoming v. New Mexico*, No. 09-10876 (U.S. June 23, 2011). After failing field sobriety tests and refusing a breath test, Bullcoming was arrested and required to give a blood sample for the purpose of determining his blood-alcohol concentration ("BAC"). Bullcoming's blood sample was sent to the New Mexico Department of Health, Scientific Laboratory Division, where a forensic analyst signed a "certificate of analyst," part of a standard form titled "Report of Blood Alcohol Analysis," recording Bullcoming's BAC as 0.21 grams per hundred milliliters. New Mexico charged Bullcoming with aggravated driving under the influence of intoxicating liquor, which requires proof of a BAC of 0.16 grams per hundred milliliters. At trial the prosecutor introduced the report and certificate of analyst into evidence as a business record. The forensic analyst who authored the report did not testify at trial and was not otherwise subject to cross-examination by Bullcoming. Instead, the prosecutor called as a witness a scientist from the same laboratory who had not signed the Report of Blood Alcohol Analysis, and neither participated in nor observed the test on Bullcoming's blood sample. The testifying scientist was, however, familiar with blood-alcohol analysis and the laboratory's testing protocols. *Bullcoming*, slip op. at 1-5. Defense counsel objected on Confrontation Clause grounds, and noted that "her opening, indeed, her entire defense 'may very well have been dramatically different'" had the

prosecution disclosed prior to the day of the trial that it would not be calling the certifying analyst as a witness. *Id.* at 5-6 (citation omitted).

The Supreme Court held that the Report of Blood Alcohol Analysis was "testimonial" and therefore within the ambit of the Confrontation Clause, a resulted dictated by *Melendez-Diaz*. *Id.* at 14-16. It further clarified that the "surrogate testimony" of the substitute witness "does not meet the constitutional requirement [of cross-examination]. The accused's right is to be confronted with the analyst who made the certification, unless that analyst is unavailable at trial, and the accused had an opportunity, pretrial, to cross-examine that particular [analyst]." *Id.* at 2. Three aspects of the Court's reasoning are noteworthy here: First, the Court framed the question presented as whether "the Confrontation Clause permit[s] the prosecution to introduce a forensic laboratory report containing a testimonial certification . . . through the in-court testimony of an analyst who did not sign the certification or personally perform or observe the performance of the test reported in the certification." *Id.* at 7-8; *see also id.* at 5-6 (Sotomayor, J., concurring in part). Second, the Court rejected the argument that Bullcoming's "true accuser" was the gas chromatagraph machine that generated the BAC figure and that the analyst's role was that of a "mere scrivener." *Id.* at 10 (majority opinion). Third, the Court explained that a surrogate witness knowledgeable as to the equipment and protocol used in administering the test was ill-equipped to "convey what [the certifying analyst] knew or observed about the events his certification concerned, i.e., the particular test and testing process he employed. Nor could such surrogate testimony expose any lapses or lies on the certifying analyst's part." *Id.* at 12.

The facts of the instant case resemble in part those of *Bullcoming*. The government called as witnesses Dr. Jonathan Arden, then-Chief D.C. Medical Examiner, and Jerry Walker, a DEA senior forensic chemist. Dr. Arden testified as to the contents of approximately 30 autopsy reports authored by other medical examiners in his office, but, as in *Bullcoming*, insofar as the record provided by the parties shows, he neither performed nor observed the autopsies and his signature does not appear on any of the reports.[13] Similarly, Walker's testimony concerned 24 drug analyses, 20 of which were performed by other DEA forensic chemists on drugs seized in the course of the investigation of the charged conspiracy, the results of which were memorialized in DEA reports. The autopsy and DEA reports were admitted into evidence over appellants' objection that "there is no way to . . . confront under the Sixth Amendment" unless the government calls the reports' authors as witnesses. Oct. 23, 2002 PM Trial Tr. at 90.

This case differs from *Bullcoming* in three relevant respects. First, because Walker testified that he authored four DEA reports, *see* Oct. 23, 2002 PM Trial Tr. at 68, and he was available for cross-examination at trial, these four DEA reports present no Confrontation Clause problem under *Bullcoming*.[14] The other 20 DEA reports, however, remain at issue.

_____

[13] The autopsy report of Jaime Pereira, performed by a medical examiner for the Commonwealth of Virginia, was admitted into evidence pursuant to stipulation, and thus raises no Confrontation Clause issue. *See Bullcoming*, slip op. at 1.

[14] Of the four Walker-authored DEA reports, only the DEA report dated May 15, 2000, relating to the March 20, 2000 seizure

Second, Walker personally reviewed, but did not author, one DEA report shortly after its creation, testifying that "[he] look[ed] at what the results [were] . . . and ma[d]e sure that [the analyst] used proper scientific-based knowledge to come up with [the] results." *Id.* at 80. Although the analysis in *Bullcoming* indicates that the degree of participation by the surrogate witness can alter the Confrontation Clause analysis, *see Bullcoming*, slip op. at 12; *id.* at 5-6 (Sotomayor, J., concurring in part), Walker's role appears to be much like that of the surrogate witness in *Bullcoming* because he was unable to "convey what [the authoring forensic chemist] knew or observed about the events his certification concerned, i.e., the particular test and testing process he employed," or "expose any lapses or lies on the [authoring forensic chemist's] part," *id.* at 12 (majority opinion). Walker did not observe the test being performed and did not sign the DEA report as the approving official. Rather, Walker testified that, in performing his review, he was "making an assumption that the chemist used the sample and did the analysis. . . . I'm making the assumption that they did do each of the tests that they wrote down on their worksheet." Oct. 23, 2002 PM Trial Tr. at 81. In holding there was constitutional error in *Bullcoming*, the Supreme Court relied on a similar statement by the testifying surrogate witness: "you don't know unless you actually observe the analysis that someone else conducts, whether they followed th[e] protocol in every instance." *Bullcoming*, slip op. at 12 n.8 (alteration in original) (citation and quotation marks omitted).

Third, Dr. Arden testified as the Chief D.C. Medical Examiner, and prior to trial he may well have had either a

---

of drugs from Nunn, appears to have been made a part of the multi-volume record on appeal provided by the parties.

"supervisor[y]" role with regard to the reports from his Office or even "a personal, albeit limited, connection to the [autopsies] at issue." *Id.* at 5 (Sotomayor, J., concurring in part). Whether such reports would be inadmissible under the Confrontation Clause despite his testimony is a question left open in *Bullcoming*, where the Court was confronted only with a testifying lab technician who had "no involvement whatsoever in the relevant test and report." *Id.* at 6.

The government's attempts to avoid the Confrontation Clause, on the grounds that the autopsy reports rank as non-testimonial and that the DEA reports contain "raw data," rather than "statements," Appellee's Br. at 185-87, 189, are foreclosed by *Bullcoming*.[15]

---

[15] The government suggests that Dr. Arden's and Walker's testimony was permissible as expert testimony pursuant to Federal Rule of Evidence 703. Appellee's Br. at 187, 189. The authority on which the government relies is distinguishable because the forensic reports in those cases were not introduced into evidence at trial. *See, e.g.*, *United States v. Pablo*, 625 F.3d 1285, 1294 (10th Cir. 2010); *United States v. Turner*, 591 F.3d 928, 932-33 (7th Cir. 2010). It could well be a different case where an expert witness discussed out-of-court testimonial statements that "were not themselves admitted as evidence." *Bullcoming*, slip op. at 6 (Sotomayor, J., concurring in part); *see also People v. Williams*, 939 N.E.2d 268 (Ill. 2010), *cert. granted*, No. 10-8505 (U.S. June 28, 2011). Any expert testimony by Dr. Arden and Walker does not avoid the fact that the autopsy and DEA reports were admitted into evidence at appellants' trial. Moreover, we note but need not decide whether Dr. Arden's or Walker's testimony qualifies as proper expert opinion based on testimonial statements inadmissible under the Confrontation Clause absent live in-court testimony by the declarant. Other courts have held that an expert runs afoul the Confrontation Clause when he "parrot[s] out-of-court testimonial statements . . . directly to the jury in the guise of expert opinion."

First, "solemn declaration[s] or affirmation[s] made for the purpose of establishing or proving some fact" are testimonial statements. *Melendez-Diaz*, 129 S. Ct. at 2532 (citation and quotation marks omitted). Put another way, "[a] document created solely for an 'evidentiary purpose,' . . . made in aid of a police investigation, ranks as testimonial." *Bullcoming*, slip op. at 14 (quoting *Melendez-Diaz*, 129 S. Ct. at 2532). The Supreme Court concluded the certifications in the laboratory report analyzing Bullcoming's BAC were testimonial because "a law-enforcement officer provided seized evidence to a state laboratory required by law to assist in police investigations," the certifying forensic analyst "tested the evidence and prepared a certificate concerning the result of his analysis," the certificate was formalized in a signed document and headed a "report," and the document referenced court rules relating to the admissibility of certified blood-alcohol analyses. *Id.* at 15.

---

*United States v. Johnson*, 587 F.3d 625, 635 (4th Cir. 2009) (citation and internal quotation marks omitted); *see, e.g., Pablo*, 625 F.3d at 1291-95. Here, the testimony by Dr. Arden and Walker often relayed the contents of reports. For example, responding to the prosecutor's question about what "the report indicate[s]" regarding soot or gunpowder marks on the arm of Anthony Dent, Dr. Arden testified that "[the report] specifically says that . . . soot or gunpowder tattooing . . . are mentioned as being absent." June 4, 2002 AM Trial Tr. at 9. Likewise, examination relating to the DEA reports typically consisted of Walker confirming a lab number on an exhibit and stating the conclusion of the report regarding the tested drugs. *See, e.g.*, Oct. 23, 2002 PM Trial Tr. at 97, 98, 106, 111, 114, 118-20, 122-25.

Analogous circumstances make the autopsy reports here testimonial.[16] The Office of the Medical Examiner is required by D.C. Code § 5-1405(b)(11) to investigate "[d]eaths for which the Metropolitan Police Department ["MPD"], or other law enforcement agency, or the United States Attorney's Office requests, or a court orders investigation." The autopsy reports do not indicate whether such requests were made in the instant case but the record shows that MPD homicide detectives and officers from the Mobile Crimes Unit were present at several autopsies. Another autopsy report was supplemented with diagrams containing the notation: "Mobile crime diagram (not [Medical Examiner] — use for info only)." Still another report included a "Supervisor's Review Record" from the MPD Criminal Investigations Division commenting: "Should have indictment re John Raynor for this murder." Law enforcement officers thus not only observed the autopsies, a fact that would have signaled to the medical examiner that the autopsy might bear on a criminal investigation, they participated in the creation of reports. Furthermore, the autopsy reports were formalized in signed documents titled "reports." These factors, combined with the fact that each autopsy found the manner of death to be a homicide caused by gunshot wounds, are "circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial."

---

[16] Certain duties imposed by the D.C. Code on the Office of the Medical Examiner demonstrate, the government suggests, that autopsy reports are business records not made for the purpose of litigation. It is unnecessary to decide as a categorical matter whether autopsy reports are testimonial, and, in any event, it is doubtful that such an approach would comport with Supreme Court precedent. *See Melendez-Diaz*, 129 S. Ct. at 2532; *cf. Michigan v. Bryant*, 131 S. Ct. 1143, 1155-56 (2011).

*Melendez-Diaz*, 129 S. Ct. at 2532 (citation and quotation marks omitted).

Second, as to the suggestion that the DEA reports contained only "raw data," the Supreme Court rejected the same characterization that "Bullcoming's true accuser . . . was the [gas chromatography] machine, while [the] testing analyst['s] . . . role was that of mere scrivener." *Bullcoming*, slip op. at 10 (citation and internal quotation marks omitted). The Court emphasized that the analyst "reported more than a machine-generated number" when he

> certified that he received Bullcoming's blood sample intact with the seal unbroken, that he checked to make sure that the forensic report number and the sample number "correspond[ed]," and that he performed on Bullcoming's sample a particular test, adhering to a precise protocol. He further represented, by leaving the "[r]emarks" section of the report blank, that no "circumstance or condition . . . affect[ed] the integrity of the sample or . . . the validity of the analysis." These representations, relating to past events and human actions not revealed in raw, machine-produced data, are meet for cross-examination.

*Id.* (alterations and ellipses in original) (internal citations omitted). Likewise here, the forensic chemists who authored the DEA reports made several representations, for example, that they were trained DEA chemists who followed certain procedures regarding the marking of containers and the inspection of seals, and that the chemical reagents and/or analytical instruments used were free from contamination and operating properly. The record in this court submitted by the parties does not indicate appellants had an opportunity to cross-examine the forensic chemists about their

representations. And just as the Supreme Court concluded that the performance of a blood-alcohol analysis using gas chromatography was a "matter . . . not so simple or certain," *id.* at 4 n.1, and subject to "human error . . . at each step," *id.* at 4, the DEA drug analysis process requires forensic chemists to weigh substances, make calculations, and choose the correct "color test for a particular kind of exhibit," Oct. 23, 2002 PM Trial Tr. at 130, a process also subject to human error. Indeed, one type of test used by the DEA forensic chemists involved gas chromatography. *See id.*

Non-structural constitutional error, such as violation of the Confrontation Clause, requires vacation of a conviction only where the error was not harmless beyond a reasonable doubt. *See Wilson*, 605 F.3d at 1014 (citing *Chapman*, 386 U.S. at 24). As regards the autopsy reports, there was other evidence at trial that the 31 murders occurred by gunshots fired by members of the charged conspiracy. For example, there was testimony by cooperating co-conspirators that Gray claimed credit for shooting Anthony Dent and that Handy claimed credit for murdering Demetrius Green, and there was eyewitness testimony that Handy shot Richard Simmons. Assuming error with respect to admission of the autopsy reports, and thus not reaching the question left open in *Bullcoming*, slip op. at 5-6 (Sotomayor, J., concurring in part), we hold the error was harmless beyond a reasonable doubt.

With respect to those drug convictions dependent on a specific weight and/or quality and quantity (Counts 126-138 of the superseding indictment), any improperly admitted DEA reports, which were testimonial and within the ambit of the requirements of the Confrontation Clause, may have caused prejudicial error. The parties' briefs could not address *Bullcoming*, which was decided by the Supreme Court after oral argument, and the parties did not address which specific

counts of the superseding indictment may or may not be sustained on other grounds. Accordingly, we remand to the district court to determine whether the admission of the DEA reports was error under *Bullcoming* and which counts underlying the judgment of conviction must be vacated, *see Smith*, 640 F.3d at 364, because the government cannot establish that the error was harmless beyond a reasonable doubt.

## **X.**

Under the Jencks Act, prosecutors must disclose "any statement" of a government witness "which relates to the subject matter as to which the witness has testified." 18 U.S.C. § 3500(b). A statement includes "a written statement made by said witness and signed or otherwise adopted by him," as well as any "substantially verbatim recital" of the witness's oral statements "recorded contemporaneously with the making of such oral statement." *Id.* § 3500(e). In the course of its lengthy investigation of appellants, the government created reports of many witness interviews. Appellants argue that the district court abused its discretion when it declined to review, *in camera*, all of the reports of interviews of government witnesses who later testified at trial, in order to determine whether any of those records contained Jencks Act statements. We disagree.

A district court has an "affirmative duty" to "engage in an adequate inquiry into the nature of the documents before ruling against Jencks Act production." *United States v. Stanfield*, 360 F.3d 1346, 1355 (D.C. Cir. 2004). However, a defendant cannot compel a district court judge to sift through every record in the government's possession merely by speculating that somewhere in those records there might be Jencks Act statements. Rather, the defense must raise a

"colorable claim" that a specific document or set of documents contains Jencks statements. *See, e.g.*, *United States v. Price*, 542 F.3d 617, 621 (8th Cir. 2008); *United States v. Roseboro*, 87 F.3d 642, 646 (4th Cir. 1996).

The interview reports in question here were written by law enforcement officers, not by the witnesses themselves. Such reports generally do not qualify as Jencks Act statements; they are not usually a "substantially verbatim recital" of the witness's words or "adopted or approved by" the witness. *Cf. Price*, 542 F.3d at 621; *Roseboro*, 87 F.3d at 646. Moreover, even if the interviewer wrote down a few of the witness's exact words, there is no "substantially verbatim recital" if the interviewer engaged in "substantial selection" in quoting the witness. *United States v. Donato*, 99 F.3d 426, 433 (D.C. Cir. 1996) (quoting *Palermo v. United States*, 360 U.S. 343, 352-53 (1959)). There is thus little reason to believe that the interview reports in this case generally contained Jencks statements, and no reason to insist that the district court review every such report.

On two occasions, appellants cross-examined government witnesses in an attempt to establish a colorable claim that specific witnesses' prior interviews had produced Jencks statements. The closest appellants came was the following exchange:

Defense:  Do you recall whether or not while you were speaking and the times when these people were taking notes whether they asked you to slow down so they could write something down that you were saying?

Witness:  No.

Defense: Did you [sic] anyone ask you to repeat yourself?

Witness: Probably so.  I'm not sure.

A witness's guess that an interviewer probably asked him to repeat himself at some point during an interview does not create anything more than speculation that the report of that interview is a "substantially verbatim recital" of the interview. *Cf. Roseboro*, 87 F.3d at 646.  Under those circumstances, the district court did not abuse its discretion in declining to review the resulting report, much less every interview report created during the investigation.

## **XI.**

At trial, the government elicited testimony from two former members of the Moore and Gray conspiracy that they had converted to Islam and that their religious conversion motivated them to testify for the prosecution.  On cross-examination, the defense attempted to demonstrate that the conversions of those two witnesses were a sham.  The defense also questioned the legitimacy of many other government witnesses' religious beliefs, even though the government had not raised the issue on direct examination of those witnesses.  The government in turn sought to defend the genuine nature of its witnesses' religious beliefs.

Appellants contend that the government's elicitation of testimony with respect to its witnesses' faith violated Federal Rule of Evidence 610.  That rule states:  "Evidence of the beliefs or opinions of a witness on matters of religion is not admissible for the purpose of showing that by reason of their nature the witness' credibility is impaired or enhanced."

The government responds that the testimony of the two witnesses did not fall within Rule 610 because the evidence was offered "for the purpose of showing interest or bias because of" religious beliefs. FED. R. EVID. 610 advisory committee's notes. According to the government, the witnesses' religious conversion refuted an accusation of bias — namely, the accusation that the witnesses were testifying solely to receive favorable plea agreements. The government thus argues that this testimony went to the witnesses' motive, not their credibility.

We need not decide which side has the better argument, because even assuming *arguendo* that there was error in allowing this testimony, the error was harmless. *See* FED. R. CRIM. P. 52(a). The government elicited very little religious testimony of its own accord. It made no mention of that testimony in opening or closing; it never urged the jury to credit its witnesses on account of their faith. *Cf. United States v. Spinner*, 152 F.3d 950, 961-62 (D.C. Cir. 1998). Whatever slight influence those two witnesses' religious conversions could have had on the jury is insignificant alongside the overwhelming evidence of appellants' guilt in this case. *See Kotteakos v. United States*, 328 U.S. 750, 765, 776 (1946).

Moreover, the defense thoroughly probed the issue of religious faith not only with the two witnesses who discussed their religion on direct examination, but with many others as well. Appellants admit that they did so both to impugn the government witnesses' credibility and to support their own claim that the government witnesses used Friday prison prayer services to coordinate false testimony against appellants. On this record, the defense's extensive cross-examination on this topic cannot be used to transform a government error (assuming error) that was a relatively minor

part of the trial into a reversible error. *See Lurk v. United States*, 296 F.2d 360, 361 (D.C. Cir. 1961).

## XII.

Nunn maintains that the district court erred in denying his motion for a new trial. *See United States v. Gray*, 292 F. Supp. 2d 71, 91-94 (D.D.C. 2003). Although the motion raised four issues, this part addresses only Nunn's contention that the testimony of Steve Graham was procured by the government in violation of the federal bribery statute, 18 U.S.C. § 201(c)(2), which provides that "[w]hoever . . . gives, offers, or promises anything of value to any person, for or because of the testimony under oath or affirmation given or to be given by such person as a witness upon a trial . . . shall be fined . . . or imprisoned for not more than two years, or both."[17] Graham testified that Nunn was Gray's drug supplier and described two drug transactions between Gray and Nunn. *See* Nov. 4, 2002 AM Trial Tr. at 14-26. Our review of the district court's denial of a new trial is for abuse of discretion. *United States v. Johnson*, 519 F.3d 478, 487 (D.C. Cir. 2008).

Graham was indicted for participating in the charged drug and RICO conspiracies, but his trial was severed from that of the other co-conspirators. After refusing offers by the government to enter into a plea agreement and cooperate with the government, he was convicted by a jury of conspiracy to distribute heroin or cocaine base and possession with intent to distribute heroin. The district court sentenced Graham to two concurrent 210-month terms of incarceration, followed by two

---

[17] Nunn's claims regarding Federal Rule of Evidence 404(b) and severance pursuant to Federal Rule of Criminal Procedure 14 are addressed in Parts V and XXII, respectively.

concurrent sentences of five years' incarceration, and three years of supervised release.  *See United States v. Graham*, 317 F.3d 262, 265-66 (D.C. Cir. 2003).  More than a year after sentencing, this court in December 2001 appointed new counsel to represent Graham on appeal.  New counsel explained the benefits of cooperating with the government and the terms of such cooperation, something that Graham claims his trial counsel failed to do.  *See* Nov. 6, 2002 AM Trial Tr. at 66-67, 70.

In March 2002, Graham contacted the prosecutor's office to express his desire to cooperate.  On October 11, 2002, the government and Graham entered into an agreement whereby Graham would cooperate fully with the government and testify truthfully at appellants' trial.  The agreement stipulated that "the usefulness of the information supplied . . . could not have reasonably been anticipated by [Graham] until more than a year after his sentencing and that [Graham] promptly provided information to the government after its utility was reasonably apparent to him."  *Gray*, 292 F. Supp. 2d at 92.  This language tracks an amendment now found in Federal Rule of Criminal Procedure 35(b)(2)(C),[18] effective

---

[18] Federal Rule of Criminal Procedure 35(b)(2)(C) provides:

> (2) Upon the government's motion made more than one year  after sentencing, the court may reduce a sentence if the defendant's substantial assistance involved:
>
> * * *
>
> (C) information the usefulness of which could not reasonably have been anticipated by the defendant until more than one year after sentencing and which was promptly provided to the government after its usefulness was reasonably apparent to the defendant.

December 2002, providing an additional basis for granting a sentencing reduction based on a defendant's substantial assistance to the government. The agreement also memorialized the government's intention to file a Rule 35 motion. *See Gray*, 292 F. Supp. 2d at 92.

In Nunn's view, Graham cooperated with the government and testified against appellants because the government agreed to file an untimely and improper Rule 35(b) motion on his behalf. This agreement constituted, in Nunn's words, a "Faustian bargain," Appellants' Br. at 194, because it represented that Graham realized the importance of the information he possessed only upon appointment of new appellate counsel more than one year after sentencing, when, according to Nunn, Graham possessed this information at the time of his arrest and knew of its potential value. Nunn thus contends that the government, aware that Graham was ineligible for a Rule 35(b)(2)(C) sentence reduction, nonetheless unlawfully offered Graham leniency in exchange for his cooperation.

*United States v. Ramsey*, 165 F.3d 980 (D.C. Cir. 1999), is controlling. Ramsey was convicted of a drug crime based on testimony by an informant named Fierro. Ramsey challenged his conviction on the ground that the federal bribery statute made it unlawful for the government to offer Fierro leniency in exchange for his cooperation and testimony. This court affirmed, holding that the bribery statute was not by its terms applicable to the United States when read in conjunction with the Dictionary Act, 1 U.S.C. § 1, and reasoned that a contrary

---

The advisory committee notes that "[w]hat constitutes 'prompt' notification will depend on the circumstances of the case." FED. R. CRIM. P. 35 advisory committee's note to 2002 amendments.

conclusion would deprive the federal government of its longstanding ability to plea bargain, thereby creating absurd results. *See Ramsey*, 165 F.3d at 986-91. As additional justification, this court concluded that "even if federal prosecutors were subject to [the federal bribery statute], that fact would not justify excluding Fierro's testimony" under the exclusionary rule because Congress had prescribed only a monetary fine and imprisonment as punishments. *Id.* at 991.

Counsel for Nunn conceded at oral argument that "the cases are legion[] that the government is allowed to exchange leniency for testimony." Oral Arg. Tr. at 55. Even if the federal bribery statute were applicable, a violation would not change the course of Nunn's trial because the exclusionary rule would not operate to prevent the government from eliciting Graham's testimony. *United States v. Singleton*, 165 F.3d 1297 (10th Cir. 1999) (en banc), is not to the contrary. Nunn relies on a concurring opinion for the proposition that "[p]rosecutors may offer only those incentives that Congress has approved, and may bargain and execute agreements only within the narrow, specific procedures that Congress and the courts have articulated." *Id.* at 1308 (Lucero, J., concurring). The majority likewise stated: "Our conclusion in no way permits an agent of the government to step beyond the limits of his or her office to make an offer to a witness other than one traditionally exercised by the sovereign." *Id.* at 1302 (majority opinion). A motion under Rule 35 is functionally little different from the plea bargain at issue in *Singleton* and the leniency afforded to the informant in *Ramsey*, save for the timing. *Cf. United States v. Ridge*, 329 F.3d 535, 541 (6th Cir. 2003); *United States v. Vargas-Deleon*, 124 F. App'x 854, 858-59 (5th Cir. 2005). Because the district court acted within its discretion in crediting Graham's stipulation that he realized the usefulness of the information he possessed only upon the explanation by new appellate counsel, the

government's Rule 35 motion meets the *Singleton* test, even assuming *arguendo* its applicability here.

Accordingly, we hold that the district court did not abuse its discretion in denying Nunn's motion for a new trial motion based on Graham's testimony.

## XIII.

Gray's contention that the district court abused its discretion in denying his request for a destruction of evidence instruction is manifestly without merit. This court has no authority to depart from *Arizona v. Youngblood*, 488 U.S. 51 (1988), requiring bad faith destruction, *see Agostini v. Felton*, 521 U.S. 203, 237 (1997), a showing Gray concedes he cannot make, *see* Appellants' Br. at 204.

## XIV.

Appellants requested that the district court instruct the jury on its theory that the government demonstrated, at most, that they engaged in multiple independent conspiracies, not a single joint conspiracy. Appellants submitted several proposed instructions to the court on this theory; the district court refused to give appellants' proposed instructions, four of which are now at issue on appeal. *See* Nov. 20, 2002 PM Trial Tr. at 47-56.

We have held that a "theory-of-defense instruction is in order if there is 'sufficient evidence from which a reasonable jury could find' for the defendant on his theory." *United States v. Hurt*, 527 F.3d 1347, 1351 (D.C. Cir. 2008) (quoting *United States v. Glover*, 153 F.3d 749, 754 (D.C. Cir. 1998)). However, we have also made clear that a failure to provide a requested defense instruction is not reversible

error unless the instruction: "(1) is substantively correct; (2) was not substantially covered in the charge actually delivered to the jury; and (3) concerns an important point in the trial so that the failure to give it seriously impaired the defendant's ability to effectively present a given defense." *United States v. Taylor*, 997 F.2d 1551, 1558 (D.C. Cir. 1993) (quoting *United States v. Grissom*, 645 F.2d 461, 464 (5th Cir. 1981)) (internal quotation marks omitted).

No one disputes that appellants were entitled to an instruction on their theory that the government had proven, at most, multiple conspiracies rather than a single conspiracy. Indeed the district court gave such an instruction:

> The defendants contend that the government's proof at trial is at variance from the conspiracy charged in Count One of the indictment; that is, that the evidence presented at trial, if believed, would constitute multiple conspiracies rather than a single overall conspiracy. Whether a single conspiracy, multiple conspiracies or no conspiracy at all existed is for you to decide. . . . Proof of several separate conspiracies is not proof of the single overall conspiracy charged in the indictment. What you must determine is whether the single conspiracy as charged in Count One existed between two or more conspirators. If you find that no such conspiracy existed, you must acquit the defendants of this charge. If, however, you find the government has proved beyond a reasonable doubt that the defendants were involved at any point during the period charged in the indictment in an integrated, ongoing, common effort to distribute controlled substances, then you may find them guilty of the single conspiracy charged in Count One. In making this determination, you should consider whether the

> conspirators share a common goal . . . . You may also consider the extent to which members of the conspiracy depended on one another to accomplish the goal of narcotics distribution, the overlap of participants in the various operations of the conspiracy, and the quality, frequency, and duration of each conspirator's transactions.

Dec. 9, 2002 AM Trial Tr. at 108-10. Rather, the question here is whether the court's refusal to provide the specific instructions requested by appellants constitutes reversible error. We hold that it did not.

Appellants requested the following instructions:

Instruction 3. To determine whether the evidence supports a single conspiracy as opposed to multiple conspiracies, you must examine whether the defendants shared a common goal, any interdependence among the participants, and any overlap among the participants in the allegedly separate conspiracies. The overlap requirement is satisfied only if the main figures in the alleged conspiracy are involved in all of the conspiracy's alleged scheme.

Instruction 4. In this case, the government alleges what is known as a 'hub and spoke' conspiracy. The government alleges that Mr. Gray and Mr. Moore were at the hub of the conspiracy, and that the other defendants, in addition to other conspirators, were the 'spokes.' However, in order to prove such a conspiracy, it must be shown that there is a direct conspiratorial interrelationship, also known as 'interdependence,' among those on the 'spokes' of the conspiracy, in addition to their relationship to those at the hub.

Instruction 5. In order for the defendants to be convicted of Count One, the evidence must demonstrate beyond a reasonable doubt that each defendant knew or had reason to know the scope of the distribution and retail organization involved, and had reason to believe that their own benefits derived from the operation [were] dependent upon the success of the entire venture.

Instruction 6. A single conspiracy exists if there is one overall agreement among various parties to perform different functions in order to carry out objectives of [the] conspiracy, while multiple conspiracies exist if each of the conspirators' agreements has its own end and constitutes an end in itself.

We cannot conclude that the failure to provide any of the proposed instructions "seriously impaired the defendant's ability to effectively present a given defense." *Taylor*, 997 F.2d at 1558. In light of the district court's comprehensive instructions to the jury about the defense's multiple-conspiracies theory, which mentioned all of the factors relevant to the jury's determination, we find that appellants were able to effectively present their defense.

## XV.

Count 2 charged Moore with engaging in a continuing criminal enterprise ("CCE"), in violation of 21 U.S.C. § 848. To convict under § 848, the government must prove that the defendant committed: "1) a felony violation of the federal narcotics law; 2) as part of a continuing series of violations; 3) in concert with five or more persons; 4) for whom the defendant is an organizer or supervisor; 5) from which he derives substantial income or resources." *United States v. Hoyle*, 122 F.3d 48, 50 (D.C. Cir. 1997) (citation and

quotation marks omitted). A "continuing series of violations," 21 U.S.C. § 848(c)(2), requires participation in three or more predicate offenses, one of which may be a drug conspiracy charged under 21 U.S.C. § 846. *See United States v. Harris*, 959 F.2d 246, 252-54 (D.C. Cir. 1992), *overruled on other grounds*, *Bailey v. United States*, 516 U.S. 137 (1995); *see also* Dec. 9, 2002 AM Trial Tr. at 120. The jury convicted Moore upon finding seven proven predicate offenses. Moore challenges his CCE conviction on the ground that there was insufficient evidence to support the jury's finding of three or more predicate offenses. This court "must accept the jury's guilty verdict" where a rational trier of fact could have reasonably found that Moore committed at least three predicate offenses. *United States v. Dykes*, 406 F.3d 717, 721 (D.C. Cir. 2005).

The predicate offenses found by the jury included (1) the drug conspiracy charged in Count 1, *see* 21 U.S.C. § 846; (2) Gray's possession with intent to distribute cocaine base on October 5, 1996 (Count 1, Overt Act 78); and (3) Raynor's possession with intent to distribute heroin on February 8, 1997 (Count 1, Overt Act 90). The latter two were attributable to Moore as a co-conspirator pursuant to *Pinkerton v. United States*, 328 U.S. 640, 645-48 (1946): "As long as a substantive offense was done in furtherance of the conspiracy, and was reasonably foreseeable as a 'necessary or natural consequence of the unlawful agreement,' then a conspirator will be held vicariously liable for the offense committed by his or her co-conspirators." *United States v. Washington*, 106 F.3d 983, 1012 (D.C. Cir. 1997) (quoting *Pinkerton*, 328 U.S. at 647-68); *see also United States v. Baker*, 432 F.3d 1189, 1235 (11th Cir. 2005); *United States v. Hoover*, 246 F.3d 1054, 1057-58 (7th Cir. 2001).

Moore's challenge to these CCE predicate offenses rests on his contention that the charged conspiracy terminated before the statute of limitations period, when it split into separate conspiracies operating in different quadrants of the city more than five years prior to the filing of the superseding indictment. It follows, Moore maintains, that the government's failure to prove the charged conspiracy negates the jury's finding that these CCE predicate offenses were proven beyond a reasonable doubt. Moore suggests his conviction for the Count 1 drug conspiracy would be vacated and he would not be vicariously liable under *Pinkerton* for Gray's and Raynor's acts because there was no charged conspiracy to be furthered. *See Washington*, 106 F.3d at 1012. Because we conclude that Moore and Gray jointly led the charged drug conspiracy within the limitations period, *see supra* Part VII, and Moore identifies no other grounds for disturbing the jury's verdicts as to these CCE predicate offenses, such as challenging the sufficiency of evidence that Gray and Raynor committed these Count 1 overt acts, they are properly considered CCE predicate offenses.

Accordingly, Moore's challenge to the jury's finding of these Count 1 CCE predicate offenses fails.[19]

## XVI.

The government and Moore agree that Moore's convictions for the felony murder and the premeditated

---

[19] Any violation of the Confrontation Clause in admitting the DEA chemist report certifying the substance possessed by Raynor to be heroin, *see supra* Part IX, is rendered harmless beyond a reasonable doubt by Raynor's guilty plea to Overt Act 90, *see* Oct. 7, 2002 Trial Tr. at 131-33; *see also Chapman v. California*, 386 U.S. 18 (1967).

murder of Ronald Powell merge. We therefore vacate Moore's felony murder conviction for the murder of Powell.

## XVII.

The jury convicted Smith of murdering Eric Moore. During the initial police investigation of Moore's murder, another man, Antoine Ward, claimed to have killed Moore. Smith argues that the district court improperly excluded evidence of Ward's confession. We conclude that the district court did not abuse its discretion in excluding the Ward evidence.

Eric Moore was found shot to death in his bedroom closet, with a pillow on the floor nearby and the room ransacked. At trial, a government witness testified: that he drove Smith and an accomplice to Moore's apartment with the intent of robbing Moore; that Smith was carrying a handgun; that Smith and the accomplice returned from Moore's apartment carrying bags of clothes; and that Smith told the witness he had shot Moore in Moore's closet after placing a pillow over Moore's head to muffle the sound. Another government witness testified that Smith had confirmed those details in a conversation with the government witness.

Before the above evidence came to light, the police had found a fingerprint belonging to Ward in Eric Moore's apartment. Ward therefore became the first target of the police investigation into this murder. When questioned, Ward admitted that he knew Moore and initially claimed that he participated in Moore's robbery with three other men, one of whom killed Moore. Ward later altered his story, naming a different person as the murderer. Still later, Ward changed his account entirely, claiming that he killed Moore himself during an argument, and denying that any others were involved.

Then, in his fourth and last statement, Ward recanted his previous three accounts and denied any involvement in Moore's robbery or death. The government did not pursue charges against Ward because it did not find sufficient evidence to corroborate his involvement.

Ward's counsel informed the government that Ward would invoke his Fifth Amendment right against self-incrimination if called to testify at Smith's trial. Smith claims that the district court should have told the government to immunize Ward for purposes of testifying, and if the government refused, dismissed the charges against Smith.

But the district court had no authority to immunize Ward, or to compel the government to immunize Ward. The decision to grant immunity from prosecution rests solely with the Executive Branch. *See* 18 U.S.C. § 6003; *United States v. Doe*, 465 U.S. 605, 616-17 (1984) ("Congress expressly left this decision exclusively to the Justice Department.").

Smith contends that the district court should have dismissed the murder charge against Smith because the government refused to immunize Ward, citing the D.C. Court of Appeals' decision in *Carter v. United States*, 684 A.2d 331, 339-46 (D.C. 1996) (en banc). *Carter* allows trial courts to impose sanctions on the prosecution — including dismissal of charges — if the prosecution creates a "distortion of the fact-finding process" by unjustifiably refusing to grant immunity to a defense witness. *Id.* at 342-43. Even assuming that *Carter* applies here (given that Smith was charged with murder under the D.C. Code), the district court did everything that the *Carter* decision would require: The government had interviewed Ward when it investigated him, and decided not to grant him immunity because Ward's accounts were self-contradictory and likely to result in perjury. The district court

accepted that as a valid reason for the prosecution not to immunize Ward, and declined to impose sanctions on the prosecution. The district court's decision was well within the bounds of *Carter*. *Cf. Butler v. United States*, 890 A.2d 181, 190 (D.C. 2006); *Carter*, 684 A.2d at 342-43.

Smith also argues that the district court should have admitted into evidence the third of Ward's four contradictory statements regarding Eric Moore's murder, the statement in which Ward claimed to have killed Moore.

Ward's confession is hearsay, but under Federal Rule of Evidence 804(b)(3) such hearsay was admissible if: (1) the declarant was unavailable, (2) the statement was against the declarant's interest, and (3) "corroborating circumstances clearly indicate the trustworthiness of the statement."[20] The party offering the statement bears the burden of establishing that the statement meets these requirements. *See United States v. Jackson*, 540 F.3d 578, 588 (7th Cir. 2008); *United States v. MacDonald*, 688 F.2d 224, 233 (4th Cir. 1982).

---

[20] Under the version of Rule 804(b)(3) in effect during Smith's trial, the requirement for clear corroboration only applied to statements, such as Ward's, "tending to expose the declarant to criminal liability and offered to exculpate the accused." That portion of the rule was amended in 2010. The new text applies to any statement "offered in a criminal case as one that tends to expose the declarant to criminal liability." FED. R. EVID. 804(b)(3) (2011). That change is not relevant here; both versions of the rule apply to Ward's statement. The 2010 amendment broadened the rule so that it applies to statements against penal interest offered by the prosecution as well as statements offered by the defense (such as Ward's confession here). *See* FED. R. EVID. 804(b)(3) advisory committee's note to 2010 amendments.

There is no dispute that Ward was unavailable because he had invoked his Fifth Amendment right against self-incrimination. There is also no dispute that Ward's confession to killing Eric Moore is a statement against his interest. The issue here is thus whether corroborating circumstances "*clearly* indicate" the trustworthiness of Ward's statement. FED. R. EVID. 804(b)(3) (emphasis added).

Rule 804(b)(3)'s standard is demanding. The requirement for clear indications of trustworthiness serves to prevent someone whose reliability cannot be tested by cross-examination (such as Ward) from exonerating a guilty party by incriminating himself. The rule thus contemplates that some out-of-court admissions of guilt will be excluded, despite their relevance, because they possess insufficient indications of trustworthiness. *See United States v. Salvador*, 820 F.2d 558, 561 (2d Cir. 1987); *United States v. Silverstein*, 732 F.2d 1338, 1346-47 (7th Cir. 1984); *MacDonald*, 688 F.2d at 233; *see also United States v. Edelin*, 996 F.2d 1238, 1241-42 (D.C. Cir. 1993).

Smith's argument that Ward's confession is "clearly" corroborated for purposes of Rule 804(b)(3) rests largely on general facts that do not directly confirm Ward's claim to have killed Eric Moore. Ward's fingerprint proves that Ward was in Moore's apartment at some point. But in his statement, Ward claimed that he was in an ongoing romantic relationship with Moore and regularly stayed with him. The fingerprint thus does not corroborate Ward's claim that he was present during the murder, much less that he committed it. Smith's other examples of corroborating evidence suffer from similar problems: Evidence tending to demonstrate that Ward knew certain things about Moore only corroborate Ward's claim that he knew Moore, not that he killed him.

Against those general facts, Smith must deal with the fact that Ward contradicted his statement multiple times. Ward made four separate statements to police regarding Eric Moore's death. In three of those four statements, Ward denied killing Moore. Moreover, the details of Ward's story vary significantly in each of the four accounts he gave, and he denied killing Moore both before and after claiming that he did. Other circuits have held that such contradictions can alone render an otherwise admissible statement untrustworthy. *See United States v. Jackson*, 540 F.3d 578, 589-90 (7th Cir. 2008); *United States v. Lumpkin*, 192 F.3d 280, 287 (2d Cir. 1999); *see also United States v. Bumpass*, 60 F.3d 1099, 1102 (4th Cir. 1995) (listing consistency of declarant's statements as a factor in assessing trustworthiness under Rule 804(b)(3)).

Under the deferential abuse of discretion standard, we cannot conclude that the district court erred in excluding Ward's statement. Rule 804(b)(3)'s requirement to show clear indications of trustworthiness is a strict one. On three separate occasions, Ward contradicted his claim to have killed Eric Moore. Under those circumstances, the general corroboration advanced by Smith was not so clear that we can say that the district court abused its discretion in excluding Ward's hearsay confession.

## XVIII.

Smith also challenges the sufficiency of the evidence supporting his conviction for the murder of Anthony Dent. We have little trouble concluding that the evidence sufficed for a rational jury to find Smith's guilt beyond a reasonable doubt. *See Jackson v. Virginia*, 443 U.S. 307, 318 (1979).

The government alleged that Smith assisted Moore and Gray in murdering Dent because Dent was delinquent in a debt to Moore. The government presented testimony from two witnesses who observed the circumstances of Dent's murder. Both witnesses saw Smith, Gray, and Moore searching Dent's block prior to the murder. The first witness testified that Moore, while in Smith's company, asked the witness where to find Dent. The first witness also noted that Smith and Gray were wearing dark clothes when the witness spoke with Moore. The second witness saw a single person in dark clothes shoot Dent, but could not see the shooter's face. The second witness also saw Smith, Gray, and Moore in the vicinity of the murder soon after the killing occurred.

The second witness also related a conversation that occurred years after the murder, when that witness had himself become a lieutenant to Gray. According to the second witness, Gray stated that Moore had agreed to pay $5,000 for Dent's murder. Gray told the witness that while Smith, Gray, and Moore searched for Dent, Smith argued with Gray over who would actually shoot Dent and receive the $5,000. Gray apparently won the argument, and, after locating Dent with Smith and Moore's help, killed Dent.

The eyewitness testimony of both witnesses placed Smith at the scene of the murder, working with his fellow murderers to locate their victim and acting as a lookout during the murder. The second witness's report of the later Gray conversation provided evidence that Smith knew the purpose of the search was to kill Dent and that Smith intended to bring about that result. That evidence is sufficient to support Smith's conviction. *Cf. United States v. Wilson*, 160 F.3d 732, 737-39 (D.C. Cir. 1998).

Smith's challenges to this evidence are unavailing. He suggests alternate explanations of the eyewitness testimony and an alternate theory of the crime, but on sufficiency of the evidence review we must view the evidence in the light most favorable to the government. *See United States v. Alexander*, 331 F.3d 116, 127 (D.C. Cir. 2003). Smith also objects that the testimony of accomplices is unreliable (both government witnesses had been drug dealers in the Moore and Gray organization), but in this Circuit accomplice testimony alone can support a conviction. *See United States v. Lee*, 506 F.2d 111, 118 (D.C. Cir. 1974). And Smith objects to the admission of the second witness's later conversation with Gray, but this court "must consider all admitted evidence — whether admitted erroneously or not — in reviewing the sufficiency of the evidence." *Alexander*, 331 F.3d at 128 (citing *Lockhart v. Nelson*, 488 U.S. 33, 39-42 (1988)).[21] We therefore reject Smith's challenge to his conviction for the murder of Anthony Dent.

---

[21] Even if we construed Smith's argument against admission of the Gray conversation as a separate argument under the Federal Rules of Evidence, that argument would fail. Under Federal Rule of Evidence 801(d)(2)(E), admissions "by a coconspirator of a party during the course and in furtherance of the conspiracy" are not hearsay. When Gray gave his account of the murder to the government witness, that witness was Gray's assistant and thus a member of the conspiracy. Contrary to Smith's argument, Smith also remained a member of the conspiracy at the time of this conversation. *See infra* Part XX (Smith's claim to have withdrawn from the conspiracy fails). And this court has held that recounting past violent acts to members of a violent gang is a statement in furtherance of the conspiracy because it provides useful information on the conspiracy's activities and motivates conspiracy members' continued participation. *See United States v. Carson*, 455 F.3d 336, 367 (D.C. Cir. 2006).

## XIX.

Somewhat as a corollary to his sufficiency of evidence challenge as regards his conviction for the murder of Anthony Dent, Smith contends that his trial counsel failed to provide constitutionally adequate assistance in electing not to call Leo Benbow as a witness. Benbow, according to Smith, witnessed Dent's murder and would have identified Clayton Thomas as the shooter.

To succeed on a Sixth Amendment claim of ineffective assistance of counsel, a defendant must show both "that counsel's performance was deficient" and "that the deficient performance prejudiced the defense." *Strickland v. Washington*, 466 U.S. 668, 687 (1984). To establish deficiency "the defendant must show that counsel's representation fell below an objective standard of reasonableness," *id.* at 688; to establish prejudice "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different,'" *id.* at 694. *See also Porter v. McCollum*, 130 S. Ct. 447, 452 (2009). This court typically remands an ineffective assistance of counsel claim raised for the first time on direct appeal to the district court for an evidentiary hearing "unless the trial record alone conclusively shows that the defendant either is or is not entitled to relief," *United States v. Shabban*, 612 F.3d 693, 698 (D.C. Cir. 2010) (citation and quotation marks omitted), and provided that the defendant has raised a "colorable claim" by making "factual allegations that, if true, would establish a violation of his sixth amendment right to counsel," *United States v. Burroughs*, 613 F.3d 233, 238 (D.C. Cir. 2010) (citation and quotation marks omitted).

There was sufficient evidence upon which the jury reasonably could find that Smith aided and abetted Gray in murdering Dent. *See supra* Part XVIII. Smith defended against this charge at trial by offering evidence, pursuant to *Winfield v. United States*, 676 A.2d 1 (D.C. 1996) (en banc); *see also United States v. Wilson*, 160 F.3d 732, 742-43 (D.C. Cir. 1998), that Thomas, a third party with whom Smith had no affiliation, committed the crime. An understanding of how that defense unfolded at trial and the context in which Smith's counsel chose not to call Benbow to testify requires some background.

During opening statements, Smith's counsel forecasted to the jury that, as to the murder of Dent, "you will find that there is an eyewitness that identified other people and not Calvin Smith as being present and involved." May 13, 2002 AM Trial Tr. at 92. As groundwork for this defense, Smith introduced expert testimony that bullets fired from a gun used in the attempted murder of Michael Taylor were "tantalizingly close to being a perfect match" to those collected following Dent's murder a day later. Nov. 12, 2002 AM Trial Tr. at 33. The expert opined that it was "likely" the bullets were fired from the same pistol. *Id.* at 34. Building on this connection between the Taylor and Dent shootings, which occurred at the same location, *see* Nov. 14, 2002 PM Trial Tr. at 124; *see also* Counts 4-5, Superseding Indict. at 104-05, Smith intended to establish, through identifications made by Taylor and Benbow, that Thomas and two others, neither of them Smith, were involved in both crimes. *See* Nov. 14, 2002 PM Trial Tr. at 76.

Before any witnesses were called as to the identifications, the prosecutor advised the district court that the government's response to Smith's third-party defense might cause a potential issue to arise under *Bruton v. United States*, 391

U.S. 123, 127-28 (1968), which held that a defendant's Sixth Amendment right to cross-examination is violated when, in a joint trial, a non-testifying defendant's out-of-court admission is introduced against a codefendant. The prosecutor explained that one of the assailants identified by both Taylor and Benbow was a tall man named Rodney, who the government believed to be charged conspiracy co-principal Rodney Moore, and therefore the prosecutor would seek the identification of all three assailants on cross-examination of Benbow and other fact witnesses. *See* Nov. 14, 2002 PM Trial Tr. at 76. Counsel for Moore appeared to agree regarding the *Bruton* problem, stating that "given [the government's] proffer . . . [t]his could really come back and bite us," but demurred when pressed by the district court to articulate the concern. *Id.* at 81-82.

The evidence concerning Taylor's identification of Thomas as one of his assailants consisted of testimony by two D.C. police officers who investigated the incident. Officer Will stated that the attempted murder occurred on "October 8 of 1990, [in the] 3100 block of 15th Place, Southeast, late evening," that he directed Detective Fluck to show photographs to Taylor for purposes of identifying the perpetrator, and that ultimately an arrest warrant was issued for Thomas. Nov. 14, 2002 PM Trial Tr. at 84. Detective Fluck, in turn, recounted visiting Taylor in the hospital to do a "photo spread," prompting the prosecutor to object to the admission of an out-of-court identification by Taylor. *See id.* at 86. Following a colloquy at the bench, the district court sustained the objection, thereby limiting the direct examination of Detective Fluck to the fact that an identification was made by Taylor, without revealing the name of the person (Thomas) identified. *See id.* at 86-89, 91. Detective Fluck testified on direct examination in accordance with the ruling.

Before cross-examination of Detective Fluck, however, the prosecutor noted that the direct examination had resulted in an "incomplete accounting of what Mr. Taylor said" to Detective Fluck insofar as "Mr. Taylor actually talked about three people being involved in the shooting." *Id.* at 97. Consequently, the prosecutor indicated his intent "to flesh out all of the identification," including the fact that a man named Rodney was involved. *Id.* at 97-98. The district court, likely mindful the prosecutor had raised the specter of a *Bruton* problem, inquired whether the prosecutor could "sanitize" the cross-examination and avoid a *Bruton* problem by "[a]sk[ing] the officer if it is true . . . that Mr. Taylor also identified other individuals." *Id.* at 98. In response, however, the prosecutor stated that he "d[idn't] think it is a Brut[]on problem, because it isn't a defendant testifying against another defendant. I think that's the Brut[]on line [of authority], essentially limited to a defendant testifying against another." *Id.* The district court directed the prosecutor to sanitize the cross-examination. *Id.* at 99. The parties and the district court then engaged in the following exchange, which is central to Smith's allegation of constitutionally inadequate counsel:

Moore's Counsel: I do just want to note a concern that even that sanitized testimony, when viewed together within the testimony of what I'm told to anticipate from — the next witness may provide — could present a very serious continuing Brut[]on type problem for us.

The Court: What is next?

Smith's Counsel: Your Honor, I'll be frank with the Court. It is not my intention to call Benbow to go into the Dent shooting.

98

*If I did, I think we would have a mistrial.*

* * *

I will tell the Court that the government is free to call Benbow. They know where he is. He's out there in the witness program. If they choose. They want to open up this can of worms, they're free to do that.

But I won't be introducing it, based on the limited ability of myself and my limited ability to go into this through these two officers. Severely hamstrung. First of all, I'm missing photographs that I can't go into with Benbow because they're not in the jacket. They're missing the photographs from [Dent] and Michael Taylor.

The Court: Look, I can't solve all the problems of the whole case here. Let's finish this witness. Do what I suggested.

*Id.* at 99-100 (emphasis added). Proceeding in this sanitized manner, the prosecutor elicited from Detective Fluck that, according to Taylor, "Thomas was one of three men who shot [Taylor]" and that "there were three men, all of whom were firing at [Taylor] at the same time." *Id.* at 101-02.

Based on the foregoing, we conclude that Smith has made a "colorable claim" that his counsel's decision not to call

Benbow to testify was constitutionally deficient, and that he was prejudiced by his counsel's conduct. *See Burroughs*, 613 F.3d at 238. First, Smith has made a plausible claim that his counsel's decision not to call Benbow to testify fell below an objective standard of reasonableness. Why Smith's counsel believed that calling Benbow would precipitate a mistrial, *see* Nov. 14, 2002 PM Trial Tr. at 99, and how the district court's evidentiary rulings or other circumstances "[s]everely hamstrung" the presentation of the third-party defense, *id.* at 100, is difficult to discern from the current record. *Bruton* applies only where, unlike here, there is an "admission of incriminating out-of-court statements made by a nontestifying *codefendant*," *United States v. Wilson*, 605 F.3d 985, 1017 (D.C. Cir. 2010) (emphasis added), which Benbow was not. Moreover, although Smith's counsel was unable to elicit Taylor's identification of Thomas on direct examination of Detective Fluck, the jury could infer this fact from the issuance of an arrest warrant for Thomas and, in any event, Thomas was ultimately identified during the prosecutor's cross-examination of Detective Fluck.

The parties' briefs discuss at length whether the government could have proved that the "Rodney" who purportedly participated in the Taylor shooting was Rodney Moore, and, if so, whether this factored into defense counsel's decision not to call Benbow. The government suggests that "[t]he possibility that Benbow would implicate Moore in one or both shootings would have prejudiced Moore, but more importantly, it would also have had a direct prejudicial impact on Smith's *own* defense," Appellee's Br. at 276, insofar as the government had introduced evidence in its case-in-chief that Moore, Gray, and Smith were searching for Dent shortly before the shooting, *see* May 21, 2002 AM Trial Tr. at 137-38. The current record, however, is inconclusive as to whether the allegations "reflect the trial counsel's informed

tactical choice or a decision undertaken out of ignorance of the relevant law." *United States v. Reeves*, 586 F.3d 20, 26 (D.C. Cir. 2009) (citation and quotation marks omitted). Similarly, Smith's assertion that his counsel erroneously believed there was a *Bruton* problem fails to find conclusive support in the current record. *See id.*

Second, the extent to which an error, if any, prejudiced Smith's third-party defense is also unclear from the current record. The lack of clarity stems in part from an inability to pin down the precise nature of Benbow's testimony. In his brief, Smith proffers that Benbow would have testified: "[I] saw three men — Smith not being one of them — kill Dent." Appellants' Br. at 275. According to Smith, Benbow's eyewitness account of the Dent murder would have changed the course of the trial in light of the weak circumstantial evidence offered against Smith, thereby implicating Thomas and fully exonerating Smith of participating in the crime. The government disagrees, maintaining that the absence of Benbow's testimony was insufficient to satisfy the second *Strickland* prong because the evidence would not have been exculpatory of Smith. Recall that Smith, Gray, and Moore were seen together near the scene of the Dent murder shortly before and after it occurred and that the government introduced evidence to establish that Smith served as a lookout from an alley for Gray, the shooter. *See supra* Part XVIII. From this, the government concludes that Benbow's account of the Dent murder does not rule out Smith's participation because Benbow would not have seen Smith hiding in the alley. This may or may not be so, depending on a number of variables.

Benbow's proffered testimony ("[I] saw three men — Smith not being one of them — kill Dent") is subject to varying interpretations. On the one hand, it may be that

Benbow saw three men simultaneously shoot at Dent, none of them Smith, and that Benbow was in a position to confirm that Smith was not standing in the alley. Smith was not completely hidden from view since Sanders was able to identify him. *See* May 21, 2002 AM Trial Tr. at 140, 142. On the other hand, in stating that three men "kill[ed] Dent," Benbow might have meant that three men participated in the murder, one of whom was the shooter and two of whom served as lookouts. Such a statement could be exculpatory of Smith depending on where the lookouts were standing and, again, if Benbow were in a position to see into the alley. The trial record does not make clear which interpretation is correct. *Compare* Nov. 14, 2002 PM Trial Tr. at 76 ("Benbow . . . identified three people being *involved* in both shootings . . . ." (emphasis added)), *with id.* at 124 ("Clayton Thomas is identified both in [Dent] and in the Michael Taylor [shootings] as being the *one* that shot." (emphasis added)), *with id.* at 125 ("Thomas is identified as *one of the three* shooters." (emphasis added)).

The current record also does not allow a conclusive determination that Benbow's testimony was immaterial or cumulative such that it defeats a colorable prejudice claim. *See United States v. Toms*, 396 F.3d 427, 434-35 (D.C. Cir. 2005). The jury heard fact testimony that Taylor identified Thomas as a person who shot at him, *see* Nov. 14, 2002 PM Trial Tr. at 101-02, and expert opinion testimony that the bullets fired at Taylor and Dent were "tantalizingly close to being a perfect match," Nov. 12, 2002 AM Trial Tr. at 33. Benbow would have provided corroboration for Smith's third-party defense insofar as he witnessed Thomas shoot Dent, thereby strengthening the connection between Thomas and the two shootings. This evidence would not have been cumulative. It is conceivable that Smith could have pursued his defense based solely on Taylor's identification of Thomas

in the first shooting and the similarity in the bullet markings between the shootings, but there was no other evidence in the record linking Thomas directly to Dent's murder. *See Sussman v. Jenkins*, 636 F.3d 329, 358-59 (7th Cir. 2011). Notably, Benbow would have provided the only eyewitness identification of the shooter at the scene. *See Harrison v. Quarterman*, 496 F.3d 419, 428 (5th Cir. 2007). *But cf. United States v. McNeil*, 911 F.2d 768, 774 (D.C. Cir. 1990). Without Benbow's eyewitness account of the Dent murder and identification of Thomas, the jury was left to infer from Smith's evidence that Thomas shot Dent and to weigh this inference against the testimony of government witnesses that Gray, with Smith's assistance, committed the murder and later claimed credit for it.

The government's theory at trial was that Gray murdered Dent while Smith served as a lookout. Smith's defense was that Thomas and his cohort murdered Dent. No evidence linked the two groups; there was only the government's conjecture that one of Thomas's accomplices, identified as "Rodney," was in fact Rodney Moore. There is a "colorable" argument that Benbow's testimony would not have precipitated a mistrial or hampered Smith's defense, yet would have significantly altered the balance of evidence, tipping the scales in Smith's favor. *See Porter*, 130 S. Ct. at 455-56; *Strickland*, 466 U.S. at 693-94. Accordingly, because the current record does not conclusively resolve Smith's claim, we remand Smith's "colorable claim" of ineffective assistance of counsel under the Sixth Amendment to the district court so that it may hold an evidentiary hearing and address this claim in the first instance.

## XX.

In its instructions to the jury prior to deliberation, the district court explained: "If you find that the evidence at trial did not prove the existence of the narcotics conspiracy at a point in time continuing in existence within five years before . . . May 5th, 2000 for defendant Calvin Smith . . . you must find the defendant[] not guilty of Count One." Dec. 9, 2002 AM Trial Tr. at 104-05. After deliberating for nearly 12 days, the jury asked the court: "If we find that the Narcotics or RICO conspiracies continued after the relevant date under the statute of limitations, but that a particular defendant left the conspiracy before the relevant date under the statute of limitations, must we find that defendant not guilty?" Over appellants' objections, the district court told the jury that "[o]nce the Government has proven that a defendant was a member of a conspiracy, the burden is on the defendant to prove withdrawal from a conspiracy by a preponderance of the evidence."

Smith contends that the district court erred in instructing the jury that he rather than the government bore the burden of persuasion to show that he had withdrawn from the conspiracy. He believes that, because he met his burden of production to show that he withdrew from the charged conspiracy prior to the relevant statute of limitations period, due process required the government to prove beyond a reasonable doubt that he was a member of the conspiracy during the relevant period.

In a criminal trial due process requires the government to prove beyond a reasonable doubt all elements of the offense. *In re Winship*, 397 U.S. 358 (1970); *see also Dixon v. United States*, 548 U.S. 1 (2006); *Patterson v. New York*, 432 U.S. 197 (1977); *Mullaney v. Wilbur*, 421 U.S. 684 (1975). As a

consequence, when a defendant raises (by meeting his burden of production) a defense that negates an element of the charged offense, the government bears the burden of persuasion to disprove the defense. *See Dixon*, 548 U.S. at 11 ("We require[] the Government to prove the defendant's sanity beyond a reasonable doubt because the evidence that tended to prove insanity also tended to disprove an essential element of the offense charged." (citing *Davis v. United States*, 165 U.S. 373, 378 (1897))).

Conspiracy is a crime that presumes continuity until accomplishment or termination; once a defendant becomes a member of a conspiracy, he remains a member until he affirmatively withdraws or the conspiracy ends. *Hyde v. United States*, 225 U.S. 347, 368-70 (1912). Therefore, once the government proves that a defendant was a member of an ongoing conspiracy, it has proven the defendant's continuous membership in that conspiracy unless and until the defendant withdraws. The question here then is whether withdrawing from a conspiracy prior to the statute of limitations period negates an element of the conspiracy such that the government must prove that the defendant did not so withdraw.

Our sister circuits have differed on this issue. While some have said that the burden of proving withdrawal always rests on the defendant, *see, e.g.*, *United States v. Eppolito*, 543 F.3d 25, 49 (2d Cir. 2008); *United States v. Arias*, 431 F.3d 1327, 1340 (11th Cir. 2005); *United States v. Brown*, 332 F.3d 363, 374 (6th Cir. 2003); *United States v. Hughes*, 191 F.3d 1317, 1322 (10th Cir. 1999); *United States v. Pettigrew*, 77 F.3d 1500, 1514 (5th Cir. 1996), others have held that, once the defendant meets his burden of production that he has withdrawn prior to the relevant limitations period, the burden of persuasion shifts to the government, *see, e.g.*, *United States*

*v. Read*, 658 F.2d 1225, 1232-33 (7th Cir. 1981); *United States v. Antar*, 53 F.3d 568, 582-83 (3d Cir. 1995), *abrogated on other grounds by Smith v. Berg*, 247 F.3d 532 (3d. Cir. 2001); *United States v. Lothian*, 976 F.2d 1257, 1261-62 (9th Cir. 1992); *United States v. West*, 877 F.2d 281, 289 (4th Cir. 1989); *United States v. Dyer*, 821 F.2d 35, 39 (1st Cir. 1987).

Our circuit, however, does not write on a blank slate. We previously have said unequivocally, albeit in the context of sentencing, that the defendant, not the government, "has the burden of proving that he affirmatively withdrew from the conspiracy if he wishes to benefit from his claimed lack of involvement." *United States v. Thomas*, 114 F.3d 228, 268 (D.C. Cir. 1997); *see also United States v. Mitchell*, 49 F.3d 769, 784 (D.C. Cir. 1995); *United States v. Dale*, 991 F.2d 819, 854 (D.C. Cir. 1993). We are obliged to follow our precedent, and we thus hold that the district court correctly instructed the jury that the defendant bore the burden of persuasion to show that he withdrew from the conspiracy outside of the statute of limitations period.

## XXI.

Smith and Raynor were convicted of killing in furtherance of a continuing criminal enterprise, 21 U.S.C. § 848(e)(1)(A) (2000), murder in aid of racketeering, 18 U.S.C. § 1959, and first-degree murder under D.C. Code § 22-2401 (1981) (current version at D.C. Code § 22-2101). *See also* 18 U.S.C. § 2 (aiding and abetting); D.C. Code § 22-105 (1981) (current version at D.C. Code § 22-1805) (same). The murders were committed by other members of the charged conspiracy, with Smith or Raynor participating. With regard to the principles of liability, the district court instructed the jury that "[a]n aider and abettor is legally responsible for the acts of other

persons that are the *natural and probable consequences* of the crime in which he intentionally participates."  Dec. 9, 2002 AM Trial Tr. at 95 (emphasis added).

Smith and Raynor challenge their federal and D.C. murder convictions on the ground that the "natural and probable consequences" formulation of the aiding and abetting instruction permitted the jury to render a guilty verdict without requiring the government to prove beyond a reasonable doubt that Smith and Raynor acted with the requisite specific intent to kill.  Because they did not raise this objection in the district court, our review is for plain error.  *See United States v. Wilson*, 605 F.3d 985, 1020 (D.C. Cir. 2010).  To prevail Smith and Raynor must therefore identify a legal error that was "plain," meaning "clear" or "obvious," and demonstrate that such error affected substantial rights and "seriously affect[ed] the fairness, integrity or public reputation of judicial proceedings."  *United States v. Olano*, 507 U.S. 725, 732-37 (1993) (citation and quotation marks omitted).  "[W]here the law at the time of trial was settled and clearly contrary to the law at the time of appeal . . . [,] it is enough that an error be 'plain' at the time of appellate consideration."  *Johnson v. United States*, 520 U.S. 461, 468 (1997).

For the following reasons we conclude that even assuming error by the district court in using the "natural and probable consequences" instruction for the aiding and abetting charges, given the forfeiture of an argument by Smith and Raynor, the error was not prejudicial in view of the district court's instruction on co-conspirator liability for acts reasonably foreseen as a necessary or natural consequence of the unlawful agreement.  *See Pinkerton v. United States*, 328 U.S. 640, 645-48 (1946).

With respect to the first-degree murder convictions under the D.C. Code, *Wilson-Bey v. United States*, 903 A.2d 818 (D.C. 2006) (en banc), controls. There, the D.C. Court of Appeals reversed a conviction for first-degree premeditated murder while armed, in violation of D.C. Code § 22-2401, because the "natural and probable consequences" aiding and abetting instruction "omitted the *mens rea* element of the offense charged," namely "premeditation, deliberation, and intent to kill." *Id.* at 822. The court rejected the "natural and probable consequences" formulation because its use was at odds with the longstanding requirement that an accomplice "knowingly associate[] herself with the commission of the crime, that she participate[] in the crime as something she wished to bring about, and that she intended by her actions to make it succeed." *Id.* at 835. To hold otherwise, the court reasoned, "would permit liability to be predicated upon negligence even when the crime involved requires a different state of mind," *id.* at 837, and eviscerate the distinction between traditional first-degree murder and the unique foreseeability test of felony murder, *see id.* at 838-39. The government concedes as regards Smith's and Raynor's first-degree murder convictions under the D.C. Code that the district court's use of the "necessary and probable consequences" instruction was plain error. *See Perez v. United States*, 968 A.2d 39, 93 (D.C. 2009).

With regard to the CCE and RICO murder convictions under the U.S. Code, this court in reversing the aiding and abetting conviction in *United States v. Wilson*, 160 F.3d 732 (D.C. Cir. 1998), held that aiding and abetting liability requires proof of some shared intent by the aider and abettor with that of the principal actor. There, the jury convicted Ralph and Louis Wilson of a conspiracy to kill a witness named Leroy Copeland, killing a witness with intent to prevent him from testifying, both in violation of the U.S.

Code, and first-degree murder while armed in violation of the D.C. Code.  In addition, the jury found Marcellus Judd guilty of these crimes as an aider and abettor for his role in informing the Wilsons that Copeland could be found nearby. An aiding and abetting conviction required proof that Judd had: "(1) the specific intent to facilitate the commission of a crime by another; (2) guilty knowledge (3) that the other was committing an offense; and (4) assisting or participating in the commission of the offense."  *United States v. Gaviria*, 116 F.3d 1498, 1535 (D.C. Cir. 1997).  In concluding that there was insufficient evidence to convict Judd as an aider and abettor, this court reasoned:

> To prove aiding and abetting the government must show that Judd shared some intent with the Wilson brothers and took some affirmative action to assist them in carrying out their plan to kill Copeland.  *See Gaviria*, 116 F.3d at 1535.  Although the intent of the aider and abettor need not be identical to that of the principal, *see United States v. Walker*, 99 F.3d 439, 442 (D.C. Cir. 1996), the government still was required to show that Judd had sufficient knowledge and participation to allow a reasonable juror to infer that he "knowingly and willfully participated in the offense in a manner that indicated he intended to make it succeed."  *Teffera*, 985 F.2d at 1086 (quoting *United States v. Raper*, 676 F.2d 841, 849 (D.C. Cir. 1982)).

*Wilson*, 160 F.3d at 738.  Evidence that Judd knew the Wilsons were looking for Copeland was insufficient to show that he knew the Wilsons were intending to kill Copeland and that he had decided to assist them in that enterprise. *See id*.

The shared-intent standard for aiding and abetting in a conspiracy case is at odds with the "natural and probable

consequences formulation" of the aiding and abetting instruction insofar as the jury may substitute a foreseeability test for the *mens rea* requirement. Such use of the "natural and probable consequences" formulation functionally transforms aiding and abetting liability into conspiratorial liability, when the Supreme Court has recognized the two are distinct. *Nye & Nissen v. United States*, 336 U.S. 613, 620 (1949) ("Aiding and abetting has a broader application. It makes a defendant a principal when he consciously shares in any criminal act whether or not there is a conspiracy."); *see id.* at 630 (Murphy, J., dissenting) (the former involving "real participation" and the latter "more remote plotting"); *accord Wilson-Bey*, 903 A.2d at 839-42. Appellants contend that the district court erred in instructing the jury with respect to the federal murder charges that "[a]n aider and abettor is legally responsible for the acts of other persons that are the natural and probable consequences of the crime in which he intentionally participates." Dec. 9, 2002 AM Trial Tr. at 95. Although the above-referenced quote from *Wilson* might tend in appellants' direction, we note that the Supreme Court in 2007 cited *United States v. Walker*, 99 F.3d 439, 443 (D.C. Cir. 1996), in listing states and circuits that continue to apply the "'natural and probable consequences' doctrine." *Gonzales v. Duenas-Alvarez*, 549 U.S. 183, 190-91, 197 (2007). Although the instructional issue was not raised in *Walker*, this court described the "natural and probable consequences" instruction with approval. *See* 99 F.3d at 443 (citing *United States v. Sampol*, 636 F.2d 621, 676 (D.C. Cir. 1980)). Fortunately, we need not resolve any actual or apparent conflict between *Walker* and *Wilson* in order to decide the present issue, because the plain error standard of review applies. We can hardly say the district court plainly erred by following the same construction of precedent as the Supreme Court. We further note that Smith and Raynor fail to show how any such error "seriously affect[ed] the fairness, integrity

or public reputation of judicial proceedings." *Olano*, 507 U.S. at 732 (citation and quotation marks omitted). This is because the district court's co-conspirator liability instruction cured any prejudice.

As a threshold matter, Smith and Raynor cursorily contend that their murder convictions may not be sustained under this alternative theory of liability because it is impossible to know whether the jury arrived at its verdict by following the district court's aiding and abetting instruction or its *Pinkerton* instruction. They provide no citation for this argument, *see* Appellants' Br. at 303 n.167, and it is mentioned only in a footnote. Hence the argument is forfeited. *See Bush v. District of Columbia*, 595 F.3d 384, 388 (D.C. Cir. 2010) (citing FED. R. APP. P. 28(a)(9)(A)); *Am. Wildlands v. Kempthorne*, 530 F.3d 991, 1001 (D.C. Cir. 2008).[22]

---

[22] We note, however, that the Supreme Court held in *Yates v. United States*, 354 U.S. 298, 312 (1957), that "the proper rule to be applied is that which requires a verdict to be set aside in cases where the verdict is supportable on one ground, but not on another, and it is impossible to tell which ground the jury selected." The Court narrowed this holding in *Griffin v. United States*, 502 U.S. 46, 59 (1991), to situations in which one of the grounds upon which the jury could have reached its verdict was legally, as opposed to factually, inadequate. *See United States v. Johnson*, 216 F.3d 1162, 1165 n.2 (D.C. Cir. 2000). Although the prejudice inquiry might normally be cut short by application of the *Yates* rule where, as here, the challenge is to the legality of the aiding and abetting instruction, this court has suggested that review under the plain error standard, as opposed to the harmless error standard, in a *Yates* case "would significantly affect the way in which [the court] analyze[s] [the] appeal" to the extent there is overwhelming evidence to support the conviction under the proper jury instruction,

The D.C. Court of Appeals' post-*Wilson-Bey* decisions in *Wheeler v. United States*, 977 A.2d 973 (D.C. 2009), and *Neal v. United States*, 940 A.2d 101 (D.C. 2007), are instructive. In both cases, the court held that, despite an erroneous aiding and abetting instruction, a *Pinkerton* instruction preserved the convictions for a given crime because the jury, having convicted the aider and abettor of a charged conspiracy, could have found that the crime was foreseeable and committed in furtherance of the charged conspiracy. Smith and Raynor correctly respond that *Wheeler* concerned a conspiracy to commit a single overt act of murder, and the jury necessarily found that Wheeler acted with the specific intent to kill in convicting him of conspiracy to commit murder. 977 A.2d at 984. Here, by contrast, the conspiracy count contains 236 overt acts and such a conclusion cannot be drawn. But their argument misunderstands the relationship between the two

---

but had no occasion to decide which was the appropriate standard. *United States v. Perkins*, 161 F.3d 66, 73-74 (D.C. Cir. 1998). Other circuits have held that *Yates* does not apply under the plain error standard because the burden of establishing harm is on the defendant. *See United States v. Hastings*, 134 F.3d 235, 242-44 (4th Cir. 1998); *see also United States v. Colvin*, 353 F.3d 569, 576-77 (7th Cir. 2003).

Here, for two reasons, we will assume without deciding that under plain error review *Yates* does not require Smith's and Raynor's murder convictions to be set aside even though we do not know whether the jury convicted for aiding and abetting or under *Pinkerton*. First, Smith and Raynor have forfeited the argument by citing no authority and by raising it in a footnote. *See Bush*, 595 F.3d at 388; *Am. Wildlands*, 530 F.3d at 1001. Second, Smith and Raynor shoulder the burden of demonstrating that instructional error prejudiced their defense under the plain error standard, *see* Appellants' Br. at 302, a position their counsel reiterated during oral argument, *see* Oral Arg. Tr. at 80.

types of liability and conflates the two alternative approaches taken in *Wheeler*. *See id.* It is true that a conviction for conspiracy based on hundreds of possible overt acts does not permit the inference that the jury found the overt act murders to have been committed with the requisite intent. Such proof, however, is not required under the *Pinkerton* theory of liability. As the D.C. Court of Appeals explained in *Wheeler*:

> Under *Pinkerton* . . . the intent necessary for conviction of murder as an aider and abettor under *Wilson-Bey* yields to virtually the same state of mind — the lesser foreseeability or natural and probable consequences standard — found erroneous in the court's aiding-and-abetting instruction. In short, a conspiracy — an agreement not necessarily present among aiders and abettors — is deemed a *substitute* for the particular state of mind required for convicting a nonconspiratorial accomplice of murder under *Wilson-Bey*. A jury finding that Wheeler had the state of mind required for conviction of first-degree murder was therefore not necessary for conviction under the *Pinkerton* theory.

*Id.* at 985 (emphasis added); *accord United States v. Vazquez-Castro*, 640 F.3d 19, 24 (1st Cir. 2011). *Pinkerton* co-conspirator liability exists, moreover, even where the substantive offense is not an overt act alleged in the indictment. *See United States v. Washington*, 106 F.3d 983, 1011 (D.C. Cir. 1997). It requires only that the substantive offense be committed in furtherance of the conspiracy and reasonably foreseeable as a necessary or natural consequence of the unlawful agreement. *See id.* at 1012. This is the relevant analysis here.

There was ample evidence for the jury reasonably to find that the murders for which Smith and Raynor were convicted were foreseeable and in furtherance of the charged conspiracy. Smith and Raynor's attempt to show otherwise is unpersuasive; they summarize the facts of each murder and claim either there was insufficient admissible evidence to support the murder conviction or there is no evidence establishing the murders were related to the conspiracy's dealings. As regards the former, those contentions are discussed and rejected elsewhere. *See supra* Part XVIII. As regards the latter, the superseding indictment and evidence at trial make clear that one of the principal goals of the drug conspiracy was killing to enhance the conspiracy's power, protect the reputation of the conspiracy and its members, and collect money owed to the conspiracy. *See* Superseding Indict. at 4-5. It was reasonable for the jury to find that each of the murders furthered one (if not more) of these goals. *See United States v. Carson*, 455 F.3d 336, 376 (D.C. Cir. 2006).

Accordingly, any error regarding the "natural and probable consequences" instruction did not "seriously affect[] the fairness, integrity or public reputation of judicial proceedings," *Olano*, 507 U.S. at 732 (citation and quotation marks omitted), because the evidence supports the jury's verdict on Smith's and Raynor's CCE, RICO, and first-degree murder convictions under the alternative *Pinkerton* theory of liability.

## XXII.

Following the government's proposal to try appellants together—in a trial separate from and prior to other charged co-conspirators—Nunn and Handy moved for severance of their trials from that of their codefendants. In a memorandum opinion, the district court denied Nunn's and Handy's

motions, adopting the government's proposal to try all appellants in a single trial. *United States v. Gray*, 173 F. Supp. 2d 1 (D.D.C. 2001). Nunn and Handy argue on two bases that the district court erred by refusing to sever their trials. First, they argue that their codefendants were charged with more numerous and serious crimes, the evidence of which could have a "spillover" effect, akin to guilt-by-association, that would prejudice the jury against them. Second, they maintain that they should not have been forced to be tried alongside Moore and Gray, who were facing the death penalty, because it caused them prejudice to be tried by a death-qualified jury.

Rule 14(a) of the Federal Rules of Criminal Procedure provides that "[i]f the joinder of offenses or defendants in an indictment, an information, or a consolidation for trial appears to prejudice a defendant or the government, the court may order separate trials of counts, sever the defendants' trials, or provide any other relief that justice requires." As is clear from the text of the rule, district courts have significant flexibility to determine how to remedy any potential risk of prejudice posed by the joinder of multiple defendants in a single trial. *See United States v. Lane*, 474 U.S. 438, 449 n.12 (1986). Thus "Rule 14 does not require severance even if prejudice is shown," *Zafiro v. United States*, 506 U.S. 534, 538-39 (1993), and in many circumstances district courts may order lesser forms of relief to cure any prejudice. Indeed, although a district court may grant a severance in a wider array of circumstances, the Supreme Court has held that "a district court should grant a severance under Rule 14 only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." *Id.* at 539. The Court has further explained that even "[w]hen the risk of prejudice is high, . . . less drastic measures, such as

limiting instructions, often will suffice to cure any risk of prejudice." *Id.*

We review the district court's decision not to sever the trials of defendants under Rule 14(a) only for abuse of discretion. *Id.* at 541; *United States v. Brown*, 16 F.3d 423, 426-27 (D.C. Cir. 1994). In reviewing the exercise of the district court's discretion, we keep in mind that "'[t]he balance has been struck in favor of joint trials.'" *United States v. Hines*, 455 F.2d 1317, 1334 (D.C. Cir. 1972) (alterations in original) (quoting *United States v. Krechevsky*, 291 F. Supp. 290, 294 (D. Conn. 1967)). We hold that the district court did not abuse its discretion when it declined to sever the trials of Handy and Nunn from that of the other appellants.

We turn first to the question of "spillover" prejudice: Acknowledging that it may prejudice a defendant to be tried together with another defendant accused of more serious or more numerous crimes, we have held that "severance is required when the evidence against one defendant is 'far more damaging' than the evidence against the moving party." *United States v. Bruner*, 657 F.2d 1278, 1290 (D.C. Cir. 1981) (quoting *United States v. Mardian*, 546 F.2d 973, 977 (D.C. Cir. 1976) (en banc)). However, "[a]bsent a *dramatic* disparity of evidence, any prejudice caused by joinder is best dealt with by instructions to the jury to give individual consideration to each defendant." *United States v. Slade*, 627 F.2d 293, 309 (D.C. Cir. 1980) (emphasis added). In other words, some disparity in evidence does not compel severance; rather, when there is "substantial and independent evidence of each [defendant's] significant involvement in the conspiracy," severance is not required. *United States v. Tarantino*, 846 F.2d 1384, 1399 (D.C. Cir. 1988); *see also Slade*, 627 F.2d at 310 (finding severance not required despite disparity in

evidence because evidence against defendant was "independent and substantial").

In this case, although Handy and Nunn were alleged to have committed fewer crimes and arguably had a less extensive role in the charged conspiracy than the other defendants tried with them, the disparity of evidence did not rise to a level necessary to mandate severance. The government presented substantial and independent evidence of Handy's and Nunn's involvement in the charged conspiracy and crimes in furtherance thereof. Furthermore, the district court gave the following instruction to the jury:

> Unless I have instructed you otherwise, you should consider each instruction that the Court has given you to apply separately and individually to each defendant on trial. Likewise, you should give separate consideration and render separate verdicts with respect to each defendant. Each defendant is entitled to have his guilt or innocence of the crime for which he is on trial determined from his own conduct and from the evidence that applies to him as if he were being tried alone. The guilt or innocence of any one defendant should not control or influence your verdict as to the other defendants. You may find any one or more of the defendants guilty or not guilty.

Dec. 9, 2002 AM Trial Tr. at 90.

Although we do not ignore the possibility that some "spillover" prejudice may have resulted to Handy and Nunn from being tried together with their codefendants, the district court's jury instructions, by explaining that each defendant's guilt should be considered individually based upon the

evidence that pertained to him, were sufficient to cure any such prejudice.

Furthermore, Handy and Nunn were not entitled to severance merely because their guilt was adjudicated by a death-qualified jury. Facing a death-qualified jury did not "compromise a specific trial right" of Handy or Nunn. *Zafiro*, 506 U.S. at 539. Indeed, in *Buchanan v. Kentucky*, the Supreme Court made clear that trial before a death-qualified jury does not violate the constitutional rights of a noncapital defendant. 483 U.S. 402, 414-20 (1987). Neither did the death-qualification of the jury "prevent the jury from making a reliable judgment about guilt or innocence." *Zafiro*, 506 U.S. at 539. Implicit in the holding of *Buchanan* is the recognition that a death-qualified jury, no less than any other jury, is able to make a reliable judgment concerning guilt or innocence. To the extent appellants ask us to find that severance was required based only upon their allegation that death-qualified juries are more likely to convict than other juries, we may easily dispense with this argument as well. As the Supreme Court has explained, "defendants are not entitled to severance merely because they may have a better chance of acquittal in separate trials." *Id.* at 540. The district court acted within the appropriate bounds of its discretion in declining to sever Handy's and Nunn's trials from that of their codefendants.

## XXIII.

Next Handy contends that the district court erred in denying his motions for a new trial. Our review is for abuse of discretion unless the issue presented on appeal is purely legal, in which event our review is *de novo*. *See United States v. Oruche*, 484 F.3d 590, 595 (D.C. Cir. 2007).

Handy filed his first motion for a new trial following his conviction for participating in drug and RICO conspiracies and several other crimes involving narcotics, murder, obstruction of justice, and the use of firearms. *See* Jan. 9, 2003 AM Trial Tr. at 55-59. He argued there was insufficient evidence of his guilt and that the district court erred in making various evidentiary rulings and in instructing the jury. The district court denied the motion, finding that there was sufficient evidence for a reasonable jury to conclude that Handy was a "hitman" for the conspiracy, which he joined in the mid-1990s, and rejecting his other claims of error. *See United States v. Gray*, 292 F. Supp. 2d 71, 90-91 (D.D.C. 2003). Handy filed his second motion for a new trial during the pendency of the subsequent, separate trial of other alleged co-conspirators. This time he argued that the government had unconstitutionally withheld exculpatory and impeachment evidence, in violation of *Brady v. Maryland*, 373 U.S. 83 (1963), and its progeny. The district court denied the motion, ruling that "the evidence is not at all exculpatory or impeaching" and "the withholding of the evidence did not prejudice Handy." *United States v. Handy*, No. 00-157, at 3-4 (D.D.C. Mar. 4, 2005).

On appeal, Handy raises only some of the arguments he made in his motions; only the sufficiency of evidence claims relating to Handy's entry into the conspiracy and the murders of Richard Simmons and Demetrius Green, and the *Brady* claim relating to the pretrial statements of Cheryl Pinkard, are properly presented. The remaining arguments (including those relating to Scorpio Phillips) are forfeited because Handy has presented unsupported narratives lacking citation to the record and relevant authority. *See Bush v. Dist. of Columbia*, 595 F.3d 384, 388 (D.C. Cir. 2010); *United States v. Hall*, 370 F.3d 1204, 1209 n.4 (D.C. Cir. 2004).

## A.

Handy's arguments regarding the sufficiency of evidence are unpersuasive. Handy maintains there was a fatal variance between the superseding indictment and the government's proof at trial regarding his entry into the conspiracy because none of the cooperating co-conspirators testified that Handy had agreed with them or with Gray or Moore to join the charged conspiracy in the mid-1990s or thereafter. Such direct evidence of agreement is not required, however; the jury may infer conspiratorial agreement from the circumstances and the defendant's knowledge. *See United States v. Childress*, 58 F.3d 693, 710 (D.C. Cir. 1995). The cooperating co-conspirators provided ample testimony upon which the jury reasonably could infer Handy's knowledge of, and agreement to join, the drug conspiracy in the mid-1990s, and as early as 1994. *See, e.g.*, May 21, 2002 AM Trial Tr. at 33-34; July 9, 2002 AM Trial Tr. at 53-54. For example, Maurice Andrews testified that Handy was a participant in a drug operation located in the Northeast quadrant of Washington, D.C., which Moore and Gray actively managed in 1995-1996. *See* July 9, 2002 PM Trial Tr. at 82-83; *supra* Part VII. Further, the continuity of Handy's participation through 1998-1999, *see* July 10, 2002 PM Trial Tr. at 71, undermines his contention that the evidence demonstrated at best a buyer-seller relationship, rather than membership in the conspiracy. *See United States v. Thomas*, 114 F.3d 228, 241 (D.C. Cir. 1997); *Childress*, 58 F.3d at 714.

With respect to the Richard Simmons murder, the superseding indictment did not inconsistently charge Handy with committing the murder in July 1997 to gain entrance to the conspiratorial enterprise while also alleging that he joined the charged conspiracy in the mid-1990s. An indictment may charge alternative means of committing a crime. *See United*

*States v. Coughlin*, 610 F.3d 89, 106-07 & n.10 (D.C. Cir. 2010). The superseding indictment, tracking the text of the RICO violent crimes statute, charged Handy with murdering Simmons for the alternative reasons listed in the statute — "as consideration for the receipt of, or as consideration for a promise or agreement to pay, anything of pecuniary value . . . or for the purpose of gaining entrance to or maintaining or increasing position in an enterprise engaged in racketeering activity." 18 U.S.C. § 1959(a); *see also* Count 60, Superseding Indict. at 134. The jury reasonably could have found from the evidence that Handy committed the murder in exchange for money, *see* Oct. 16, 2002 AM Trial Tr. at 130-34, or to maintain his status as an enforcer, *see* July 9, 2002 AM Trial Tr. at 54; *see also United States v. Carson*, 455 F.3d 336, 370 (D.C. Cir. 2006).[23]

It also was well within reason for the jury to find that Demetrius Green's murder was a consequence of a territorial drug dispute associated with the charged conspiracy. Green was selling marijuana for James Penn, who controlled a stretch of houses at the top of a hill on Forrester Street Southwest, less than a quarter mile from the Southeast border. Handy, accompanied by another man identified in the superseding indictment as Taron Oliver, was also selling marijuana down the hill nearer to the Southeast quadrant of Washington, D.C., not too far from Green. Penn understood Handy and Oliver to be associated with Erskine Hartwell, *see* Sept. 24, 2002 PM Trial Tr. at 19, all of whom were members of Moore and Gray's drug operation in Northeast, *see* July 9, 2002 PM Trial Tr. at 82; Aug. 26, 2002 PM Trial Tr. at 113-

---

[23] There is no claim that the jury lacked unanimity as to the ground for conviction. *See United States v. North*, 910 F.2d 843, 876 (D.C. Cir. 1990).

16. Because Handy was, in Penn's words, "stepping on [Green's] toes" by taking sales away, Penn walked down the hill to "holler at [Handy]" to "slow down" and not make so many sales. Sept. 24, 2002 PM Trial Tr. at 23, 25-26. Following the verbal warning, which was essentially ignored, Penn retreated up the hill to get his guns. Penn testified that he took action because Handy "didn't have no business right there" and that Handy's selling marijuana on that section of Forrester Street was considered to be "some sort of violation." *Id.* at 26. By the time he retrieved his guns, Penn testified, "somebody had ran in and said they had shot [Green]." *Id.* at 28. Oscar Veal testified that Handy later claimed credit for murdering Green. *See* Aug. 27, 2002 PM Trial Tr. at 18. Eliminating rival competitors furthered the charged conspiracy by strengthening its presence in the D.C. drug trade. *See United States v. Walker*, 142 F.3d 103, 114 (2d Cir. 1998).

**B.**

More colorable is Handy's contention that the government failed to fulfill its obligations under *Brady*, 373 U.S. 83, by not disclosing exculpatory and impeachment evidence from Cheryl Pinkard, an eyewitness to Richard Simmons's murder. The government's key evidence against Handy was an eyewitness account of the murder by the victim's mother, Margarita Simmons. Ms. Simmons testified at trial that just prior to the murder she was standing by Richard as he used a street pay phone. She watched as Handy ran down H Street, Northeast, from the 12th Street side, drew a gun, and fired at Richard. Ms. Simmons grabbed Richard briefly before he ran away from Handy toward the corner of 11th Street and H Street. Richard collapsed at that intersection and Handy, standing over him, shot Richard several times. *See* Aug. 19, 2002 AM Trial Tr. at 9-14. Handy contends that an FBI 302

interview report[24] and the grand jury testimony of Pinkard, Richard's girlfriend, were exculpatory and subject to disclosure under *Brady* because they could have been used to impeach Ms. Simmons's testimony. *See Giglio v. United States*, 405 U.S. 150, 153-54 (1972). In Handy's view, the report and grand jury testimony show that Pinkard did not see Ms. Simmons standing with Richard at the pay phone and therefore Ms. Simmons was not an eyewitness to the murder. The government responds that there was nothing exculpatory about the report or Pinkard's grand jury testimony, and because they were not "material" disclosure was not required under *Brady*.

Under *Brady*, the government has a constitutional obligation to disclose "evidence favorable to an accused that is material to guilt or to punishment." *Cone v. Bell*, 129 S. Ct. 1769, 1772 (2009); *see also Oruche*, 484 F.3d at 596. To show a *Brady* violation, the defendant must establish that the evidence or information is favorable to him, either because it is exculpatory or impeaching; that the evidence was suppressed by the government, either willfully or inadvertently; and that he was prejudiced by the nondisclosure. *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999); *see also United States v. Bailey*, 622 F.3d 1, 8 (D.C. Cir. 2010). Prejudice exists when the undisclosed evidence or information is "material," meaning "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Bagley*, 473 U.S. 667, 682 (1985); *see also United States v. Pettiford*, 627 F.3d 1223, 1227 (D.C.

---

[24] FBI 302 reports "are the formal typewritten interview reports prepared from the rough [interview] notes and recorded on Form FD-302." *United States v. Harrison*, 524 F.2d 421, 424 n.2 (D.C. Cir. 1975).

Cir. 2010). The district court's findings of fact, including determinations of credibility at trial and in post-trial proceedings, are reviewed for abuse of discretion, "[b]ut once the existence and content of undisclosed evidence has been established, the assessment of the materiality of evidence under *Brady* is a question of law," which this court reviews *de novo*. *Oruche*, 484 F.3d at 595.

In making an initial determination about whether evidence or information is "material" and therefore subject to disclosure under *Brady*, *see United States v. Williams-Davis*, 90 F.3d 490, 514 (D.C. Cir. 1996), the prosecutor is afforded "a degree of discretion" bound by "a corresponding burden" (inasmuch as the prosecution "alone can know what is undisclosed") of "gaug[ing] the likely net effect of all such evidence and mak[ing] disclosure when the point of 'reasonable probability' is reached," *Kyles v. Whitley*, 514 U.S. 419, 437 (1995). The Supreme Court has instructed that "the prudent prosecutor will resolve doubtful questions in favor of disclosure." *United States v. Agurs*, 427 U.S. 97, 108 (1976); *see Kyles*, 514 U.S. at 439. This is particularly true where the defendant brings the existence of what he believes to be exculpatory or impeaching evidence or information to the attention of the prosecutor and the district court, in contrast to a general request for *Brady* material. *See Pennsylvania v. Ritchie*, 480 U.S. 39, 59 (1987).

Here, a prudent prosecutor would have disclosed at least Pinkard's grand jury testimony. Handy filed multiple requests for discovery, each of which sought *Brady* material related to the Simmons murder. Although Pinkard was not mentioned by name, Handy specifically sought, "[i]n reference to the Richard Simmons homicide, . . . any and all documents." Def. Timothy Handy's First Mot. to Compel Disc. app. 2, at 5 (Sept. 13, 2001). In subsequent

correspondence with the government, Handy asked for "all documents pertaining to statements of non-testifying witnesses" and "*Brady* evidence and information regarding the murder of Mr. Richard Simmons," including "information that may impeach the witnesses against Mr. Handy." *Id.* app. 3, at 3. Although the Supreme Court has rejected the notion that *Brady* created a right of open file discovery for criminal defendants, *see Kyles*, 514 U.S. at 437; *Ritchie*, 480 U.S. at 59, given Handy's repeated requests and the centrality of eyewitness testimony to the government's case against him concerning the Simmons murder, *cf. Kyles*, 514 U.S. at 441-44, the prosecutor should have recognized that Pinkard's eyewitness account raised at the least a "doubtful question[]" favoring disclosure under *Brady*, *see Agurs*, 427 U.S. at 108.

The government's suggestion on appeal that Handy's *Brady* claim is foreclosed by his knowledge at the time of trial is not well taken. It noted that Handy knew Pinkard had witnessed the shooting and cross-examined Ms. Simmons without Pinkard's grand jury testimony. Although "the right of the defendant to disclosure by the prosecutor is deemed waived if defense counsel with actual knowledge of the . . . information chooses not to present such information to the jury," *United States v. Iverson*, 648 F.2d 737, 739 (D.C. Cir. 1981), the specificity and scope of the defendant's knowledge is the key consideration. In *United States v. Smith*, 77 F.3d 511, 515-16 (D.C. Cir. 1996), the court held that although aspects of a witness's plea agreement were known to the defendant, the prosecutor's nondisclosure of other elements of the plea agreement unknown to the defendant violated *Brady* because the information was material to the defendant's ability to impeach the witness. A review of the trial transcript excerpts provided by the parties indicates that Handy knew only that Pinkard was at the murder scene and had accompanied Ms. Simmons to the hospital after the shooting;

his cross-examination of Ms. Simmons was limited to whether she spoke to Pinkard at the hospital, Aug. 19, 2002 AM Trial Tr. at 60-61, and when she first saw Pinkard at the scene, Aug. 19, 2002 PM Trial Tr. at 20-21. Absent the government's disclosure of Pinkard's grand jury testimony, Handy lacked a reason to delve further into Ms. Simmons's and Pinkard's allegedly different accounts of the murder. Under *Brady* it was incumbent upon the prosecutor to disclose Pinkard's grand jury testimony to Handy for his use at trial. *See Giglio*, 405 U.S. at 154; *Bagley*, 473 U.S. at 678; *United States v. Celis*, 608 F.3d 818, 835 (D.C. Cir. 2010).

Nonetheless, Handy fails to show that the violation of his due process right to disclosure under *Brady* was "material." *See Strickler*, 527 U.S. at 281-82; *Bagley*, 473 U.S. at 682. Handy places significant weight on Pinkard's testimony of December 11, 2003, during the subsequent trial of other co-conspirators. *See* Dec. 11, 2003 PM Group 2A Trial Tr. at 28-30, 50-51, 82-83, 86, 92, 95-98. In his view, her testimony that Ms. Simmons was *not* standing by Richard's side when he was talking on the pay phone before being shot is "illustrative" of the fact that Pinkard witnessed the murder but Ms. Simmons did not. This proves, Handy maintains, that the government knew Pinkard was a witness capable of impeaching Ms. Simmons's credibility as an eyewitness to Richard's murder, and thus her pretrial statements to law enforcement and grand jury testimony should have been disclosed. But Handy overstates the force of any likely impeachment.

First, Pinkard's subsequent trial testimony is not as impeaching as Handy suggests. She acknowledged up to a minute gap between observing Richard walk out to the pay phone and looking up to see him run down the street. *See id.*

at 95.  Ms. Simmons might easily have appeared at Richard's side during this time.

Second, before the grand jury Pinkard recounted that, prior to the murder, she was talking to her father on a pay phone across the street from Richard's sports store.  *See* Oct. 27, 2000 Grand Jury Tr. at 23-24.  She observed Richard exit the store to use the pay phone and signaled that they were running late by tapping her wrist.  She then testified that "less than five minutes" later she "heard something go boom" and looked up to see Richard running down the street.  *See id.* at 24.    She then crossed the street to where Richard had collapsed, noting that Ms. Simmons "was, like, already right there.  I don't know where she had come from."  *Id.* at 26.  Absent from the grand jury transcript is any assertion by Pinkard that Ms. Simmons was not standing next to Richard when he was shot while standing at the pay phone.  To the contrary, the following exchange occurred:

> Q:   And do you remember [Ms. Simmons] being outside at the time [of the shooting]?
>
> A:   I think she was, but I'm not sure . . . .  I think she was, because I think — I'm not sure, but I think when [Richard] came out to use the phone, he had locked the door.  But I'm not sure.  I don't know where she popped up from.

*Id.* at 41.  Thus, Pinkard's subsequent trial testimony is inconsistent with, rather than illustrative of, her grand jury testimony on the key point.  In another respect, her grand jury testimony shares the same flaw as her subsequent trial testimony.  The five-minute gap between Pinkard observing Richard at the pay phone and hearing the first gunshot was a relatively lengthy period during which Ms. Simmons could

have emerged from the store and joined Richard on the sidewalk without Pinkard's knowledge. Had the government disclosed the grand jury testimony to Handy prior to his trial, there is not a reasonable probability that this information could have been used to impeach Ms. Simmons's claim to be an eyewitness to Richard's murder such that it would have changed the outcome of the proceeding.

Third, even assuming a prudent prosecutor would have disclosed the FBI 302 interview report, it contains no representation one way or the other as to whether Ms. Simmons was present at the time of Richard's murder. The only reference to Ms. Simmons is this sentence: "PINKARD stated that she and [Richard] SIMMONS has just left their house and were en route to the movies when SIMMONS' mother paged him." *See* Def. Handy's Second Mot. for New Trial Exhibit 18, at 1 (Dec. 18, 2004). It is far from apparent how Handy could have used information from the FBI 302 interview report to impeach Ms. Simmons's credibility as an eyewitness and, as such, we are confident its use, even with disclosure of Pinkard's grand jury testimony, would not have changed the outcome of the proceedings.

## XXIV.

We reject all claims raised by appellants that we have not discussed individually. We have fully considered all such claims and find they do not warrant separate discussion or relief.

\* \* \*

For the foregoing reasons, we affirm all of appellants' convictions except Count 32, which we vacate; Counts 4 and 5, which we remand to the district court for an evidentiary

hearing and to address Smith's ineffective assistance of counsel claim; and Counts 126-138, which we remand to the district court for consideration in light of *Bullcoming v. New Mexico*, No. 09-10876 (U.S. June 23, 2011).

ROGERS, *Circuit Judge*, concurring in part in Part I of the per curiam opinion: In *Batson v. Kentucky*, 476 U.S. 79 (1986), the Supreme Court announced a three-part analysis to identify whether racial discrimination had motivated peremptory challenges in jury selection. First, the defendant must establish a *prima facie* case by showing that "the totality of the relevant facts gives rise to an inference of discriminatory purpose," with respect to either a particular peremptory strike or a pattern of strikes. *Id.* at 93–94. Second, the prosecutor must "come forward with a neutral explanation for challenging [the] jurors," not based on racial or other impermissible classifications. *Id.* at 97. Third, the trial judge then "will have the duty to determine if the defendant has established purposeful discrimination." *Id.* at 98; *see also Johnson v. California*, 545 U.S. 162, 168 (2005); *Purkett v. Elem*, 514 U.S. 765, 767 (1995). This court has seldom addressed a *Batson* challenge, and on the rare occasion it has, our analysis of step three was limited.[1] A few observations beyond those stated by the court today are in order.

Justice Marshall, concurring in *Batson*, which he characterized as a "historic step toward eliminating the shameful practice of racial discrimination in the selection of juries," had grave doubts that the goal of "end[ing] the racial discrimination that peremptories inject into the jury-selection process" could be accomplished without "eliminating peremptory challenges

---

[1] *See United States v. Watson*, 483 F.3d 828 (D.C. Cir. 2007); *United States v. Spriggs*, 102 F.3d 1245, 1254–55 (D.C. Cir. 1996); *United States v. White*, 899 F.2d 52 (Table), 1990 WL 42213 (D.C. Cir. Apr. 4, 1990). By contrast, the *Batson* issue has been fulsomely explored on multiple occasions by the District of Columbia Court of Appeals where the United States Attorney is also responsible for prosecutions involving felonies and major misdemeanors under the D.C. Code. *See, e.g.*, *Smith v. United States*, 966 A.2d 367, 369–88 (D.C. 2009).

entirely." *Id.* at 102–03 (Marshall, J., concurring). His doubts, he explained, arose because defendants are only able to attack discriminatory use of peremptory challenges where the challenges are so flagrant as to establish a *prima facie* case, and because trial judges face the difficult burden of assessing a prosecutor's motives. *See id.* at 105–06. As to the latter, Justice Marshall asked, citing examples from the case law:

> How is the court to treat a prosecutor's statement that he struck a juror because the juror had a son about the same age as [the] defendant, or seemed "uncommunicative," or "never cracked a smile" and, therefore "did not possess the sensitivities necessary to realistically look at the issues and decide the facts in this case"?

*Id.* at 106 (internal citations omitted). Justice Marshall foresaw that "[i]f such easily generated explanations are sufficient to discharge the prosecutor's obligation to justify his strikes on nonracial grounds, then the protection erected by the Court today may be illusory." *Id.*

Justice Powell, writing for the Court, responded:

> While we respect the views expressed in Justice Marshall's concurring opinion concerning prosecutorial and judicial enforcement of our holding today, we do not share them. . . . We have no reason to believe that prosecutors will not fulfill their duty to exercise their challenges only for legitimate purposes. Certainly, this Court may assume that trial judges, in supervising *voir dire* in light of our decision today, will be alert to identify a prima facie case of purposeful discrimination. Nor do we think that this historic trial practice, which long has served the selection of an

impartial jury, should be abolished because of an apprehension that prosecutors and trial judges will not perform conscientiously their respective duties under the Constitution.

*Id.* at 99 n.22 (majority opinion).

The Supreme Court, therefore, expected that trial judges, in fulfilling their duty, would effectively ensure that the justice system did not facilitate the denial of equal protection by remaining vigilant and attentive to the risk that overzealous prosecutors may inject racial strategies into jury selection in the effort to obtain a conviction. *See, e.g.*, *Duncan v. Louisiana*, 391 U.S. 145, 155-56 (1968). The Court expected the trial judge would undertake "'a sensitive inquiry into such circumstantial and direct evidence of intent as may be available.'" *Batson*, 476 U.S. at 93 (quoting *Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266 (1977)).

The Supreme Court has repeatedly emphasized the significance of the trial judge's role at step three. In *Johnson*, the Court explained:

> The first two *Batson* steps govern the production of evidence that allows the trial court to determine the persuasiveness of the defendant's constitutional claim. "It is not until the *third* step that the persuasiveness of the justification becomes relevant — the step in which the trial court determines whether the opponent of the strike has carried his burden of proving purposeful discrimination."

545 U.S. at 171 (quoting *Purkett*, 514 U.S. at 768). Indeed, the defendant need not show that it is more likely than not that the peremptory challenges, if unexplained, were based on

impermissible group bias, *id.* at 168, 173, and the case proceeds to step three even if the prosecution "produces only a frivolous or utterly nonsensical justification for its strike," *id.* at 171. As explained in *Snyder v. Louisiana*, 552 U.S. 472 (2008):

> The trial court has a pivotal role in evaluating *Batson* claims. Step three of the *Batson* inquiry involves an evaluation of the prosecutor's credibility, and "the best evidence [of discriminatory intent] often will be the demeanor of the attorney who exercises the challenge." In addition, race-neutral reasons for peremptory challenges often invoke a juror's demeanor (*e.g.,* nervousness, inattention), making the trial court's first-hand observations of even greater importance.

*Id.* at 477 (alteration in original) (internal citations omitted). A reviewing court, in turn, "ordinarily should give [the trial judge's] findings" based on an evaluation of demeanor and credibility "great deference." *Batson*, 476 U.S. at 98 n.21.

"The *Batson* framework is designed to produce actual answers to suspicions and inferences that discrimination may have infected the jury selection process." *Johnson*, 545 U.S. at 172. "The three-step process . . . simultaneously serves the public purposes *Batson* is designed to vindicate and encourages prompt rulings on objections to peremptory challenges without substantial disruption of the jury selection process." *Id.* at 172–73 (citation and internal quotation marks omitted). The rights *Batson* vindicates, however, are not confined to the rights possessed by the defendant on trial, but extend "to those citizens who desire to participate 'in the administration of the law, as jurors,'" *id.* at 172 (quoting *Strauder v. West Virginia*, 100 U.S. 303, 308 (1880)), as well as to "the overriding interest in eradicating discrimination from our civic institutions [that] suffers whenever an individual is excluded from making a

significant contribution to governance on account of his race" or other suspect characteristic, *id.* The "harm from discriminatory jury selection extends beyond that inflicted on the defendant and the excluded juror to touch the entire community,"for "[s]election procedures that purposefully exclude black persons from juries undermine public confidence in the fairness of our system of justice." *Batson*, 476 U.S. at 87; *see also Powers v. Ohio*, 499 U.S. 400, 412 (1991). Long before *Batson*, the Supreme Court had observed: "For racial discrimination to result in the exclusion from jury service of otherwise qualified groups not only violates our Constitution and the laws enacted under it but is at war with our basic concepts of a democratic society and a representative government." *Smith v. Texas*, 311 U.S. 128, 130 (1940) (footnote omitted). The role of the trial judge, in either dispelling any notion that the proceedings have been affected by prejudice or repudiating such prejudice when it occurs, remains paramount, even today in the District of Columbia.[2] This important function of the trial judge is fully consistent with the motivations underlying *Batson*, 476 U.S. at 87, and not served by conclusory or dismissive rulings of the district court.

---

[2] A five-part study of jury service in the District of Columbia by the National Center for State Courts identified that among the reasons the general public avoids jury service is perceived unfairness and biases in the justice system. *See* Richard Seltzer, *The Vanishing Juror: Why Are There Not Enough Available Jurors?*, 20 JUST. SYS. J. 203, 212 (1999). Various recommendations have been developed to address this perception, including the elimination or curtailment of peremptory strikes that in "the experience of most trial judges . . . at a minimum, give[] the appearance that prospective jurors are being peremptorily stricken on grounds of race, gender or both." COUNCIL FOR COURT EXCELLENCE: DISTRICT OF COLUMBIA JURY PROJECT, JURIES FOR THE YEAR 2000 AND BEYOND: PROPOSALS TO IMPROVE THE JURY SYSTEMS IN WASHINGTON, D.C. 26 (1998).

Since *Batson*, when the Supreme Court has encountered cases where the trial judge failed to fulfill his or her duty, it has not hesitated to examine the *voir dire* proceedings in painstaking detail, inasmuch as a single instance of racial discrimination in jury selection requires reversal of a conviction, *see id.* at 95–96. An example of such detailed review is *Snyder*, where the trial judge failed to make a finding on the record based on the evidence presented regarding the prosecutor's two explanations for striking an African American juror, and consequently the deference inherent in clear error review was replaced by what was tantamount to *de novo* review.  *See* 552 U.S. at 479, 482.[3] This is reflected in the practice of circuit courts of appeals when reviewing contentions that would normally be subject to clear error review but for the fact that the district court made no findings of fact.  *See, e.g.*, *United States v. Microsoft Corp.*, 147 F.3d 935, 945 n.7 (D.C. Cir. 1998); *see also United States v. Smith*, 640 F.3d 580, 596 (4th Cir. 2011); *United States v. McMath*, 559 F.3d 657, 663 (7th Cir. 2009); *Dennis v. Mitchell*, 354 F.3d 511, 517 (6th Cir. 2003); *Armienti v. United States*, 234 F.3d 820, 822 (2d Cir. 2000); *United States v. Vega*, 221 F.3d 789, 795 (5th Cir. 2000).  As to the first of two explanations proffered, the Supreme Court reasoned in *Snyder* that, in the absence of a specific finding, it could not "presume that the trial judge credited the prosecutor's assertion that [the juror] was nervous."  *Id.*  As to the second proffered explanation, the Supreme Court concluded, quoting at length the

---

[3] In adopting a clear error standard of review, the Supreme Court in *Snyder*, 552 U.S. at 77, cited the plurality opinion in *Hernandez v. New York*, 500 U.S. 352 (1991), in which concern was expressed that a more searching review of findings made in a state trial court would be incompatible with concepts of federalism.  *Id.* at 369. No federalism concern exists with respect this court's review of the district court's *Batson* ruling.

transcription of the trial court proceedings, that the prosecutor's "explanation given for the strike . . . is by itself unconvincing," *id.* at 478, and that "[t]he implausibility of this explanation is reinforced by the prosecutor's acceptance of white jurors who disclosed conflicting [time] obligations that appear to have been at least as serious as [those of the struck black juror]," *id*. at 483; *cf. Miller-El v. Cockrell*, 537 U.S. 322 (2003) (on habeas petition). Additionally, when confronted on habeas review with a state prosecutorial policy to strike African American members of the venire that resulted in a pattern of such strikes in *Miller-El v. Dretke*, 545 U.S. 231, the Supreme Court held, upon a searching record review, that the trial judge's factual findings as to the nonpretextual nature of the state's race-neutral explanations were wrong by clear and convincing evidence, *id*. at 266. In a concurring opinion one Justice acknowledged Justice Marshall's concerns and the defects intrinsic to the *Batson* analysis, *see id.* at 266–67 (Breyer, J., concurring), and concluded that "a peremptory jury-selection system that permits or encourages the use of stereotypes work[s] at cross-purposes" with "the law's antidiscrimination command," *id.* at 271–72.

The Supreme Court's post-*Batson* precedent has forewarned lower courts that *Batson* objections are not to be lightly dismissed. A one-size-fits-all approach by the trial judge — summarily stating that the prosecutor's explanations are credible — risks reversal of a conviction on appeal. The Supreme Court has held that the prosecutor's response to an allegation of racially motivated peremptory strikes "must [be] a 'clear and reasonably specific' explanation of his 'legitimate reasons' for exercising the challenges." *Batson*, 476 U.S. at 98 n.20 (quoting *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 258 (1981)). It would be remarkable, to say the least, to conclude that the trial judge's evaluation at step three of the *Batson* analysis need not also be clear and reasonably specific.

8

Even though "these determinations of credibility and demeanor lie peculiarly within a trial judge's province and . . . in the absence of exceptional circumstances, [the Supreme Court] would defer to [the trial court]," *Snyder*, 552 U.S. at 477 (second alteration in original) (internal citations and quotation marks omitted), no deference is due to the trial judge's *Batson* ruling based on the evidence before it unless it explains on the record why it credited the prosecutor's race-neutral explanation and rejected the defendant's arguments that an individual strike was racially motivated or that a series of strikes demonstrated a pattern of racially motivated strikes. *See id.* at 479; *cf. Miller-El v. Cockrell*, 537 U.S. at 341–43. After all, in *Batson*, and before and after, the Supreme Court emphasized that purposeful racial discrimination in jury selection, resulting in the denial of equal protection, "harms not only the accused whose life or liberty they are summoned to try," but "extends beyond that inflicted on the defendant and the excluded juror to touch the entire community," "undermin[ing] public confidence in the fairness of our system of justice." *Batson*, 476 U.S. at 87; *see also Miller-El v. Dretke*, 545 U.S. at 237–38; *Strauder v. West Virginia*, 100 U.S. 303, 309 (1880). The Court's precedent contemplates no less than that trial judges will give full consideration to the evidence presented of racial bias, *see Snyder*, 552 U.S. at 478, by, for example, comparing the prosecutor's behavior in striking, not striking, and questioning like jurors of different races, looking for patterns or statistical disparities, and examining whether any policy or practice of the relevant prosecutor's office implicates *Batson* concerns, *see, e.g.*, *Miller-El v. Cockrell*, 537 U.S. at 331–35.

Because the district court's findings in the instant case were conclusory, without sufficient explanation to permit meaningful appellate review, the usual deferential review falls away and the question is whether this court, upon review of the record, finds by a preponderance of the evidence that the

defendant has established purposeful discrimination by the prosecutor. Although not characterized by the Supreme Court as *de novo* review, the analysis of the court today, sifting struck-juror by struck-juror through the transcription of the *Batson* proceedings, much as the Supreme Court did for a single struck juror in *Snyder*, reflects this reality. *See* Op. at 9–13. The Supreme Court contemplated, inasmuch as a single *Batson* violation requires reversal of a conviction, *see, e.g.*, *Snyder*, 552 U.S. at 478, that the trial judge would provide a record that reveals on an objection-by-objection basis how, upon considering "all of the circumstances that bear upon the issue of racial animosity," *id.* (citing *Miller-El v. Dretke*, 545 U.S. at 239), the defense objections to the prosecutor's strike explanations were resolved. Otherwise, the Supreme Court's expectation of the constitutional protection institutionalized in *Batson*, as well as the expectations for the prosecutor and trial judge described in Justice Powell's response to Justice Marshall's concerns, will have proven illusory. This explains the painstaking review of the trial court record that the Supreme Court has undertaken, for example, in *Snyder*, 552 U.S. at 478-84, and *Miller-El v. Dretke*, 545 U.S. at 240–66, to underscore that the third step of *Batson* cannot become a matter of rote or one-size-fits-all analysis.

On the merits, appellants' *Batson* challenges do not entitle them to reversal of their convictions, even upon *de novo* review of the record.[4] A single example suffices. Defense counsel challenged the striking of "Juror 5773" on the ground that the prosecutor was applying a double standard in peremptorily striking "Juror 5773," an African American male, but not "Juror 6487," a Caucasian male. Both were opposed to the death penalty. The prosecutor in his *Batson* step two response stated

---

[4] Appellants do not pursue on appeal their *Batson* challenges based on gender. *See* Appellee's Br. at 28 n.21.

that "Juror 5773" gave equivocal answers about the death penalty and his religious views thereon. Appellants maintain that the record showed that the main concern of "Juror 5773" was not religious but a concern of condemning the wrong man to death. During the *Batson* colloquy, defense counsel had argued that "Juror 5773" had "some pro-prosecution instincts regarding the death penalty, but [was] generally thoughtful," and disagreed that "Juror 5773" "would oppose the death penalty on religious grounds." Instead of dealing with this factual disagreement and making reasonably specific findings on the record to which this court, as appropriate, could defer, the district court ruled as to all defense challenges that it credited the prosecutor's explanation of non-racial reasons for all of the peremptory strikes of African American members of the venire.

A review of the transcription of the *Batson* proceedings supports the plausibility of the prosecutor's race-neutral explanations for its peremptory challenge to "Juror 5773," even upon *de novo* review. The relevant answers provided by the two veniremen in their questionnaires reveals a salient difference. The Caucasian venireman followed his expression of opposition to the death penalty with the statement: "I would try to abide by the Court's instruction, not my personal belief." By contrast, the African American venireman indicated his concerns about the death penalty would cause him to have concerns about being fair, explaining he had "so many questions about the death penalty and [his] belief in it." Cognizant that the burden of persuasion to prove the existence of purposeful discrimination in peremptory strikes ultimately rests with the defendant, *Johnson*, 545 U.S. at 170–71, it is apparent that the prosecutor's proffered explanation that the difference in the veniremen's answers and not a difference in their race motivated their disparate treatment. For essentially the reasons stated by the court with respect to the remaining strikes, *see* Op. at 9–13, each likewise survives *de novo* review of the record.

In view of the equal protection concerns identified earlier, a final observation bears mentioning. As a matter of public record, the jury venire in the District of Columbia in 2011 is unlikely, as it was in 2002 when jury selection began in the instant case, to have a majority of African American venire members, no matter how many are peremptorily struck by the prosecutor. The U.S. Census of 2000 showed that African Americans were 60.0% of the District of Columbia's population, with Caucasians making up 30.8%; Hispanics or Latinos were 7.9%. The venire in the instant case was approximately three-quarters African American, and the twelve-member jury that was selected for trial was composed of nine African American jurors and three Caucasian jurors. The demographics have changed. The U.S. Census of 2010 showed that African Americans comprise 50.7% of the District of Columbia's population to Caucasian's 38.5%, with Hispanics or Latinos comprising 9.1%. Likely then,[5] in a trial of an African American defendant, a prosecutor will no longer be able to pose the rhetorical question in the government's brief, contrary to the purposes of *Batson* and its progeny: Why, as a matter of trial tactics, would the government discriminate in exercising peremptory challenges when the venire and the petit jury would be overwhelming African American? Appellee's Br. at 68; *see also* May 7, 2002 PM Trial Tr. at 25, 32. Courts in the District of Columbia likewise will likely be unable, as a factual matter, to base acceptance of a prosecutor's race-neutral explanations for strikes at *Batson*'s third step in part on the generality, as in 2002, that a predominantly African American jury will nonetheless be seated. To the extent distrust of the justice

---

[5] Individuals are called for jury service in the District of Columbia based on lists of registered voters, licensed drivers, and those having nondriver identification cards from the D.C. Department of Motor Vehicles. *See* Seltzer, *supra* note 2, at 204.

system among minorities and women persists, based in part on fear that they will be discriminated against during jury service, *see supra* note 2, accepting the prosecution's approach, as reflected in the rhetorical question, suggests in view of the changing demographics in the District of Columbia at least two concerns: First, a growing risk that an overzealous prosecutor could be successful in turning a jury toward conviction based on racially motivated or otherwise discriminatory peremptory strikes. Second, such activity by prosecutors would result in greater mistrust of the justice system and reduced participation in jury service by the affected populations.